IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JOHN DOE 1, et al.,

    Plaintiffs,

    v.

WORLD WRESTLING
ENTERTAINMENT, LLC, et al.,

    Defendants.

CIVIL NO. JKB-24-3487

 

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM

## TABLE OF CONTENTS

I.   Introduction ............................................................................................................. 1

II.  Background ............................................................................................................. 1

    A.   Factual Allegations ........................................................................................ 1

    B.   Procedural History ......................................................................................... 4

III. Legal Standards ...................................................................................................... 6

    A.   Sufficiency of the Claims Stated.................................................................... 6

    B.   Personal Jurisdiction ..................................................................................... 6

IV.  WWE and TKO's Motion to Dismiss (ECF No. 59) ............................................... 8

    A.   Sufficiency of the Claims Stated.................................................................... 8

        1.   Duty ..................................................................................................... 8

        2.   Breach, Injury, and Causation ............................................................ 20

    B.   Personal Jurisdiction ................................................................................... 22

        1.   WWE .................................................................................................. 22

        2.   TKO ................................................................................................... 27

V.   Linda McMahon's and Vincent McMahon's Motions to Dismiss (ECF Nos. 57, 58) ....... 30

    A.   Sufficiency of the Claims Stated.................................................................. 30

    B.   Personal Jurisdiction ................................................................................... 37

VI.  Duplication of Claims ........................................................................................... 39

VII. Punitive Damages.................................................................................................. 40

VIII. Conclusion............................................................................................................ 41

# I.    INTRODUCTION

This case concerns allegations of egregious sexual abuse of children. Motions to dismiss are pending (ECF Nos. 57–59). Mostly, the Motions will not be granted, and that's because the Plaintiffs have *plausibly pled* that the adults around them—including Vincent and Linda McMahon—had relevant knowledge at relevant times, and that they could and should have taken action to prevent the abuse and the harm that ensued.

Not all of the Plaintiffs' claims survive this first stage of the case, but as to the majority that do, the next question is whether there is *evidence* to sustain the various allegations and accusations. That, of course, remains to be seen. For now, though, the plaintiffs' pleadings in the surviving claims warrant the case proceeding to the investigative or "discovery" phase.

# II.    BACKGROUND

## A.    Factual Allegations[1]

Plaintiffs are eight John Does who allege they were sexually abused as children while working as "Ring Boys," assisting with errands and other tasks for wrestling events held by Defendant World Wrestling Entertainment, LLC ("WWE"). (*See generally* ECF No. 55.) Plaintiffs allege they were abused primarily by Mel Phillips, a ringside announcer for WWE, at and after WWE events in various states, including Maryland, mostly in the 1980s. (*Id.* ¶¶ 1–3, 171, 173–302.) Having lured them with access to WWE wrestlers and front row seats to WWE events, Phillips groomed and used the Plaintiffs—then as young as 11 or 12 years old (*id.* ¶ 251)—to satisfy his pedophilia and his foot fetish. (*Id.* ¶¶ 1–3, 171, 173–302.) He gave them alcohol and money, wrestled with them and manipulated their feet for sexual gratification, made them undress

---

[1] The facts recited here are those alleged in the operative complaint: Plaintiffs' Corrected First Amended Complaint (ECF No. 55). At this stage of the case, the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005).

and be naked in his presence and was naked himself, touched their genitals and forced them to touch his, attempted to have penetrative sex with them, ejaculated on and in front of them, sometimes videotaped this conduct, and instructed them not to tell their parents. (*Id.*)

John Doe 6 alleges he was also abused by Pat Patterson, the "right-hand man" of Defendant Vincent McMahon, then-owner of WWE: John Doe 6 says Patterson gave him alcohol, put pornography on the television, and forced him to engage in oral sex. (*Id.* ¶¶ 35, 265–66.) John Doe 3 alleges he was also abused by another WWE executive, Terry Garvin, Vice President of WWE Operations: Garvin allegedly put his hands on John Doe 3's shoulders and made a comment that John Doe 3 interpreted to be sexual. (*Id.* ¶¶ 35, 211.) Phillips, Patterson, and Garvin (collectively, "the alleged abusers") are now deceased. (ECF No. 57 at 8.)

Plaintiffs allege that their abuse was part and parcel of a broad culture of sexual misconduct that was pervasive at WWE. (ECF No. 55 ¶¶ 23, 32, 125, 141–42, 385.) For example, many other Ring Boys and wrestlers have made similar allegations against Phillips, Patterson, and/or Garvin. (*Id.* ¶¶ 35, 71, 75, 76, 80, 81, 85, 94–99, 110, 113.) And Vincent McMahon is alleged to have abused women working for WWE by, for example, coercing them into oral sex and then demoting them after they resisted further sexual encounters; sending them unsolicited naked photographs of himself; sexually assaulting them; and subjecting them to sexual acts of cruelty, degradation, and injury. (*Id.* ¶¶ 129–30, 132, 134.)

Plaintiffs allege that WWE and its cofounders, Vincent and Linda McMahon, knew about the sexual abuse of Ring Boys. (*Id.* ¶¶ 26, 317–18.) Plaintiffs point to former WWE employees who apparently have publicly stated that such knowledge was widespread. Plaintiffs note that a "former high-level employee" allegedly told Business Insider that "[t]he boys that the company hired to put up the ring and so forth, were being . . . *had* [that is, abused]. . . . And it was just generally known, by everybody, that it was going on. . . . [The McMahons] clearly knew what was

2

going on, but really did nothing to stop it." (*Id.* ¶¶ 36–37.) Nelson Sweglar, the former WWE operations manager, when speaking about the Ring Boys' abuse allegations, allegedly said: "Everyone knew what was going on." (*Id.* ¶ 38.) Plaintiffs allege further that Defendant Vincent McMahon was generally a micro-manager who was aware and in control of everything happening in the company, and that Linda McMahon was "aware of every move in the ring" and "the leader in trying to conceal the sordid underbelly of WWE's sexual abuse culture." (*Id.* ¶¶ 73, 144–45, 152, 155, 158, 161, 166.)

Beyond these general allegations, Plaintiffs also claim more specifically that WWE and the McMahons knew that Phillips sexually abused Ring Boys. For example, Plaintiffs say that in 1982 or 1983, in Allentown, Pennsylvania, "Phillips was spotted in a car with a child about 10–11 years old performing oral sex on him. . . . [A] security guard brought the child into the arena and presented him to Vince McMahon," who, along with McMahon's father, responded that "they would handle it." (*Id.* ¶ 42.) "Several years later," Phillips was briefly suspended by WWE "for a similar act." (*Id.* ¶ 43.) In or around 1987, Vincent McMahon was allegedly aware of a teen boy being widely referred to within WWE as "Mrs. Mel Phillips." (*Id.* ¶¶ 54, 113–114.) And in 1988, both Vincent and Linda McMahon are alleged to have fired Phillips because, in Vincent McMahon's words, "[his] relationship with kids seemed peculiar and unnatural," only to have hired him back weeks later with an admonition to "steer clear from kids"—an admonition they knew Phillips did not heed. (*Id.* ¶¶ 14, 43–45, 51, 58, 264.) Vincent McMahon responded to a New York Post reporter's assertion that he "had to have known that Garvin and Patterson and Phillips were doing this" by saying "that's why we have gotten rid of them." (*Id.* ¶¶ 7, 55.)

Plaintiffs allege that the FBI investigated Phillips in the early 1990s and identified ten victims of his abuse. (*Id.* ¶ 8.) In receipt of a videotape showing Phillips' public behavior with Ring Boys, the FBI allegedly opined that "his activity with boys' feet is most likely sexual

3

behavior," but declined to pursue criminal charges because "no alleged 'victims' are willing to admit to or describe the nature of their activity with Phillips." (*Id.* ¶ 19.)

Despite their knowledge of Phillips' abuse of Ring Boys, Plaintiffs allege, Defendants failed to intervene and protect Plaintiffs from abuse. (*Id.* ¶¶ 143, 345–47, 360, 371–72, 382, 387–88, 390.) Indeed, Plaintiffs allege that Defendants took steps that affirmatively enabled the abuse: They continued to employ Phillips in a capacity that involved direct contact with Ring Boys, and they provided him with WWE props and paraphernalia, free tickets to ringside seats at shows, access to WWE wrestlers, private rooms at venues, and hotel rooms—and Vincent McMahon personally participated in WWE's culture of sexual misconduct as described above. (*Id.* ¶¶ 5, 49, 143, 174–75, 179, 184, 193, 198, 209, 212, 223, 240, 252, 258, 267, 269, 275, 284, 359, 362.) Through this negligent conduct, Defendants are alleged to have proximately caused the mental and emotional distress that resulted from Phillips, Patterson, and Garvin's sexual abuse of the Plaintiffs. (*Id.* ¶¶ 191, 205, 218, 237, 250, 273, 291, 302, 373–76, 391–93.) In addition to mental and emotional distress, the Plaintiffs allege "physical and mental injuries, lost wages and benefits of employment." (*Id.* ¶ 392.)

### B.    Procedural History

Plaintiffs' Complaint was originally filed in the Circuit Court for Baltimore County on October 23, 2024, and was removed to this Court on December 2, 2024. (ECF No. 1.) Plaintiffs allege the same two counts—negligence and negligent hiring, training, and retention—against all four Defendants—Vincent McMahon, Linda McMahon, WWE, and WWE's parent company, TKO Group Holdings, Inc. ("TKO"). (ECF Nos. 15, 55.)

On December 4, 2024, the Court stayed the case pending a ruling by the Supreme Court of Maryland in the consolidated appeals of *Roman Catholic Archbishop of Washington v. Doe*, 316 A.3d 519 (Table) (Md. 2024), *Bunker v. Key School, Inc.*, No. MJM-23-2662, 2024 WL 1580184

4

(D. Md. Apr. 11, 2024), and *Board of Education of Harford County v. Doe*, 316 A.3d 519 (Table) (Md. 2024). (ECF No. 13.) On February 3, 2025, the Supreme Court of Maryland resolved the appeals, ruling that the Maryland Child Victims Act's retroactive elimination of time restrictions applicable to child sexual abuse claims (2023 Md. Laws, Ch. 6) is constitutional. *Roman Cath. Archbishop,*, 330 A.3d 1069, 1073 (Md. 2025). The legislature's decision to permit victims of childhood sexual abuse to file suit even when the abuse occurred long ago, the Court held, was rationally related to the problems the legislature sought to confront, namely:

> that numerous child sexual abuse claims, more prevalent than previously understood, were never pursued during the then-applicable limitations period through no fault of the victims and too often based at least in part on efforts of both perpetrator and non-perpetrator defendants to hide the misconduct, . . . [and] that many individuals do not disclose abuse well into adulthood but still suffer life-long emotional, psychological, and physical health issues resulting from the abuse.

*Id.* at 572. After this decision, the Court lifted the stay in this case on February 19, 2025. (ECF No. 31.)

Defendants first filed motions to dismiss on April 7, 2025 (ECF Nos. 48–50), which were denied without prejudice as moot after Plaintiffs amended their complaint (ECF Nos. 51, 55, 56). Now pending before the Court are Motions to Dismiss filed on June 11, 2025, by all four Defendants. (ECF Nos. 57–59 (collectively, "the Motions").) All four Defendants argue that Plaintiffs' claims should be dismissed for both failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), and for lack of personal jurisdiction under Rule 12(b)(2). The Motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2025).

For the reasons discussed below, the Motions will be granted in part and denied in part. All three Motions will be granted with respect to Plaintiff John Doe 7, and Linda McMahon's Motion will be granted with respect to Plaintiffs John Doe 1, 3, 4, 5, and 8. The Motions will otherwise be denied.

5

## III.    LEGAL STANDARDS

### A.    Sufficiency of the Claims Stated

When considering a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff." *Venkatraman v. REI Sys., Inc.*, 417 F.3d 418, 420 (4th Cir. 2005). Viewed through that lens, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 662. A "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555, 557). However, a plaintiff need not include "detailed factual allegations," *Twombly*, 550 U.S. at 555, and federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted," *Johnson v. City of Shelby*, 574 U.S. 10, 11 (2014).

"A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011).

### B.    Personal Jurisdiction

The Due Process Clause of the Fourteenth Amendment cabins the authority of courts in a particular forum to exercise power over out-of-state defendants by recognizing "two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific'

6

(sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262 (2017) (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). A court properly imbued with general jurisdiction may hear any claim against a defendant, even if all the conduct underlying the claim occurred outside of the forum state. *Id.* Specific jurisdiction, by contrast, is predicated on a substantial relationship between the forum state and the discrete claim asserted: for a court "to exercise specific jurisdiction [over a particular defendant], 'the suit' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'" *Id.* (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)).

The jurisdictional question is to be resolved by the judge, with the burden on the plaintiff ultimately to prove grounds for jurisdiction by a preponderance of the evidence. *AMA Sys., LLC v. 3B Tech, Inc.*, No. 1:21-cv-01472-JRR, 2023 WL 7410854, at *2 (D. Md. Nov. 9, 2023) (quoting *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 763 (D. Md. 2009) (citations omitted)). However, "[t]he plaintiff's burden in establishing jurisdiction varies according to the posture of a case and the evidence that has been presented to the court." *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016). "[W]hen the court addresses the personal jurisdiction question [on a Rule 12(b)(2) motion] by reviewing only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint, a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive the jurisdictional challenge." *Id.* "In deciding whether the plaintiff has proved a *prima facie* case of personal jurisdiction, the district court must draw all reasonable inferences arising from the proof, and resolve all factual disputes, in the plaintiff's favor." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 60 (4th Cir. 1993).

## IV. WWE AND TKO'S MOTION TO DISMISS (ECF NO. 59)

### A. Sufficiency of the Claims Stated

The Court first addresses the claims against the two corporate defendants, WWE and TKO. Plaintiffs' suit asserts two counts: for negligence, and for negligent hiring, training, and retention. (ECF No. 55.) Maryland adheres to the *lex loci delicti* rule to determine the applicable law in tort actions. *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 230 (Md. 2000). Under this rule, the "substantive tort law of the state where the wrong occurs governs." *Hauch v. Connor*, 453 A.2d 1207, 1209 (Md. 1983). Each Plaintiff asserts that he was sexually abused in Maryland (among other places). (ECF No. 55 ¶¶ 184–85, 201, 215, 222, 244–45, 258, 260, 264–65, 285–87, 292–94, 296–97, 299.) Therefore, the Court applies Maryland tort law.

To plead a claim for negligence in Maryland, a complaint must plausibly allege: (1) that the defendant owed a duty to the person who was injured; (2) that the defendant breached that duty; (3) that an actual injury or loss existed; and (4) that the injury or loss proximately resulted from the defendant's breach of the duty. *See Pace v. State*, 38 A.3d 418, 423 (Md. 2012); *Rosenblatt v. Exxon Co., U.S.A.*, 642 A.2d 180, 188 (Md. 1994); *Estate of Green v. City of Annapolis*, 696 F. Supp. 3d 130, 170–71 (D. Md. 2023). To plead a claim for negligent hiring, training, and retention in Maryland, a complaint must allege these same four elements. *State v. Jones*, 38 A.3d 333, 343 (Md. 2012); *Marrick Homes LLC v. Rutkowski*, 161 A.3d 53, 65 (Md. 2017). The focus in a claim for negligent hiring, training, and retention is on an employer's duty to use reasonable care in selecting and supervising competent employees. *Id.*

#### 1. Duty

"In a negligence claim, duty is defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." *Simon v. Dick's Sporting Goods, Inc.*, No. JKB-22-cv-1238, 2022 WL 16722400, at *3 (D. Md. Nov. 4,

8

2022) (internal quotations omitted). Whether a legal duty exists is a question of law to be decided by the Court. *Id.*

Maryland recognizes "the general rule that there is no duty to control a third person's conduct so as to prevent personal harm to another." *Remsberg v. Montgomery,* 831 A.2d 18, 26–27 (Md. 2003); *Fletcher v. Md. Transit Admin.,* 741 F. App'x 146, 149–50 (4th Cir. 2018). However, there are exceptions, namely where: (1) the defendant has control over the conduct of the third party; (2) there is a special relationship between the defendant and the third party, or between the defendant and the plaintiff; or (3) there is a statute that is designed to protect a specific class of people. *Remsburg,* 831 A.2d at 583 (citing *Bobo v. State,* 697 A.2d 1371 (Md. 1997)); *see also Estate of Madden v. Sw. Airlines, Co.,* No. 21-cv-00672-SAG, 2021 WL 2580119, at *3 (D. Md. June 23, 2021).[2]

Defendants argue that Plaintiffs have not sufficiently alleged that any exception to the general rule of non-liability for third-party conduct applies, and that Plaintiffs' claims must

---

[2] While the Court follows the analytical framework articulated in *Bobo,* that is not the only framework for determining if a duty exists. A separate analysis looks to the following seven factors: (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered the injury, (3) the closeness of the connection between the defendant's conduct and the injury, (4) the moral blame attached to the defendant's conduct, (5) the policy of preventing future harm, (6) the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise reasonable care with resulting liability for breach, (7) and the availability, cost and prevalence of insurance for the risk involved. *See Kiriakos v. Phillips,* 139 A.3d 1006, 1033–34 (Md. 2016). Some courts have been "unable to divine a clear rule demarcating the application of one duty analysis versus the other," *Est. of Madden,* 2021 WL 2580119, at *3; *see also Sumo v. Garda World,* No. 1010, Sept. Term 2016, 2017 WL 2962819, at *3 (Md. Ct. Spec. App. July 12, 2017), and have thus analyzed duty under both frameworks, concluding that "the two approaches [are] 'consonant' with one another." *Est. of Madden,* 2021 WL 2580119, at *3 (quoting *Sumo,* 2017 WL 2962819, at *3). But where, as here, defendants are alleged to be liable "for failure to control the conduct of a third party," it is only necessary to perform the *Remsberg/Bobo* analysis. *Doe v. Salisbury Univ.,* 123 F. Supp. 3d 748, 762–63 (D. Md. 2015). Thus, the Court will analyze whether any of the three exceptions to the default rule of non-liability for third-party conduct exists here. As should be clear throughout, though, the parties' arguments concerning, for example, foreseeability, and the closeness of the connection between the defendants' conduct and plaintiffs' injuries, are pertinent under the *Bobo* analysis as well and are considered within the *Bobo* framework.

9

therefore be dismissed. (ECF Nos. 57-1 at 30–35, 58-1 at 19–33, 59-1 at 30–36.) Plaintiffs respond that they have alleged facts to support the applicability of all three exceptions—control, special relationships, and statute—and that the Court should therefore find they have plausibly pled that a duty existed. (ECF Nos. 60 at 21–34, 61 at 23–35, 62 at 22–35.)

The Court finds that Plaintiffs have plausibly pled facts to support the existence of at least one relevant special relationship—namely, the employment relationship between WWE and Phillips—and that WWE therefore had a duty to control Phillips' conduct despite the general rule of non-liability for third-party conduct.

Maryland courts have held employers liable for negligence relating to their employees' conduct under both direct and vicarious theories of liability. The Court considers each in turn.

### a. Direct Liability

An employer can be directly liable for negligent failure to control the employee's conduct where an employee acts outside the scope of the employment relationship, if such conduct occurs on the employer's premises or with use of the employer's property, and the employer knew it could and should exert such control. *Barclay v. Briscoe*, 47 A.3d 560, 576 (Md. 2012) (holding that the Restatement (Second) of Torts § 317 identifies the circumstances where such a duty attaches).

Section 317 of the Restatement (Second) of Torts provides:

> A master is under a duty to exercise reasonable care so to control his servant while acting outside the scope of his employment as to prevent him from intentionally harming others or from so conducting himself as to create an unreasonable risk of bodily harm to them, if
>   (a) the servant (i) is upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant, or (ii) is using a chattel of the master, and
>   (b) the master (i) knows or has reason to know that he has the ability to control his servant, and (ii) knows or should know of the necessity and opportunity for exercising such control.

Restatement (Second) of Torts § 317. In such situations, an employer's duty is to "us[e] reasonable care to exercise his authority as a master in order to prevent his servant from doing harm to others

[and to] prevent them from misusing chattels which he entrusts to them for use as his servant."
Reporters' Notes to § 317.[3]

Maryland courts have cited § 317 generally as providing the foundation for negligent supervision liability. *See, e.g., Doe v. AE Outfitters Retail Co.*, No. WDQ-14-cv-508, 2015 WL 9255325, at *12 (D. Md. Dec. 17, 2015). And they have made clear that Maryland employers do indeed owe a duty of reasonable care in the selection, training, and retention of their employers. *Jones v. State*, 38 A.3d 333, 342–43 (2012). Such duty is owed not only to fellow employees but also to the public at large, at least insofar as the employee is expected to have contact with the public. *Id.*

Plaintiffs have plausibly pled that WWE had a duty to control the conduct of its employee, Phillips, under § 317. Considering first the requirement that the employee's injurious conduct occur "upon the premises in possession of the master or upon which the servant is privileged to enter only as his servant," or "using a chattel of the master," the Court finds that this element is adequately alleged. Four of the eight Plaintiffs—John Does 1, 2, 4, and 6—allege that Phillips sexually abused them in dressing rooms or private rooms at the venues where WWE events were being held. (ECF No. 55 ¶¶ 174, 179, 180, 192–93, 224–25, 260–61.) Such locations clearly constitute "premises in possession of the master or upon which the servant is privileged to enter only as his servant." Further, all eight Plaintiffs allege that Phillips sexually abused them in hotels

---

[3] Some courts have also held that employers can be liable for conduct outside the scope of employment where, rather than using the employer's premises or chattels in the injurious conduct, an employee uses the authority bestowed upon him by the employer. *See, e.g., Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 651 (7th Cir. 2017) (adopting the Restatement (Second) of Agency § 219(2)(d) and holding masters liable for their servants' torts when the servants are "aided in accomplishing the tort by the existence of the agency relation" in Illinois); *Costos v. Coconut Island Corp.*, 137 F.3d 46 (1st Cir. 1998) (same in Maine); *Larson v. Berumen*, 125 F.3d 858 (9th Cir. 1997) (same in Arizona); *Doe v. Newbury Bible Church*, 509 F.3d 69 (2nd Cir. 2007) (same in Vermont for law enforcement officers, but not pastors). The parties do not cite any Maryland case addressing this theory of liability.

11

or motels that were connected to WWE events. (*Id.* ¶¶ 176–77, 181–83, 185, 193, 208, 213, 222, 232–33, 245–46, 265–66, 287, 296–97, 362.) Although the Plaintiffs do not plead as to each individual hotel room in which they were abused that it was paid for or provided by WWE, they do claim that these were hotels Phillips took them to immediately before or after travelling to WWE events (*id.*), and at least two Plaintiffs assert additional facts supporting an inference that these were WWE-funded hotel rooms (*id.* ¶¶ 281–84, 296 (alleging that not only Phillips but also WWE wrestlers were present at the same hotel and/or in transportation to and from the hotel)). Further, Plaintiffs assert generally that "WWE and the McMahons . . . were providing Phillips with the funds . . . necessary to provide . . . room and board . . . to the Ring Boys . . . ." (*Id.* ¶ 362.) Taken together and considered in the light most favorable to the Plaintiffs, these allegations support an inference that the hotel rooms where the Plaintiffs allege they were abused were "premises in possession of the master or upon which the servant is privileged to enter only as his servant." *See* Restatement (Second) of Torts § 317.

Furthermore, in the context of sexual harassment claims filed under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, courts have held that the "work environment" can include work-related locations such as an employer-provided hotel. *See, e.g., Ferris v. Delta Air Lines, Inc.*, 277 F.3d 128, 135 (2d Cir. 2001) (holding that flight attendant's rape by a coworker in a hotel room she occupied during a layover, in a block of hotel rooms booked and paid for by the employer, occurred within her work environment); *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 967 (9th Cir. 2002) (business meeting locations can be part of the work environment); *Lapka v. Chertoff,* 517 F.3d 974, 979, 983 (7th Cir. 2008) (training center can be part of the work environment). Though not strictly dispositive, the Court finds the rationale in *Ferris* persuasive

12

and applicable here.[4] "Even though the employer does not direct its employees as to how to spend their off-duty hours," "the circumstances of the employment tend to" create certain risks of misbehavior for employees temporarily housed with other employees in employer-provided hotel rooms—they have "little opportunity to develop private lives in that place, . . . do not have family, friends, or their own residences there, . . . likely . . . will band together for society and socialize as a matter of course in one another's hotel rooms." *Ferris*, 277 F.3d at 135.  Given this, the circumstances of employment are sufficiently connected to the premises to support the imposition of a duty on employers to exercise control over employees' conduct in such locations—subject, of course, to § 317's independent requirement that the employer know of its ability, the necessity, and the opportunity for such control.

Defendants cite *Doe v. Alsaud*, 12 F. Supp. 3d 674 (S.D.N.Y. 2014), for the proposition that they cannot be held liable "for harm that [the alleged abusers] caused while outside of [WWE] events . . . [b]ecause such alleged conduct took place off premises where Defendants had no control over its employees . . . ." (ECF No. 59-1 at 36; *see also* ECF Nos 57-1 at 34–35.)  But *Alsaud* is neither binding nor persuasive given important differences in the circumstances surrounding the abuse alleged there and that alleged here.  In *Alsaud*, the alleged abuser *resided* in a hotel room on a long-term basis—he was "living in New York temporarily at the Plaza Hotel," *Alsaud*, 12 F. Supp. 3d at 676—and the Court found that the employer's connection to the hotel did not generate any "dominion or control" over it, *id.* at 684.  Further, the plaintiff in *Alsaud* was not a co-employee

---

[4] At its core, the determination of whether a duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant. *Pendleton v. State*, 921 A.2d 196, 204–05 (2007); *see also Rosenblatt*, 642 A.2d at 189 ("[U]ltimately, the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant."); *Ashburn v. Anne Arundel County*, 510 A.2d 1078, 1083 (1986) (quoting *Prosser and Keeton on the Law of Torts* § 53 ("[Duty] is only an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection.")).

13

of the alleged abuser and bore no apparent connection to the employer or its work. *Id.* at 676. Thus, the rationale discussed above does not apply with the same force as it does here—the circumstances of the alleged abuser's employment did not have the same tendency to generate foreseeable risks in the hotel room at issue and thus did not support the imposition of a duty on the employer to exercise control (where necessary and possible) over employees' conduct there. Here, by contrast, the circumstances of employment—the fact that the alleged abusers and plaintiffs alike were temporarily housed, away from home, together, in close proximity and without recourse to their private lives, family, or friends—do support such imposition.

Turning to the second requirement of § 317, Plaintiffs have plausibly pled that WWE knew or should have known of its need, opportunity, and ability to control Phillips at both WWE event venues and at the employer-provided hotel rooms. As described above, Plaintiffs assert several general allegations that WWE knew about Phillips' abuse of Ring Boys: for example, that "it was just generally known, by everybody, that it was going on" (ECF No. 55 ¶¶ 36–37), and "[e]veryone knew what was going on" (*id.* ¶ 38). But further, critically, Plaintiffs also allege that WWE had very specific knowledge of Phillips abusing Ring Boys surrounding WWE events, including knowledge that preceded the abuse Plaintiffs allege he committed against most of them. Most significantly, they allege that in 1982 or 1983, "Phillips was spotted in a car with a child about 10–11 years old performing oral sex on him. . . . [A] security guard brought the child into the arena and presented him to Vince McMahon," who, along with McMahon's father, responded that "they would handle it." (ECF No. 55 ¶ 42.) This allegation alone, viewed in the light most favorable to the Plaintiffs, is sufficient to plead WWE's knowledge of the need to control Phillips in his interactions with children. As to WWE's opportunity and ability to do so, the Comments to § 317 are instructive: "There may be circumstances in which the only effective control which the master can exercise over the conduct of his servant is to discharge the servant." Even apart from any other

14

interventions WWE may have taken to protect future Ring Boys against Phillips' abuse, at minimum, it most certainly could have terminated his employment with WWE.

The Court therefore finds that Plaintiffs have alleged with adequate specificity to survive a motion to dismiss that WWE's employment relationship with Phillips created an exception to the general rule of non-liability for third-party conduct under a direct liability theory—WWE had a duty of reasonable care to exercise its authority over Phillips to prevent him from sexually abusing children on premises he was authorized to enter only as WWE's employee, given WWE's knowledge of the need, opportunity, and ability to control him.

The one exception to this finding is for John Doe 7, who alleges that he was abused in the 1970s—before any specific knowledge of abuse has been alleged. (ECF No. 55 ¶ 274, 288.) The Court finds that John Doe 7 has not alleged with adequate specificity that WWE had a duty under this theory, because he has not pled facts that make plausible the inference that WWE knew of the need to control Phillips in advance of the abuse Phillips allegedly committed against him.

### b.    Vicarious Liability

Where an employee's conduct is committed within the scope of the employment relationship and is itself negligent, employers can be held vicariously liable under the doctrine of *respondeat superior*. *Barclay*, 47 A.3d at 567–68.

"For an employee's tortious acts to be considered within the scope of employment, the acts must have been in furtherance of the employer's business and authorized by the employer." *S. Mgmt. Corp. v. Taha*, 836 A.2d 627, 638 (Md. 2003) (citing *Sawyer v. Humphries*, 587 A.2d 467, 470 (Md. 1991)). "'Where the conduct of the servant is unprovoked, highly unusual, and quite outrageous,' courts tend to hold 'that this in itself is sufficient to indicate that the motive was a purely personal one' and the conduct outside the scope of employment." *Sawyer*, 587 A.2d at 471–72 (quoting *Prosser and Keeton on the Law of Torts* § 70, at 506 (5th ed. 1984)); *see also*

15

*Carroll v. Hillendale Golf Club*, 144 A. 693 (Md. 1929). For this reason, many courts have found sexual assault to be outside the scope of employment. *See* Rochelle Rubin Weber, Note, *"Scope of Employment" Redefined: Holding Employers Vicariously Liable for Sexual Assaults Committed by Their Employees*, 76 Minn. L. Rev. 1513 (1992).

However, even where the motive for the employee's conduct is purely personal, "where an employer with 'knowledge of all the material facts' ratifies an employee's misconduct . . . the employer may be held responsible" as though the conduct were within the scope of employment. *Doe #1 v. Bd. of Educ. of Somerset Cnty.*, No. RDB-22-cv-1491, 2023 WL 375189, at *5 (D. Md. Jan. 24, 2023) (quoting *Tower Oaks Blvd., LLC v. Procida*, 100 A.3d 1255, 1273 (Md. 2014)); *Integrated Consulting Servs., Inc., v. LDDS Commc'ns, Inc.*, 996 F. Supp. 470, 476 (D. Md. 1998). "A corporation may be found to have ratified an unauthorized act by adopting it or acquiescing in it, by accepting and retaining its benefits, or by failing to timely disavow or repudiate it." *Tower Oaks Blvd.*, 100 A.3d at 1273 (internal citations omitted).

Plaintiffs have plausibly pled that WWE ratified Phillips' negligent and injurious conduct by acquiescing in it, accepting and retaining its benefits, or failing to timely disavow or repudiate it. Defendants argue that WWE could not have ratified Phillips' conduct because it had no knowledge thereof. (ECF No. 64 at 18 (citing *Finley Alexander Wealth Mgmt., LLC v. M&O Mktg., Inc.*, No. 19-cv-1312 SAG, 2025 WL 1592464, at *5–6 (D. Md. June 5, 2025) ("[A]n employer cannot ratify an employee's act without 'knowledge of the material facts.'")).) But as discussed above, Plaintiffs have indeed pled specific facts concerning WWE's knowledge of Phillips abusing Ring Boys. In addition to the 1982/83 incident of witnessed sexual abuse that Plaintiffs allege Vincent McMahon was told about, Plaintiffs also allege several other instances of WWE knowledge in the following years: "Several years" after the 1982/83 incident, Plaintiffs allege Phillips was briefly suspended by WWE "for a similar act." (ECF No. 55 ¶ 43.) In or

16

around 1987, Vincent McMahon was allegedly aware of a teen boy being widely referred to within WWE as "Mrs. Mel Phillips." (*Id.* ¶¶ 54, 113–114.) And in 1988, both Vincent and Linda McMahon are alleged to have fired Phillips because, in Vincent McMahon's words, "[his] relationship with kids seemed peculiar and unnatural." (*Id.* ¶¶ 14, 43–45, 51, 58, 264.) Vincent McMahon allegedly responded to a New York Post reporter's assertion that he "had to have known that [the alleged abusers] were doing this" by saying "that's why we have gotten rid of them." (*Id.* ¶¶ 7, 55.) But Plaintiffs allege that the McMahons hired Phillips back within a matter of weeks and knew that he continued to interact with Ring Boys. (*Id.* ¶¶ 14, 45, 51, 58, 264.)

Plaintiffs do not specifically allege that WWE knew of each of them personally and individually having been abused. Such allegations, however, are not needed to support a claim of ratification. *Somerset County*, 2023 WL 375189, is illustrative on this point. There, the Court held that the county Board of Education was plausibly alleged to have ratified sexual misconduct committed by a school district employee against three students by acquiescing in the face of knowledge that previous students were groomed for and subjected to similar abuse. *Id.* at *5. As Judge Bennett explained:

> The plaintiffs here allege that the Board had actual knowledge of [the abuser's] grooming conduct based on its agents' firsthand observations and as a product of reports filed by both parents and school personnel. They claim further that the Board received a report that [the abuser] engaged in a sexual relationship with another student. Yet the Board did nothing. And [the abuser] then proceeded to engage in sexual misconduct with the student-plaintiffs. The Board's purported acquiescence to [the abuser's] misconduct is sufficient to sustain a claim that it ratified her behavior and is thus subject to vicarious liability . . . .

*Id.* So too here. Plaintiffs have specifically and plausibly pled that WWE knew Phillips sexually abused Ring Boys and yet acquiesced to this category of conduct. Such allegations suffice to state a claim that WWE ratified Phillips' conduct and that it can therefore be held vicariously liable as though the conduct were within the scope of Phillips' employment.

17

Defendants also argue that Plaintiffs' pleading is deficient insofar as it fails to specify the common-law tort Phillips is himself alleged to have committed—in a claim for *respondeat superior*, the employee's conduct must itself be negligent for an employer to be vicariously liable. (*See* ECF No. 58-1 at 34 (citing *Nammack v. Hampstead Pre-Owned*, No. 19-cv-1798 (DKC), 2020 WL 1033589, at *6 (D. Md. Mar. 3, 2020)).) Defendants concede that Phillips' alleged conduct "could conceivably support various common law torts against him—for example, battery, assault, intentional infliction of emotion [sic] distress, or negligent infliction of emotional distress," but they assert that Plaintiffs must identify which cause(s) of action it is they are pleading in order to afford Defendants the opportunity "to properly investigate and prepare a defense." (*Id.* at 34–35.)

But the cases Defendants cite for this proposition establish far less. In *Parker v. Ciena Corp.*, No. 14-cv-4036 (WDQ), 2016 WL 153035, at *7 (D. Md. Jan. 12, 2016), *aff'd*, 787 F. App'x 817 (4th Cir. 2019), and *Wimbush v. Kaiser Foundation Health Plan of the Mid Atlantic States, Inc.*, No. 14-cv-525 (TDC), 2015 WL 2090654, at *11 (D. Md. May 4, 2015), for example, courts held that the plaintiffs failed to state a claim for the underlying tort, which they had affirmatively alleged, and as a result, the plaintiffs also failed to state a claim of vicarious liability for that underlying tort. Courts have also explained that where the plaintiff's injury is not cognizable under the common law but is instead based on federal statute (such as Title VII, for example), a tort claim for vicarious liability cannot be sustained. *See, e.g., Nammack,* 2020 WL 1033589, at *6 (citing *Bryant v. Better Bus. Bureau of Greater Md.*, 923 F. Supp. 720, 750 (D. Md. 1996)). But Plaintiffs do not claim that Phillips' conduct violated a federal statute, and the requirement that their injuries be cognizable under the common law does not amount to a requirement that the underlying tort must itself be identified or pled. Rather, what must be pled are facts from which an injury cognizable under common law can be inferred—the claim must be

18

"based on actions that constitute a common law violation." *Nammack,* 2020 WL 1033589, at *6. Defendants concede that such facts are pled here, and their argument therefore fails.

The Court thus finds that Plaintiffs have alleged with adequate specificity that WWE's employment relationship with Phillips created an exception to the general rule of non-liability for third-party conduct under a vicarious liability theory—WWE ratified Phillips' negligence by acquiescing in it, accepting and retaining its benefits, or failing to timely disavow or repudiate it. As with the direct liability theory, however, this finding does not extend to John Doe 7, who alleges that he was abused in 1970s—before any specific knowledge of abuse has been alleged and therefore before any ratification could have occurred. (ECF No. 55 ¶ 274, 288.)

* * *

The employment relationship between WWE and the alleged abusers is not the only special relationship Plaintiffs argue they have pled to support the existence of a tort duty under Maryland law. In addition, they argue they have asserted facts to support a duty generated by the employment relationship between WWE and the Plaintiffs (rather than between WWE and the alleged abusers)—the duty to provide a reasonably safe place to work and to warn employees concerning known dangers they may not discover through the exercise of reasonable care. (ECF Nos. 60 at 24, 61 at 26, 62 at 25.) They also argue for a duty generated by the special relationship between WWE as a possessor of land held open to the public and the Plaintiffs as invitees thereupon—the duty to protect invitees from any known hidden dangers. (ECF Nos. 60 at 32, 61 at 33, 62 at 33.) They argue too for a duty generated by the special relationship of WWE as custodians *in loco parentis* over the Plaintiffs—the duty to protect children in their custody. (ECF Nos. 60 at 27–28, 61 at 28–29, 62 at 27–28.) And beyond these special relationships, Plaintiffs press a statutory exception to the general rule of non-liability for third-party conduct—namely that Maryland's statutory reporting rules for suspected instances of child abuse, Md. Code Ann., Fam.

19

Law §§ 5-705, 5-705.1, create a duty requiring "a person in this State . . . who has reason to believe that a child has been subjected to abuse or neglect" to "notify the local department or the appropriate law enforcement agency" (*id.*).  (ECF Nos. 60 at 24, 61 at 25–26, 62 at 25.)

Because the Court finds that the employment relationship between WWE and the alleged abusers created a tort duty here, the Court need not reach these arguments except insofar as they may support the existence of a duty to John Doe 7, since he was excluded from this finding.  The Court finds that, like the theories that support a duty to the other Plaintiffs, these alternative theories fail to support the finding of a duty to John Doe 7 and for exactly the same reasons.  Each of these duties is premised on WWE having knowledge or a reason to believe that the alleged abusers created a danger.  But the earliest specific allegation Plaintiffs make to support such the contention that WWE had such knowledge concerns the 1982/83 incident discussed above.  Because John Doe 7's injuries were incurred before this, the Court finds that John Doe 7 has not plausibly alleged that WWE had a duty to prevent them.  Thus, John Doe 7's claims will be dismissed without prejudice.[5]

### 2.    Breach, Injury, and Causation

In addition to duty, Plaintiffs must plausibly plead the other elements of a negligence or negligent hiring/supervision/retention claim—breach, injury, and proximate causation—to survive Defendants' motions to dismiss.  *Pace,* 38 A.3d at 423.  Defendants assert that Plaintiffs have not adequately pled breach or proximate causation, though their arguments are threadbare.  (ECF No. 59-1 at 36–37.)

How specifically a plaintiff must plead breach depends on the type of duty at issue.  *Loveless v. Estevez*, No. 01985 Sept. Term 2017, 2019 WL 4187465, at *7 (Md. Ct. Spec. App.

---

[5] John Doe 7's claims against the defendants other than WWE meet the same fate for reasons that are discussed below.

Sept. 3, 2019). "[W]here the plaintiff's right and the defendant's corresponding duty are simple and easily perceived, a simple factual statement of the defendant's act or omission in breach thereof, coupled with the general characterization of the defendant's act or omission as negligent, will suffice. On the other hand, the less apparent the plaintiff's right and the defendant's duty, the more likely the pleader will be required to specify the acts or omissions relied upon to constitute the negligent conduct." *Pendleton v. State*, 921 A.2d 196 (Md. 2007) (quoting Joseph O. Kaiser, *Pleading Negligence in Maryland–Res Ipsa Loquitur as a Rule of Pleading,* 11 Md. L. Rev. 102, 103–04 (1950), as cited approvingly by *Read Drug and Chemical Co. v. Colwill Construction Co.*, 243 A.2d 548, 553 (Md. 1968)).

The Court finds that Plaintiffs' allegations suffice to state a claim that WWE breached its duty. Plaintiffs assert, for example, that Defendants "allowed Phillips to use the WWE and its assets to entice young boys to company events [and] failed to take action to prevent injury to the Ring Boys" (ECF No. 55 ¶ 347), failed to "prohibit [the alleged abusers] from having inappropriate contact with minors and/or prohibit[] them from using the WWE to traffic and sexually harass and abuse the Ring Boys" (*id.* ¶¶ 360, 372, 390), "failed to take the action reasonably necessary to warn or protect Plaintiffs and other Ring Boys from harm" (*id.* ¶ 371), "hired, supervised, and retained [the alleged abusers]" (*id.* ¶ 382), and "failed to make a reasonable inquiry into the conduct of [the alleged abusers] to ascertain their fitness—particularly with respect to their interactions with underaged boys—before hiring, supervising, and retaining them" (*id.* ¶ 388). These characterizations of WWE's acts and omissions are adequate given the relative simplicity of WWE's duty to control Phillips' conduct as his employer.

To establish proximate causation, a plaintiff must show that the alleged negligence was both a "cause in fact" and a "legally cognizable cause" of the plaintiff's injuries. *Mitchell v. Rite Aid of Md., Inc.*, 290 A.3d 1125, 1157–58 (App. Ct. Md. 2023). Where, as here, the criminal acts

21

of a third party may constitute an intervening cause, Maryland courts have applied an "enhanced risk" theory of proximate causation, according to which "a breach of duty by the defendant would result in [its] liability . . . only if the breach enhanced the likelihood of the particular criminal activity which occurred." *Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.*, 854 A.2d 1232, 1241–45 (Md. 2004) (quoting *Scott v. Watson,* 359 A.2d 548, 555 (Md. 1976)); *see also* Restatement (Second) of Torts § 449 ("If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.").

Plaintiffs have plausibly pled that WWE's failure to exercise reasonable care over Phillips as his employer heightened the risk that Phillips would sexually abuse the Plaintiffs. Defendants' only argument to the contrary is that "the alleged harm to Plaintiffs was not foreseeable." (ECF No. 55 ¶ 37.) But as the Court has found above, Plaintiffs have adequately alleged that WWE had knowledge, preceding the abuse of all Plaintiffs but John Doe 7, of precisely the hazard that caused injury and of Phillips' recurring opportunity to do similar harm. Their allegations of proximate causation (*id.* ¶¶ 373, 375, 391) therefore suffice.

\* \* \*

John Does 1–6 and 8 have stated a claim of negligence against WWE under a *respondeat superior* theory, and a claim of negligent hiring, training, and retention against WWE under a direct liability theory. These Plaintiffs' claims against WWE will therefore not be dismissed pursuant to Rule 12(b)(6).

### B.    Personal Jurisdiction

#### 1.    WWE

WWE argues that even if Plaintiffs have stated a claim against it, this Court lacks personal

jurisdiction over WWE. (ECF No. 59-1.) None of the parties to this action are citizens of Maryland. Plaintiffs are citizens of Massachusetts, Pennsylvania, Florida, Mississippi, Pennsylvania, and Nevada. (ECF No. 55 ¶¶ 303–310.) Defendants Vincent and Linda McMahon are citizens of Connecticut (*id.* ¶ 317–18), and Defendants WWE and TKO are Delaware companies with corporate offices in Connecticut and New York, respectively (*id.* ¶¶ 319, 324).

A corporate defendant is "at home" and under the general jurisdiction of a forum only when it: (1) is incorporated in the forum; (2) has its principal place of business in that forum; or (3), in an "exceptional case," has operations that are "so substantial and of such a nature as to render the corporation at home" in the forum. *Daimler AG,* 571 U.S. at 137–39. Plaintiffs do not argue that WWE or TKO is at home in Maryland. (ECF No. 60.)

Courts have specific jurisdiction over out-of-state defendants if the exercise of such jurisdiction is both authorized by the state's long-arm statute and comports with the due process requirements of the Fourteenth Amendment. *Phillips v. British Airways*, 743 F. Supp. 3d 702, 711 (D. Md. 2024) (citing *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003)). Maryland's long-arm statute authorizes specific jurisdiction only in causes of action arising from the conduct of a party who, directly or through an agent:

> (1) Transacts any business or performs any character of work or service in the State;
> (2) Contracts to supply goods, food, services, or manufactured products in the State;
> (3) Causes tortious injury in the State by an act or omission in the State;
> (4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State; [or]
> (5) Has an interest in, uses, or possesses real property in the State.

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b).

The exercise of specific jurisdiction over a nonresident defendant comports with the due process requirements of the Fourteenth Amendment only if "the defendant has purposefully established minimum contacts in the forum State such that it should reasonably anticipate being

23

haled into court there." *Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 138 (4th Cir. 2020) (quoting *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016)). When determining whether specific jurisdiction exists, courts in this Circuit use a three-pronged analysis that considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of [or relate to] those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Perdue Foods*, 814 F.3d at 189 (internal quotation marks omitted).

The Court finds that Plaintiffs have established a *prima facie* case of specific personal jurisdiction over WWE. The negligence alleged against WWE arose out of conduct that satisfies at least Sections 6-103(b)(1) and (3) of Maryland's long-arm statute, if not others, and constitutes purposeful availment of the privilege of conducting activities in Maryland. And the exercise of personal jurisdiction over WWE is constitutionally reasonable.

WWE argues that Section 6-103(b)(1)—permitting jurisdiction over parties who "transact[] any business or perform any character of work or service" in Maryland—does not authorize jurisdiction over WWE here because "Plaintiffs' claims do not arise out of [WWE's] business dealings [in Maryland] within the meaning of the long-arm statute." (ECF No. 59-1 at 20–21.) WWE acknowledges Plaintiffs' allegations that "WWE . . . held hundreds of wrestling shows and other public appearances in Maryland (ECF No. 55 ¶ 330), "taped promotional videos to advertise for WWE shows in Maryland" (*id.* ¶ 331), and "hosted a TV program called 'Tuesday Night Titans'" in Maryland (*id.* ¶ 333), but argues that WWE's alleged negligence is "wholly separate from such business dealings." (ECF No. 59-1 at 21.)

This is incorrect. WWE's most obvious business dealings in Maryland related to the "hundreds" of wrestling shows it hosted here during the relevant timeframe. Among the transactions related to these shows were WWE's transactions with the employees who were

24

physically present in Maryland to create and staff them—one of whom was Phillips. And as discussed above, it is precisely this employment relationship—a relationship that obtained here in Maryland—that generated the tort duty Plaintiffs seek to enforce. Not only is WWE's tort duty therefore meaningfully connected to its business transactions in Maryland, but so too are the breach and injury elements of Plaintiffs' negligence claims. WWE's alleged breach of its duty includes acts or omissions in Maryland—here too, among other places, WWE failed to prohibit Phillips from interacting with Ring Boys, instead retaining him as an employee and providing him with private spaces that he misused, despite its knowledge that he posed a danger. And Plaintiffs were injured here—each one of the Plaintiffs alleges that he was sexually abused by Phillips in Maryland either at or immediately before or after a Maryland show. These allegations suffice to establish a *prima facie* case of specific jurisdiction under Section 6-103(b)(1). *See Maxtena, Inc. v. Marks*, No. DKC-11-cv-0945, 2012 WL 113386, at *8 (D. Md. 2012) ("Maryland courts have long held that the long-arm statute confers jurisdiction as long as the claims asserted bear some relationship to acts in the forum state." (internal quotation and citation omitted)). Defendants' cited cases (ECF No. 59-1 at 20–21) do not compel a different result, as they are neither binding nor involve forum-state business dealings nearly as robust or as related to the claim stated as those that are pled here.

For the same reasons, WWE's argument that Section 6-103(b)(3) does not authorize jurisdiction (*id.* at 23–24) fails as well. Plaintiffs have stated a claim that WWE "cause[d] tortious injury in [Maryland] by [*inter alia*] an act or omission in [Maryland]."

Similarly, the analysis above demonstrates that exercising specific jurisdiction over WWE comports with due process. WWE argues to the contrary, relying principally on *Doe v. Archdiocese of Philadelphia*, No. 19-cv-20934(FLW), 2020 WL 3410917 (D.N.J. June 22, 2020). (ECF No. 59 at 27.) But like the cases WWE cites in relation to its business transactions in Maryland (ECF No. 59-1 at 20–21), *Archdiocese of Philadelphia* is not binding and concerns a

25

defendant with far less forum-state presence than is alleged here. The plaintiff there was a former altar boy at a Pennsylvania church who alleged that a priest assigned to his church abused him there and also at a personal beach house in New Jersey. *Id.* at *1. In finding that the Archdiocese had not purposefully availed itself of New Jersey as a forum even if it was foreseeable that the priest might commit abuse there, the court relied on the plaintiff's failure to plead negligent acts of the Archdiocese in New Jersey, any exercise of supervisory authority over the abuser in New Jersey, or any authorization to interact with the plaintiff in New Jersey. *Id.* at *3. All three such allegations are made against WWE here. Plaintiffs' claims relate to activities that WWE purposefully directed into Maryland.

Finally, to determine whether an exercise of specific personal jurisdiction is constitutionally reasonable, courts assess "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477–78 (1985) (internal quotations omitted). The Court finds the second and third factors are particularly weighty here. Maryland's interest in adjudicating allegations of childhood sexual abuse committed within its boundaries is significant, as is expressed clearly by both the Maryland Child Victims Act's retroactive elimination of time limitations on suits concerning such allegations (2023 Md. Laws, Ch. 6) as well as Maryland's statutory reporting rules for suspected instances of child abuse (Md. Code Ann., Fam. Law §§ 5-705), which trigger investigatory obligations for any such reports. These statutes facilitate the provision of effective and convenient relief to victims like the Plaintiffs, and WWE does not identify any alternative forum where such relief would be equally available. WWE's assertion

that "[t]here is nothing remotely convenient or efficient about calling the parties to Maryland to resolve this dispute" (ECF No. 59-1 at 29) fails to overcome this assessment.

The Court therefore concludes that Plaintiffs have established a *prima facie* case of specific personal jurisdiction over WWE.

### 2. TKO

Plaintiffs' theory of liability against Defendant TKO is that it is liable for the torts of WWE as a successor entity. (ECF No. 55 ¶ 341–42.)

Where a plaintiff's claims rest "entirely on the actions of companies for which [plaintiff] claims [defendants] are liable as successors . . . [j]urisdictional issues are inextricably intertwined . . . with the adequacy of the factual allegations of successor liability; in other words, . . . if the Complaint fails to state a plausible claim for successor liability, then [the court] also lacks personal jurisdiction." *68th Street Site Work Group v. Airgas, Inc.*, No. SAG-20-3385, 2021 WL 4255030, at *7–8 (D. Md. Sept. 16, 2021).

"[A] corporation that acquires assets of another corporation typically does not acquire its liabilities, unless '(1) the successor expressly or impliedly agrees to assume the liabilities of the predecessor; (2) the transaction may be considered a *de facto* merger; (3) the successor may be considered a 'mere continuation' of the predecessor; or (4) the transaction is fraudulent.'" *PCS Nitrogen Inc. v. Ashley II of Charleston LLC*, 714 F.3d 161, 173 (4th Cir. 2013) (quoting *U.S. v. Carolina Transformer Co.*, 978 F.3d 832, 838 (4th Cir. 1992)). "Cases considering successor liability claims under a motion to dismiss standard have generally required (1) the plaintiff to identify which of the four exceptions it is invoking for successor liability and (2) facts supporting the invocation of the chosen exception." *AMA Sys.*, 2023 WL 7410854, at *5 (quoting *68th Street Site Work Group v. Airgas, Inc.*, No. SAG-20-3385, 2021 WL 4255030, at *9 (D. Md. Sept. 16, 2021)).

The Court finds that Plaintiffs have adequately alleged that TKO is liable for claims against WWE as a successor and that the Court therefore has specific personal jurisdiction over TKO. Plaintiffs make a number of allegations that are pertinent to TKO's alleged successor liability, beginning with detailed descriptions tracing WWE's many corporate incarnations from its founding as Capitol Wrestling Corporation Ltd. in 1953, through its acquisition in 1982 by Titan Sports, Inc. (which was founded by the McMahons in 1980), to its present form as World Wrestling Entertainment, LLC, now owned by TKO. (*E.g.,* ECF No. 55 ¶¶ 321, 323, 326.) As a preliminary matter, the Court notes that Defendants do not challenge Plaintiffs' assertion that WWE is a successor entity liable for the torts of the predecessor entities that existed at the time Plaintiffs were allegedly abused. (*Id.* ¶ 323, 341; ECF No. 59-1 at 14–16.)

Plaintiffs plead that "[a]s [a] successor entit[y], . . . TKO acquired any and all assets and liabilities for the predecessor entities." (ECF No. 55 ¶ 342 (emphasis added).) Plaintiffs allege further that

> [o]n September 12, 2023, a transaction completed between Endeavor Group Holdings and World Wrestling Entertainment, Inc., resulted in a merger between the WWE and Ultimate Fighting Championship ("UFC") promotions and the formation of their new parent company, TKO. As part of the merger, World Wrestling Entertainment, Inc. converted to and became known as Defendant World Wrestling Entertainment, LLC.

(*Id.* ¶ 322; *see also id.* ¶ 325.) Plaintiffs also assert that TKO now owns WWE and UFC (*id.* ¶ 326) and that WWE currently operates as a division of TKO (*id.* ¶ 319). Further, in a sworn Declaration attached to her Motion to Dismiss, Linda McMahon herself describes TKO as the "successor company" to WWE. (ECF No. 57-2 ¶ 7 ("I own stock in WWE's successor company TKO Group Holdings, Inc. . . . .").) Plaintiffs' allegations, viewed in the light that most favors them, support a claim that TKO, through the 2023 merger, expressly or implied agreed to assume WWE's liabilities.

28

Defendant cites two cases in arguing that these allegations could describe nothing more than a "run-of-the-mill" business transaction falling far short of an assumption of all liabilities: *68th St. Site Work Group* and *AMA Systems, LLC.* (ECF No. 59-1 at 14.) In both cases, the court dismissed claims against corporate entities because successor liability was not adequately pled. In *68th St. Site Work Group*, the court explained:

> Use of the conclusory word 'acquired' is no more fact-specific than use of the conclusory word 'successor.' A transaction described as an 'acquisition' can fall anywhere along a broad spectrum of contractual arrangements, from a run-of-the-mill asset purchase between entirely separate companies to a full merger. Thus, use of that word does not automatically place a transaction within one of the four exceptions to the general rule of non-successor liability, and does not, absent a more specific factual assertion, provide basis for an inference that one company is a successor to another.

2021 WL 4255030, at *11. So too the court found claims that an alleged predecessor "is owned by and/or was acquired by and/or is one and the same as" a defendant were too "imprecise and conclusory" to sufficiently state a claim of successor liability. *Id.* at *13. In *AMA Systems, LLC*, similarly, the court found that pleading that an alleged predecessor "was acquired by" the Defendant was insufficient, as such claims "are merely conclusory." 2023 WL 7410854, at *3.

But more than just "acquisition" is alleged here. Plaintiffs assert that TKO resulted from a merger specifically—the liability-imposing end of the spectrum that the *68th Street* Court described. In *Ramlall v. MobilePro Corp.*, the Court of Special Appeals of Maryland made clear that as a statutory matter, where two corporations merge, "the debts and obligations of the predecessor corporation become the debts and obligations of the successor corporation." 30 A.3d 1003 (Md. Ct. Spec. App. 2011). While the Court is somewhat sympathetic to Defendants' complaint that Plaintiffs' legal theory on this point could be clearer, it is also mindful that federal pleading rules "do not countenance dismissal . . . for imperfect statement of the legal theory supporting the claim asserted." *Johnson*, 574 U.S. at 11. Neither of Defendants' cited cases dismissed claims for imperfect *identification* of the successor liability exception the Plaintiff

29

intended to invoke, but rather for failure to assert facts that would support the applicability of any exception. Because the Court finds that Plaintiffs have asserted such facts here, it will not dismiss the claims against TKO on this basis.

Plaintiffs have met their burden to establish a *prima facie* case of TKO's liability as a successor to WWE. Plaintiffs' claims against TKO will therefore not be dismissed pursuant to Rule 12(b)(6) or 12(b)(2).

## V.   LINDA MCMAHON'S AND VINCENT MCMAHON'S MOTIONS TO DISMISS (ECF NOS. 57, 58)

Defendants Vincent and Linda McMahon argue that even if Plaintiffs' claims against WWE and TKO are permitted to proceed, the claims against them in their individual capacities should nevertheless be dismissed. (*See generally* ECF Nos. 57-1, 58-1.) They assert the same two grounds for dismissal: failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) and lack of personal jurisdiction under Rule 12(b)(2). (*Id.*)

### A.   Sufficiency of the Claims Stated

Corporate owners and/or officers can be held liable for the tortious conduct of the corporation under two distinct theories in Maryland: a corporate veil theory and a participation theory. *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 905 F. Supp. 2d 675, 681 (D. Md. 2012). Under a corporate veil theory, the individual is liable "because the corporation is not a bona fide independent entity," whereas under a participation theory, "liability attaches where the record establishes the individual's participation in the tortious activity." *Id.*

Plaintiffs do not advance a corporate veil theory (ECF No. 62 at 32), nor does the Court find support for such a theory here. By contrast, though, the Court finds that Plaintiffs have adequately alleged sufficient personal participation in WWE's tortious conduct by both of the McMahons to preclude dismissal of the individual claims against them.

30

Under a participation theory of individual officer liability, the "general rule is that corporate officers or agents are personally liable for those torts which they personally commit, or which they inspire or participate in, even though performed in the name of an artificial body." *Metromedia Co. v. WCBM Maryland, Inc.*, 610 A.2d 791, 794 (Md. 1992) (quoting *Tedrow v. Deskin*, 290 A.2d 799, 802–03 (Md. 1972)). An officer's "participation in the tort is essential to liability." *Id. Levi v. Schwartz*, 95 A.2d 322 (Md. 1953) is an oft-cited foundational Maryland case permitting individual liability under this theory. There, the Court of Appeals of Maryland held the president of a development corporation personally liable for the corporation's negligent removal of lateral support from an adjacent landowner's lot, where the president had personally and directly supervised the operation. A more recent application of the doctrine to similar facts is *St. James Construction Co. v. Morlock*, 597 A.2d 1042 (Md. Ct. Spec. App. 1991). There, the Court of Special Appeals held that the same standard of care applied to the individual defendant personally as applied to the corporation, since, as a policy matter, it is sensible to impose liability on those best able to avoid the risks at hand, namely those as to whom the risks are foreseeable. *Id.* at 223–24; *see also Metromedia*, 610 A.2d at 795 (CEO personally liable for directing, participating, or cooperating in decision that the company would commit tortious conduct); *Kiddie Acad. Domestic Franchising, LLC v. Wonder World Learning, LLC*, No. CV ELH-17-3420, 2019 WL 6117410, at *17 (D. Md. Nov. 15, 2019) (individual officers liable for negligent misrepresentation where they personally made the false statements at issue).

Plaintiffs allege that both of the McMahons personally participated in WWE's negligence in a number of different ways. First, as discussed above, WWE's knowledge of the risk that Phillips would sexually abuse Ring Boys is imputed to WWE through knowledge that was allegedly possessed by the McMahons personally—it was Vincent McMahon himself, not some other employee of WWE's, who is alleged to have been notified of the 10 or 11 year old boy seen

31

engaged in oral sex with Phillips in 1982 or 1983. And it was both Vincent and Linda McMahon who were alleged to have known, at some point before temporarily firing him in 1988, that Phillips was abusing Ring Boys. This knowledge was critical in creating the tort duty that WWE was accordingly obligated to satisfy.

But further, both McMahons are alleged to have been involved in decisions to nevertheless retain Phillips as a WWE employee. Indeed, the McMahons are alleged to have taken an active participatory role in managing the dangers Phillips posed at both of these times. Having been notified of Phillips' abuse in 1982 or 1983, Vincent McMahon is alleged to have responded that he and his father "would handle it." And both Vincent and Linda McMahon are alleged to have instructed Phillips, when they brought him back in 1988, to "steer clear of kids," which they allegedly knew he did not. Through these affirmative acts, the McMahons are therefore alleged to have personally participated in WWE's breach of its duty—in their personal management of the risk, they actively permitted Phillips to continue interacting with Ring Boys and continue utilizing private WWE-provided spaces. The McMahons personally could have, at any point, decided not to do so, or to terminate Phillips' employment with WWE, and their failures to do so constitute participatory omissions that partially comprise WWE's alleged breach.

In arguing against individual liability, the McMahons identify a distinct line of Maryland cases that appear to stand in some tension with those discussed above. In particular, the McMahons argue that they cannot be held individually liable for WWE's negligence here, because corporate officers and supervisory employees are immune from personal liability for negligence where they are alleged to have breached "an employer's nondelegable duty," rather than a personal duty they owed to the plaintiffs as individuals. (ECF No. 58-1 at 20–24.) According to the McMahons, only where the duty alleged to have been breached is one that attaches to the employee *qua individual* rather than the employee *qua employee*, can she be held liable for a breach of that duty. (*Id.* (citing

*Beasley v. Bernard*, No. 23-cv-3133 (DKC), 2024 WL 326952, at *4 (D. Md. Jan. 29, 2024); *Jarrett v. Home Depot U.S.A., Inc.*, No. 21-cv-1514 (SAG), 2021 WL 3288361, at *3 (D. Md. Aug. 2, 2021).)

*Athas v. Hill,* 476 A.2d 710 (Md. 1984) is the foundational case here, and the McMahons argue that it is "instructive." (ECF No. 58-1 at 21.) In *Athas*, the chef at a country club assaulted a busboy, who sued individual supervisors alleging they had notice of the chef's violent disposition but failed to protect the plaintiff. *Id.* at 711. The Court of Appeals of Maryland affirmed dismissal of the claims against the supervisors despite allegations that they were, as supervisors, personally "responsible for discharging [the employer's] duty to provide [the plaintiff] with a safe place to work and to retain only competent, nonviolent employees." *Id.* at 718. The court held that "[i]n undertaking such managerial and personnel functions, the officers assumed an obligation to the employer only," not to the plaintiff, and thus, that even if "the [supervisors] knew of [the chef's previous] involvement in altercations . . . and did nothing about this behavior, then they merely breached the duty of providing a safe place to work which [the employer] owed to [the plaintiff]." *Id.* at 719. More recently, in *Beasley,* 2024 WL 326952, at *4 and *Jarrett,* 2021 WL 3288361 at *3, Maryland courts have relied on *Athas* and its progeny to dismiss negligence claims against individual supervisors where they were alleged to have been in charge of keeping store premises safe but where plaintiffs allege they were injured through failure to do so.

The McMahons argue that they, *qua individuals,* had no duty at all to the Plaintiffs, but at most are alleged to have participated in the breach of *WWE's* duties to the Plaintiffs and that *Athas* therefore requires dismissal—they were not personally Phillips' employers, and thus the duties attendant to the employment relationship do not attach to the McMahons in their individual capacities. (ECF No. 58-1 at 20–24.)

The two lines of cases just discussed pull in opposing directions. Under the *Athas* line of cases, personal knowledge of a risk does not generate personal liability even where that knowledge forms the basis of the tort duty alleged to have been violated, if the duty is a duty of the employer. But under the *Levi* line of cases, the fact that conduct is "performed in the name of an artificial body" does not preclude individual liability if the conduct constitutes participation in a tortious act. *Metromedia*, 610 A.2d at 794. The Court finds that here, given the specific participatory acts and omissions Plaintiffs have alleged, the rationale underpinning the participation doctrine is weightier, and the McMahons' alleged conduct supports a claim of individual liability even though it was performed in WWE's name.

*Hayes v. Pratchett*, 45 A.3d 861 (Md. Ct. Spec. App. 2012) is helpful. In *Hayes*, the Court of Special Appeals considered and distinguished *Athas*, holding an individual employee liable even where the duty he allegedly violated was arguably a duty of the employer's rather than a personal duty. *Id.* at 872. Plaintiff Hayes' automobile sustained damage after it collided with a vehicle that was being operated by his supervisor at the tire service center where they both worked. *Id.* at 863. The plaintiff alleged that the supervisor personally participated in the breach of the duty to provide a safe workplace and sued him in his individual capacity. *Id.* The supervisor argued that by operating the vehicle, he was merely fulfilling a nondelegable duty of the employer and was therefore immune from suit, pursuant to *Athas*. *Id.* But the Court held that by driving the vehicle himself rather than assigning a fellow employee to do so, the individual defendant undertook sufficient personal activity and participation to warrant individual liability—"the performance of routine work assignments [is not] part of the employer's nondelegable duty to provide a safe workplace . . . ." *Id.* at 870. A supervisory employee's affirmative act of negligence can therefore provide a basis for individual liability even in the face of *Athas*. *Id.* at 872.

34

*Bowman v. Top Gun of Va., Inc.*, No. 21-cv-2207 (TJS), 2021 WL 5827776, at \*4 (D. Md. Dec. 8, 2021) also provides guidance. *Bowman* held that the CEO and Director of a company could not be held individually liable for the torts committed by his company, where the plaintiff "relie[d] on a theory of nonfeasance, alleging that [he was] liable for the negligence of an employee of [the company] because of [his personal] purported failures to develop and follow procedures for the maintenance of vehicles, as well as the selection, training, and supervision of [company] drivers." *Id.* at \*3. The Court explained:

> When evaluating a corporate officer's potential liability under *Metromedia*'s 'participation' doctrine, it is useful to draw a distinction between acts that constitute 'misfeasance' and those that constitute 'mere nonfeasance.' Examples of a corporate officer's inaction, which do not subject the officer to liability under the 'participation' doctrine, include: failing to maintain a premises in a safe and reasonable manner; failing to warn persons that a condition was a hazard; failing to properly train, instruct, or hire employees, and failing to establish appropriate policies and procedures to keep a premises safe. A corporate officer must take an active role in the commission of a tort for liability to attach; passive behavior and inaction will not suffice.

*Id.* at \*4–5 (citations omitted).

Taken together, these cases suggest that *Athas* precludes individual liability where the personal participation alleged is "mere nonfeasance," or an *omission* constituting failure to perform a corporate duty, but does not necessarily preclude liability where "an affirmative act of negligence" constituting active "misfeasance" in the performance of that duty is alleged. In other words, it was critical that in *Athas* (and *Beasley* and *Jarrett*), the allegations against the individual defendants were merely that an entire category of corporate responsibilities were assigned to them but not adequately performed by anyone—there was no allegation that the supervisors in question personally committed affirmative acts in their responsibility to satisfy the employer's duty.

Here, as discussed above, the allegations of the McMahons' personal participation are not limited to a claim that they were responsible for ensuring that *someone* was properly supervising Phillips and that he posed no unreasonable risk to Ring Boys, nor is it solely omissions they are

35

accused of. Rather, Plaintiffs allege that, like the individual supervisor in *Hayes*, the McMahons undertook to personally perform work assignments themselves but executed them so poorly as to constitute a breach of duty. In particular, by representing that he "would handle" the report of abuse in 1982/83, Vincent McMahon allegedly undertook a course of misfeasance rather than mere nonfeasance. And by actively directing Phillips to "steer clear of kids," after they rehired him in 1988, the McMahons did so as well. Their personal knowledge and personal management of the risks that Phillips posed rendered the harms at issue foreseeable to them as individuals, thus supporting the imposition of a duty on them personally. The Court therefore finds that despite *Athas*, the McMahons can be held personally liable under Maryland law.

That said, the earliest acts of affirmative misfeasance that are specifically alleged against Linda McMahon are those that occurred in 1988, when the McMahons rehired Phillips and undertook to personally manage the risks they allegedly knew he posed to the Ring Boys. Thus, Linda McMahon's personal liability will be limited to the Plaintiffs who plausibly plead they were injured after this time. Because only John Does 2 and 6 allege such injuries (ECF No. 55 ¶¶ 201, 251, 259–60), the other Plaintiffs' claims will be dismissed without prejudice as against Linda McMahon. Affirmative misfeasance on the part of Vincent McMahon, by contrast, is specifically alleged to have begun much earlier, in 1982 or 1983. Thus, all Plaintiffs (except John Doe 7) will be permitted to proceed against him.

John Does 1–6 and 8 have stated a claim of negligence against Vincent McMahon and John Does 2 and 6 have stated a claim against Linda McMahon. The McMahons' Motions (ECF Nos. 57, 58) will therefore not be granted pursuant to Rule 12(b)(6) as against these Plaintiffs.

36

### B.    Personal Jurisdiction

The McMahons also argue that even if the Court finds personal jurisdiction over WWE/TKO, it does not have personal jurisdiction over the McMahons in their individual capacities. (ECF Nos. 57-1 at 15–29, 58-1 at 12–18.)

"Employment [alone] is insufficient to give rise to personal jurisdiction, and a corporation's contacts with a forum state cannot be attributed to its employees." *Glynn v. EDO Corp.*, 536 F. Supp. 2d 595, 604 (D. Md. 2008). Rather, "personal jurisdiction over a corporate employee must arise from the employee's individual contacts with the forum." *Maxtena*, 2012 WL 113386, at *6.

Further, "[t]he fiduciary shield doctrine protects an individual, who acts in the forum state solely as the representative of the corporation, from suit in that state because he does not personally avail himself of the laws and protection of the forum state in any meaningful way." *United States v. Undetermined Quantities of Articles of Drug,* 145 F. Supp. 2d 692, 706 (D. Md. 2001) (internal quotation marks omitted).    While Maryland courts do recognize this "rarely used" doctrine, *Compass Mktg., Inc. v. Schering–Plough Corp.,* 438 F. Supp. 2d 592, 596–97 (D. Md. 2006), there are three common circumstances in which they decline to invoke it: (1) the individual is the alter ego of the corporation, (2) the individual has a substantial interest in the corporation, and (3) the basis for personal jurisdiction over the individual arises under section (b)(1) of the Maryland long-arm statute. *CoStar Realty,* 604 F. Supp. at 767. Because the second and third of these circumstances both apply here (*see* ECF No. 55 at ¶¶ 317–18 and below), the Court declines to permit invocation of the fiduciary shield doctrine in determining whether the McMahons are subject to personal jurisdiction in Maryland.

Looking to the McMahons' individual contacts with Maryland, the Court finds that Plaintiffs have established a *prima facie* case that each of the McMahons individually "transacted

business" in Maryland for purposes of Section 6-103(b)(1) of the long-arm statute. For example, Plaintiffs allege that Vincent McMahon taped promotional videos to advertise for WWE shows in Maryland (ECF No. 55 ¶ 331), attended most WWE shows that were taped for television, including those in Maryland (*id.* ¶ 332), and taped and hosted a weekly television program called "Tuesday Night Titans" in Owings Mills, Maryland (*id.* ¶ 333). Further, both McMahons are alleged to have participated personally in booking and calendaring WWE shows and other appearances in Maryland, and securing contracts or other agreements with venues, promoters, and/or distributors in Maryland (*id.* ¶ 334). Linda McMahon is also alleged to have been physically present at least once at a Maryland WWE show, where, in 1989 (after reinstating Phillips' employment with a warning to "steer clear of kids"), she is alleged to have witnessed Phillips and John Doe 6 present in a dressing room together and then summoned Vincent McMahon to leave the room with her. (*Id.* ¶ 264.)

"[E]ven a single contact with the forum can satisfy the transaction of business standard in subsection (b)(1)." *Finley Alexander Wealth Mgmt., LLC*, 2020 WL 1322948, at *9 (quoting *Hausfeld v. Love Funding Corp.*, 16 F. Supp. 3d 591, 599 (D. Md. 2014)). Further, transacting business does not require physical presence in Maryland, but only that the defendant's actions culminate in purposeful activity within Maryland. *Fidelis Cybersecurity, Inc. v. Partner One Cap., Inc.*, 771 F. Supp. 3d 614, 630–31 (D. Md. 2025). While a closer call for Linda McMahon than it is for Vincent McMahon, Plaintiffs' allegations are sufficient to allege coverage under section (b)(1) of the long-arm statute. Drawing all inferences in Plaintiffs' favor, their allegations establish that both of the McMahons engaged in business transactions culminating in purposeful activity within Maryland.

Further, the requirement that Plaintiffs' claims arise out of a defendant's contacts with the forum state is not as onerous as the McMahons suggest. (ECF Nos. 57-1 at 26, 58-1 at 17.) As

discussed above in the context of jurisdiction over WWE, Maryland courts have long held that the long-arm statute confers jurisdiction as long as the claims asserted "bear some relationship to the acts in the forum state." *Malinow v. Eberly*, 322 F. Supp. 594, 599 (D. Md. 1971). As Plaintiffs argue, "booking, contracting, and/or scheduling WWE events [in Maryland]—along with marketing WWE's brand for such events—created the opportunity for WWE's predator employees to abuse Plaintiffs in Maryland in connection with WWE events." (ECF No. 61 at 15.) And being physically present at Maryland WWE shows clearly relates to the McMahons' personal participation in managing the risks that Phillips posed, as described above—the McMahons are alleged to have engaged in critical omissions at all times after they learned of Phillips' misconduct, including at any Maryland shows where they were present.

Defendants' due process arguments are likewise addressed by the analyses above—these same considerations show that the McMahons purposefully availed themselves of the privilege of doing business in Maryland and that they therefore could have reasonably anticipated being haled into court here. The exercise of personal jurisdiction over the McMahons is "constitutionally reasonable" as well. "Generally, such an analysis ensures that litigation is not so gravely difficult and inconvenient as to place the defendant at a severe disadvantage in comparison to his opponent." *CFA Inst. v. Inst. of Chartered Fin. Analysts*, 551 F.3d 285, 296 (4th Cir. 2009) (internal quotation marks omitted). None of the McMahons' arguments show that this is so.

Plaintiffs have met their burden to establish a *prima facie* case of specific jurisdiction over both Vincent and Linda McMahon. Therefore, the McMahons' Motions (ECF Nos. 57, 58) will not be granted pursuant to Rule 12(b)(2).

## VI.    DUPLICATION OF CLAIMS

Defendants argue that "Plaintiffs' general negligence claim is duplicative of Plaintiffs' negligent hiring, training, and retention claim because they are 'functionally the same' under

Maryland law," and that the general negligence claim should thus be dismissed as duplicative. (ECF No. 59-1 at 37 (citing *Pizarro Orta v. Creekstone Landscaping & Excavating, LLC*, No. EA-23-cv-1954, 2024 WL 3555093, at *4 (D. Md. July 25, 2024)).)

"Whether to dismiss on grounds of duplication is discretionary." *Doe v. Mercy High Sch., Inc.*, No. 1:23-CV-01184-JRR, 2024 WL 3103396, at *23 (D. Md. June 24, 2024). While the facts alleged in support of Plaintiffs' general negligence claim substantially overlap with the facts alleged in support of their negligent hiring, training, and retention claim, the Court has found that Plaintiffs may proceed not only on a theory of direct liability for failure to control the alleged abusers, but also on a theory of *respondeat superior*, which is distinct from negligent hiring/training/retention. Thus, the Court declines to dismiss either of Plaintiffs' claims on grounds of duplication. *See Robinson v. Bd. of Educ. of Washington Cnty.*, No. 1:22-CV-01102-ELH, 2023 WL 2499854, at *22–23 (D. Md. Mar. 14, 2023) (because vicarious liability for employee misconduct is different from a claim of negligent hiring or supervision, neither claim is superfluous where both are adequately alleged).

## VII.  PUNITIVE DAMAGES

Defendants also argue that "Maryland law precludes an award of punitive damages" and that Plaintiffs' claim for such damages should therefore be dismissed. (ECF No. 57-1 at 36–37 (citing *Owens-Illinois, Inc. v. Zenobia*, 601 A.2d 633, 652–53 (Md. 1992)).)

As this Court has recently noted, "[p]ractices in this District regarding dismissal of punitive damages claims on a Rule 12(b)(6) motion vary." *Aarow Elec. Solutions v. Tricore Systems, LLC*, No. JKB-22-2326, 2024 WL 1443743, at *4 (D. Md. Apr. 3, 2024). Here, as in *Aarow*, the Court finds that Defendants' argument is best understood as a challenge to the relief Plaintiffs seek rather than a challenge to Plaintiffs' claims, consideration of which is the purpose of a motion under Rule 12(b)(6). *Id.* Although dismissal of a punitive damages request may be appropriate "where the

40

claim cannot support a request for punitive damages," *id.* at n.2 (citing cases), Defendants do not demonstrate that this is the case here. Rather, as *Owens-Illinois* makes clear, punitive damages are at least sometimes appropriate in cases of negligence, namely where the negligent conduct is performed with actual malice—"characterized by evil motive, intent to injure, ill will, or fraud." *Owens-Illinois, Inc.*, 601 A.2d at 652-53 ("The right to recover punitive damages cannot sensibly, in this day and age, be made to turn on the form of the pleading.") (quoting with approval *Fischer v. Johns–Manville Corp.,* 512 A.2d 466, 474 (N.J. 1986)). Thus, the Court declines to dismiss Plaintiffs' request for punitive damages at this stage.

## VIII. CONCLUSION

For the foregoing reasons, Defendants' Motions will be granted in part and denied in part in an accompanying Order. All three Motions (ECF Nos. 57–59) will be granted with respect to Plaintiff John Doe 7, and Linda McMahon's Motion (ECF No. 57) will also be granted with respect to Plaintiffs John Doe 1, 3, 4, 5, and 8. The Motions will be otherwise denied.

DATED this _10_ day of December, 2025.

BY THE COURT:

James K. Bredar
United States District Judge

41