**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JOHN DOE 1, et al.,<br><br>    Plaintiffs,<br><br>     v.<br><br>WORLD WRESTLING ENTERTAINMENT, LLC, et al.,<br><br>    Defendants. | Civil Action No. 1:24-cv-3487-JKB |

**<u>DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS</u>**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 3

I.  Media Coverage and Federal Investigation of the Allegations............................................ 3

II.  Plaintiffs' Negligence Allegations..................................................................................... 5

RELEVANT PROCEDURAL HISTORY ................................................................................. 7

I.  Maryland's Statute of Limitations for Plaintiffs' Claims ...................................................... 7

II.  This Litigation................................................................................................................. 8

LEGAL STANDARD........................................................................................................... 10

ARGUMENT....................................................................................................................... 11

I.  The Child Victims Act Violates the Due Process Clause as Applied to Defendants ....... 11

    A.  Revival of Plaintiffs' Claims Causes Special Hardships to Defendants and Has Oppressive Effects In Violation of the Due Process Clause ................................. 11

    B.  Applying the CVA to Out-of-State Assaults Exacerbates the Hardships of Revival and Exceeds Due Process Limits on Personal Jurisdiction................................... 14

II.  The Child Victims Act Violates the Ex Post Facto Clause............................................. 17

    A.  The CVA Violates the Ex Post Facto Clause Under Existing Supreme Court Precedent Because It Is Punitive In Nature and Retroactive ............................... 18

        1.  The CVA Is Punitive In Nature ............................................................... 19

        2.  The CVA's Retroactive Application Violates the Ex Post Facto Clause . 23

    B.  Independently, the Ex Post Facto Clause Should Apply to Retroactive Civil Laws, Including the CVA ........................................................................................... 24

CONCLUSION.................................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berry* v. *State*,
2019 WL 360147 (Md. Jan. 29, 2019) ................................................................20

*Besser* v. *E.R. Squibb & Sons, Inc.*,
146 A.D.2d 107 (N.Y. App. Div. 1989) ...............................................................17

*Bristol-Myers Squibb Co.* v. *Superior Ct. of Cal.*,
582 U.S. 255 (2017) ............................................................................................15

*Burgess* v. *Salmon*,
97 U.S. 381 (1898) ..............................................................................................26

*Burnett* v. *N.Y. Cent. R. Co.*,
380 U.S. 424 (1965) ............................................................................................11

*Calder* v. *Bull*,
3 U.S. 386 (1798) ...............................................................................3, 17, 23, 24

*Carey* v. *Fiberfloat Corp.*,
849 F. Supp. 423 (D. Md. 1994) .........................................................................16

*Carpenter* v. *Com. of Pa.*,
58 U.S. 456 (1854) ..............................................................................................24

*United States* v. *Charles*,
240 F. Supp. 2d 488 (M.D.N.C. 2002) ...............................................................13

*Chase Secs. Corp.* v. *Donaldson*,
325 U.S. 304 (1945) ............................................................................................11

*Cranford* v. *State*,
373 A.2d 984 (Md. 1977) ....................................................................................19

*Cunningham* v. *Grant*,
2026 WL 384838 (D.S.C. Jan. 20, 2026) ..............................................................7

*DeBellis* v. *Woodit*,
728 F. Supp. 3d 330 (D. Md. 2024) ....................................................................16

*Doe* v. *Roe*,
20 A.3d 787 (Md. 2011) .....................................................................................7, 8

*Does #1-5* v. *Snyder*,
   834 F.3d 696, (6th Cir. 2016) ..................................................................20, 21, 23

*Drager* v. *PLIVA USA, Inc.*,
   741 F.3d 470 (4th Cir. 2014) ...............................................................................10

*Ellingburg* v. *United States*,
   607 U.S. 163 (2026)..............................................................................18, 24, 25, 26

*Ghassemieh* v. *Schafer*,
   447 A.2d 84 (Md. App. 1982).................................................................................22

*Grice* v. *Colvin*,
   97 F. Supp. 3d 684 (D. Md. 2015).....................................................................11, 12

*Hauch* v. *Connor*,
   453 A.2d 1207 (Md. 1983) .....................................................................................15

*Jackson* v. *Minn. Life Ins. Co.*,
   275 F. Supp. 3d 712 (E.D.N.C. 2017).....................................................................10

*Keeton* v. *Hustler Magazine*,
   465 U.S. 770 (1984)................................................................................................16

*Kennedy* v. *Mendoza-Martinez*,
   372 U.S. 144 (1963).........................................................................................18, 19

*League* v. *State of Texas*,
   184 U.S. 156 (1902)................................................................................................24

*N.Y. Rifle & Pistol Ass'n, Inc.* v. *Bruen*,
   597 U.S. 1 (2022)....................................................................................................24

*NFIB* v. *Sebelius*,
   567 U.S. 519 (2012)................................................................................................20

*O.M.* v. *Calvary Chapel Int'l Worship Ctr.*,
   2026 WL 1107740 (D. Md. Apr. 23, 2026)............................................................14

*Philip Morris Inc.* v. *Angeletti*,
   752 A.2d 200 (Md. 2000) .......................................................................................15

*Phillips* v. *British Airways*,
   743 F. Supp. 3d 702 (D. Md. 2024).......................................................................16

*United States* v. *Ramirez*,
   846 F.3d 615 (2d Cir. 2017)...................................................................................26

iii

*Robertson* v. *United States ex rel. Watson*,
  560 U.S. 272 (2010) (Roberts, C.J., dissenting) .................................................................26

*Roman Cath. Archbishop of Washington* v. *Doe*,
  330 A.3d 1069 (Md. 2025) ................................................................................ *passim*

*S.H.* v. *Diocese of Brooklyn*,
  205 A.D.3d 180 (N.Y. App. Div. 2022) .................................................................17

*Sellers* v. *Newrez LLC*,
  2026 WL 632357 (D. Md. Mar. 6, 2026).................................................................10

*Smith* v. *Doe*,
  538 U.S. 84 (2003).............................................................................................18, 19

*Stogner* v. *California*,
  539 U.S. 607 (2003)........................................................................................ *passim*

*Temple-Inland, Inc.* v. *Cook*,
  192 F. Supp. 3d 527 (D. Del. 2016).......................................................................13

*Wentz* v. *State*,
  150 A. 278 (Md. 1930) ...........................................................................................19

## Constitutional Provisions

U.S. Const. art. I, § 9, cl. 3...........................................................................................17

U.S. Const. art. I, § 10, cl. 1.........................................................................................17

## Statutes

Md. Code Ann., Crim. Law § 3-602(a)(4)(ii) ...............................................................8

Md. Code Ann., Cts. & Jud. Proc. §§ 5-101 ................................................................7

Md. Code Ann., Cts. & Jud. Proc. § 5-201(a)..............................................................7

Md. Code Ann., Cts. & Jud. Proc. § 5-117 .......................................................... *passim*

Md. Code Ann., Cts. & Jud. Proc. § 6-103(b) ............................................................16

## Other Authorities

Evan C. Zoldan, *The Civil Ex Post Facto Clause*, 2015 Wis. L. Rev. 727 (2015).........................25

Fed. R. Civ. P. 5.1........................................................................................................10

Fed. R. Civ. P. 12(b)(2)..................................................................................................1

Fed. R. Civ. P. 12(b)(6)....................................................................................................10

Fed. R. Civ. P. 12(c) ......................................................................................................1, 10

H.B. 642, 2017 Gen. Assemb., 437th Session (Md. 2017).................................................8

Jane H. Aiken, *Ex Post Facto in the Civil Context: Unbridled Punishment*, 81 Ky.
    L.J. 323 (1993)...........................................................................................................26

Oliver P. Field, *Ex Post Facto in the Constitution*, 20 Mich. L. Rev. 315, 319–20
    (1922).........................................................................................................................25

S.B. 68, 2003 Gen. Assemb., 417th Session (Md. 2003)....................................................7

*Scienter*, BLACK'S LAW DICTIONARY (12th ed. 2024)....................................................20

World Wrestling Entertainment, LLC ("WWE"), TKO Group Holdings, Inc. ("TKO"), Vince McMahon, and Linda McMahon (collectively, "Defendants") respectfully move pursuant to Federal Rule of Civil Procedure 12(c) for judgment on the pleadings on all remaining claims asserted in Plaintiffs' Corrected First Amended Complaint (ECF No. 55) (the "AC" or "Amended Complaint").[1]

## PRELIMINARY STATEMENT

Plaintiffs commenced this action against four Defendants asserting negligence claims arising from alleged conduct that purportedly caused Plaintiffs to be injured as minors in several different states, primarily during the 1980s.  Specifically, Plaintiffs allege they were invited by a now-deceased ring announcer named Mel Phillips to attend, and assist with, wrestling shows.  Each Plaintiff asserts that Phillips sexually assaulted him in connection with some of these events.  Some Plaintiffs further allege abuse or harassment by former WWE workers Terry Garvin and Pat Patterson, both of whom are also deceased.

Allegations of abuse or harassment by Phillips, Garvin, and Patterson were the subject of widespread public reporting beginning as early as 1992—some 32 years before Plaintiffs brought this lawsuit.  Shortly after the first public reports, the federal government began an investigation.  A grand jury was empaneled, but no one—including Phillips, Garvin, or Patterson—was charged.  Plaintiffs' Maryland-based claims, which accrued years earlier in the 1980s and were subject to Maryland's long-standing three-year statute of limitations, became time-barred, at the latest, by the late 1990s.

---

[1] Defendants respectfully submit that the Court lacks personal jurisdiction for the reasons previously set forth in Defendants' Rule 12(b)(2) motions.  ECF Nos. 57–59.  Defendants do not consent to personal jurisdiction in this Court and reserve the right to pursue dismissal on that basis at all appropriate stages of this litigation.

For decades, these Maryland-based claims remained time-barred, and it appeared that this chapter had long ago come to a final and irreversible close.  Three decades later, however, Maryland enacted the Child Victims Act of 2023 (the "CVA")—a statute aimed at addressing systemic abuse of Maryland residents by priests and the Catholic Church in Maryland.  *See Roman Cath. Archbishop of Washington* v. *Doe*, 330 A.3d 1069, 1098–99 (Md. 2025).  The statute provides that "an action for damages arising out of a claim or claims of sexual abuse that occurred while the victim was a minor may be filed at any time."  Md. Code Ann., Cts. & Jud. Proc. § 5-117(b).

This action followed.  Plaintiffs now seek to hold Defendants liable under common-law negligence theories predicated largely on secondhand or thirdhand allegations of Phillips's misconduct and Defendants' supposed knowledge of Phillips's alleged actions—allegations that have been vigorously debated in the public domain for more than 30 years.  In the decades since the alleged abuse, however, key witnesses have died, memories have faded, and critical documentary evidence has been lost.  Those losses significantly impair Defendants' ability to mount a meaningful defense, compared to their position before the expiration of the original limitations period in the late 1990s.

As detailed below, judgment on the pleadings should be entered for Defendants because the CVA contravenes the U.S. Constitution for at least two fundamental reasons:

*First*, the CVA violates the Due Process Clause under the Fourteenth Amendment as applied to the unique facts and circumstances of this case.  Given the loss of key witnesses, memories, and documentary evidence over the past 40 years, the revival of Plaintiffs' claims imposes peculiar hardships on Defendants and contravenes their due process rights.  Plaintiffs' attempt to extend the CVA's territorial reach to alleged conduct and harms occurring in sovereign

states with different laws also exceeds the bounds of due process governing personal jurisdiction. Applying the CVA to those allegations would allow Plaintiffs to effectively end-run the constitutional personal jurisdiction constraints by which Plaintiffs must abide.

*Second*, the CVA violates the Ex Post Facto Clause as applied here by retroactively imposing punishment for alleged criminal acts. The statute revives claims arising from childhood "sexual abuse," yet defines that term by reference to a list of criminal sexual offenses, including rape and "[a]ny other sexual conduct that is a crime." Md. Code Ann., Cts. & Jud. Proc. § 5-117(a). Although it claims to resurrect private causes of action, the CVA is punitive in effect and thus falls under the auspices of the Ex Post Facto Clause. Even if the CVA is not punitive, the statute violates the Ex Post Facto Clause because, as current Supreme Court Justices have recently explained, *Calder* v. *Bull*, 3 U.S. 386, 390–91 (1798), has been misinterpreted to artificially restrict the Clause to criminal statutes; properly understood, however, the Clause forbids laws like the CVA that impose retroactive liability, whether civil or criminal, for past wrongs.

### STATEMENT OF FACTS[2]

#### I.    Media Coverage and Federal Investigation of the Allegations

During the 1970s, 1980s, and early 1990s, now-deceased ring announcer Mel Phillips asked teenage boys to assist the ring crew with errands and tasks in preparation for wrestling shows throughout the United States. AC ¶ 1. In or around February 1992, the *New York Post* published a series of articles containing allegations made by one of these individuals, Tom Cole, who stated that he had been abused or harassed by Phillips and two others, Terry Garvin, and Pat Patterson. *See id.* ¶¶ 15, 35, 48, 95 n.49.

---

[2] This Statement of Facts is based on the allegations in the Amended Complaint. Nothing in this brief constitutes an admission of any facts beyond those that Defendants have already admitted in their respective Answers. *See* ECF Nos. 74, 75, 76.

The allegations garnered significant media attention at the time, leading to dozens of articles, televised interviews, and books featuring firsthand, secondhand, and thirdhand accounts of Cole's and others' allegations concerning Phillips, Garvin, and Patterson. *See, e.g., id.* ¶¶ 38–42, 84, 91, 93. In particular, during the March 13, 1992 airing of CNN's *Larry King Live*, then-wrestler Bruno Sammartino claimed to have heard from an unnamed person that Phillips was once observed in a car performing a sexual act on a minor. *See id.* ¶¶ 40–41 & n.14.[3] Days later, during a March 16, 1992 taping of the *Phil Donahue Show*, then-wrestler Billy Graham recounted that he had heard about the same incident. *See id.* ¶¶ 42 & n.15.[4] Graham stated that the incident had occurred in 1982 or 1983 in Allentown, Pennsylvania; that Graham was present in Allentown on the day of the alleged incident but did not witness it himself; and that he had heard that an unnamed security guard had brought the unnamed minor to Mr. McMahon and his father, Vince McMahon, Sr., to "handle it"—a narrative that Mr. McMahon denied in 1992 and still denies today. *Id.*; *see* ECF No. 74 ¶ 42.[5] Neither Sammartino nor Graham stated who told them about the alleged incident. Nor did either of them indicate that they (or anyone else) reported Phillips to law enforcement in the 1980s when they purportedly learned of the allegations.

Following the public reporting of Cole's, Sammartino's, and Graham's allegations, federal law enforcement officials initiated an investigation by June 1992. *See* AC ¶¶ 18–19, 29. The Federal Bureau of Investigation and the U.S. Attorney's Office for the Eastern District of New

---

[3] *See Vince McMahon and Bruno Sammartino on Larry King Live (1992)* at 6:20–35, https://www.youtube.com/watch?v=je5mokKJqkk (cited in AC ¶ 41 n.14) (Sammartino stating he was "told about" the incident).

[4] *The Phil Donahue Show: WWF Drug Sex Scandal in 1992* at 22:40–23:38, https://www.dailymotion.com/video/x8ooc0s (cited in AC ¶ 42 n.15) (Graham acknowledging he did not witness Phillips engaging in sexual conduct with a minor).

[5] *The Phil Donahue Show: WWF Drug Sex Scandal in 1992* at 09:44–10:14, https://www.dailymotion.com/video/x8ooc0s (cited in AC ¶ 42 n.15).

York conducted interviews; identified ten potential victims of Phillips, none of whom described their past interactions with Phillips as sexual; and obtained video footage of Phillips with potential victims which reportedly contained "no obvious sexual activity."  *See id.* ¶¶ 8, 19 & n.5.  A grand jury was empaneled, but neither Phillips nor anyone else was indicted in connection with the abuse allegations.  *Id.* ¶¶ 17, 30.

Around the same time, Cole engaged counsel, who sent Defendants' attorney a draft legal complaint asserting sexual harassment claims against Titan Sports and others arising from Phillips's, Garvin's, and Patterson's alleged conduct and the February 1990 termination of Cole.  *Id.* ¶¶ 95 & n.50, 96.  Shortly thereafter, the matter was resolved by a settlement agreement under which Cole was paid $55,000 in backpay and rehired as a per diem worker.  *Id.* ¶¶ 96, 101.

## II.     Plaintiffs' Negligence Allegations

More than 30 years later, Plaintiffs filed this litigation in Maryland, asserting that they were sexually abused as minors in the 1970s and 1980s, primarily by Phillips.  *Id.* ¶ 6.  John Doe 3 also alleges harassment by Garvin in the mid-1980s and John Doe 6 alleges abuse by Patterson in 1989.  *Id.* ¶¶ 206, 211, 264–66.  Plaintiffs claim the alleged abuse or harassment occurred in secluded settings (i.e., hotel rooms, private homes, dressing rooms, and cars) across nine Northeastern states, including Connecticut, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, and Rhode Island, in the 1970s, 1980s, and 1990s, when Plaintiffs were alone with Phillips or accompanied by Garvin, Patterson, or unidentified minors Phillips had met in or around arenas.  *See id.* ¶¶ 1, 173–74, 176–85, 192–96, 201, 207–08, 211, 213, 222–33, 244–45, 252, 254, 258–60, 263, 265, 267–70, 296–97.  In public, by contrast, Plaintiffs allege that Phillips "wrestled" with them and other ring crew volunteers in connection with wrestling events.  *See, e.g., id.* ¶¶ 224–25.

5

Plaintiffs contend that Defendants should be held liable for Plaintiffs' claimed injuries because Defendants supposedly knew about the alleged abuse and harassment and negligently failed to prevent harm to Plaintiffs. Plaintiffs do not allege that any Defendant personally witnessed the alleged sexual abuse or harassment. The Amended Complaint also does not allege that any Plaintiff has firsthand knowledge that any Defendant knew of Phillips's, Garvin's, or Patterson's claimed conduct before any Plaintiff was allegedly harmed. Instead, Plaintiffs primarily rely on the secondhand and thirdhand allegations that were the subject of widespread reporting back in 1992, including Sammartino's and Graham's secondhand statements regarding the alleged incident in a car in 1982 or 1983, and Mr. McMahon's alleged statements to a reporter in 1992 about Phillips's firing and rehiring in 1988.

The Amended Complaint also includes several vague and conclusory allegations on that subject, such as, "Everyone knew what was going on." *Id.* ¶ 38; *see, e.g.*, *id.* ¶¶ 10–12, 36–37, 68. In support, Plaintiffs rely on allegations from 1992 and also plead that their claimed abuse was part of a broad culture of sexual misconduct, often pointing to allegations that post-date Plaintiffs' allegations by decades. *Id.* ¶¶ 1, 7, 23, 32, 46–47, 56–57, 115–43, 157.

In the decades since 1992, the key witnesses have died, including:

- all three individuals who Plaintiffs accuse of abuse and harassment, or, in some instances, who bore witness to abuse inflicted by others (Phillips, Patterson, and Garvin);

- the most prominent public accuser of Phillips, Patterson, and Garvin in 1992, whose accusations are repeated in the Amended Complaint (Cole);

- the only two individuals identified as the secondhand sources of the 1982/1983 notice allegation concerning Phillips (Sammartino and Graham); and

- Vince McMahon's father, who the unnamed security guard allegedly notified of the 1982/1983 incident.[6]

## RELEVANT PROCEDURAL HISTORY

### I.    Maryland's Statute of Limitations for Plaintiffs' Claims

Plaintiffs' Maryland-based claims accrued at the time of their alleged harms in the 1980s, which were subject to Maryland's generally applicable three-year statute of limitations, tolled for minors until three years after they reached the age of majority.  *See Doe* v. *Roe*, 20 A.3d 787, 791–92 (Md. 2011); Md. Code Ann., Cts. & Jud. Proc. §§ 5-101, 5-201(a).  Liberally construing Plaintiffs' allegations, the contemporaneous limitations period for Plaintiffs' Maryland-based claims expired between 1988 and 1998.

In 1994, the Maryland General Assembly "considered . . . extending the generally-applicable three-year statute of limitations on civil claims by alleged child sexual abuse victims," but declined to do so at that time.  *Doe*, 20 A.3d at 791–92.

Nearly a decade later, in 2003, the General Assembly passed legislation extending the statute of limitations for child sexual abuse from three years to seven years.  S.B. 68, 2003 Gen. Assemb., 417th Session (Md. 2003) (enacted).  The General Assembly expressly declined to revive

---

[6] AC ¶¶ 22, 24 n.8, 49 (Phillips, Cole, other "ring boy"); *WWF Drug and Sex Scandal That Rocked The Tabloids in 1992*, ProWrestling Stories, https://prowrestlingstories.com/pro-wrestling-stories/wwe-scandal-1992 (cited in AC ¶ 42 n.15) (Sammartino, Patterson); David Bixenspan, *WWE Cofounder Linda McMahon, who Runs Trump's Biggest Super PAC, Once Hired a Suspected Child Molester on the Condition that he 'Stop Chasing After Kids.'  He Didn't*, BUSINESS INSIDER (Oct. 29, 2020), https://www.businessinsider.com/linda-mcmahon-once-employed-an-accused-child-molester-2020-10 (cited in AC ¶ 11 n.3) (Garvin); Richard Sandomir, *Superstar Billy Graham, Model of the Buff, Blond Wrestler, Dies at 79*, N.Y. TIMES (May 19, 2023), https://www.nytimes.com/2023/05/19/sports/superstar-billy-graham-dead.html (Graham); David Shoemaker, *The Story of Vince McMahon*, THE RINGER (June 2, 2016), https://www.theringer.com/2016/06/02/mma/the-story-of-vince-mcmahon-958f3274f5ce (cited in AC ¶ 149 n. 80) (Vincent McMahon's father); *see also Cunningham* v. *Grant*, 2026 WL 384838, at *6 n.3 (D.S.C. Jan. 20, 2026) (taking "judicial notice that a person is deceased based on an obituary published in a newspaper or in online records that are not subject to reasonable dispute").

any claims that had already expired under the default three-year rule. *Id.* The legislature imposed that limitation after it was advised by the Office of the Maryland Attorney General that reviving previously extinguished claims could pose due process concerns. *Doe*, 20 A.3d at 793–94.

In 2017, the General Assembly again extended the statute of limitations. That extension allowed claims to be brought for 20 years following a victim's reaching the age of majority or for three years following an abuser's conviction of certain sexual abuse crimes. Like the 2003 law, the 2017 amendment explicitly declined to revive any claims that had already expired. H.B. 642, 2017 Gen. Assemb., 437th Session (Md. 2017) (enacted). Additionally, the 2017 extension contained the further limitation that any plaintiff bringing suit more than seven years after reaching the age of majority would have to prove "gross negligence" for claims against "a person or governmental entity that is not the alleged perpetrator of the sexual abuse." *Id.*

In 2023, the General Assembly enacted the law at issue here—the CVA—codified at Section 5-117 of the Maryland Code. *Roman Cath. Archbishop of Washington*, 330 A.3d at 1074. The CVA provides that "an action for damages arising out of a claim or claims of sexual abuse that occurred while the victim was a minor may be filed at any time." Md. Code Ann., Cts. & Jud. Proc. § 5-117(b). The CVA defines "sexual abuse" to include "incest; rape; sexual offense in any degree; or [a]ny other sexual conduct that is a crime." Md. Code Ann., Cts. & Jud. Proc. § 5-117(a). This definition mirrors verbatim Maryland's criminal statute prohibiting sexual abuse of children which likewise encompasses "incest; rape; sexual offense in any degree; and any other sexual conduct that is a crime." Md. Code Ann., Crim. Law § 3-602(a)(4)(ii).

## II.    This Litigation

In October 2024, shortly after the enactment of the CVA, Plaintiffs (none of whom resides in Maryland) filed this lawsuit in Maryland state court, asserting negligence-based claims arising from allegations of sexual abuse occurring both inside and outside of Maryland. ECF No. 15.

Defendants thereafter removed the case to this Court. ECF No. 1. In December 2024, this Court issued a stay pending a decision by the Supreme Court of Maryland on as-applied challenges (unrelated to this case) of the CVA, on the basis that the CVA retroactively abrogated vested rights in violation of the Constitution of Maryland and the Maryland Declaration of Rights. ECF No. 13. In February 2025, the Supreme Court of Maryland issued a 4–3 decision rejecting the as-applied constitutional challenges in those cases. *Roman Cath. Archbishop of Washington*, 330 A.3d at 1106. The Supreme Court's decision was limited to challenges raised under Maryland's Constitution and did not address the federal Constitution's Due Process Clause or Ex Post Facto Clause. This Court then lifted the stay in this action, and the parties briefed motions to dismiss. ECF No. 31.

In December 2025, this Court denied Defendants' motions to dismiss for lack of personal jurisdiction and granted in part and denied in part Defendants' motions to dismiss for failure to state a claim. ECF No. 66. The Court determined that Plaintiffs' negligence claims were adequately pleaded with the exception of (i) John Doe 7's claims, which were dismissed as to all Defendants for failure to plead Defendants' prior knowledge of Phillips's conduct, and (ii) John Does 1, 3–5, and 8's claims against Ms. McMahon, which were dismissed for failure to plead affirmative misfeasance. *Id.* at 19–20, 36. The Court further found that Plaintiffs had met their burden to establish a prima facie case of specific personal jurisdiction over WWE and the McMahons based on their alleged business dealings in Maryland, as well as a prima facie case of liability over TKO as an alleged successor to WWE. *Id.* at 27, 30, 39. In so holding, the Court emphasized "Maryland's interest in adjudicating allegations of childhood sexual abuse committed within its boundaries," *id.* at 26, but did not squarely address Defendants' contention that the Court

9

lacked jurisdiction over Plaintiffs' claims that arise from acts and injuries alleged to have occurred outside of Maryland, e.g., ECF No. 59 at 15.

In January 2026, Defendants answered and asserted constitutional defenses. ECF Nos. 74, 75, 76. Defendants subsequently filed and served on the Maryland Attorney General a notice of the constitutional questions regarding the CVA, pursuant to Federal Rule of Civil Procedure 5.1. ECF No. 80. On March 31, the Maryland Attorney General filed a motion to intervene, which the Court granted. ECF Nos. 86, 89. On April 8, the Court conducted a telephonic conference, during which a schedule was set for Defendants to move for judgment on the pleadings on the basis of the constitutional challenges. ECF No. 91.

## LEGAL STANDARD

A party is permitted to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Motions for judgment on the pleadings are subject to the same standard as Federal Rule of Civil Procedure 12(b)(6) motions to dismiss. *Drager* v. *PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014). Thus, "a pleading 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Sellers* v. *Newrez LLC*, 2026 WL 632357, at *3 (D. Md. Mar. 6, 2026) (quoting *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009)). A Rule 12(c) motion "may reach the merits of an affirmative defense 'if all facts necessary to the affirmative defense clearly appear on the face of the complaint.'" *Jackson* v. *Minn. Life Ins. Co.*, 275 F. Supp. 3d 712, 721 (E.D.N.C. 2017) (quoting *Goodman* v. *Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)).

"In evaluating a motion for judgment on the pleadings, the Court may consider the pleadings, and any materials referenced in or attached to the pleadings, which are incorporated by reference." *Sellers*, 2026 WL 632357, at *3. "The Court also may consider 'matters of which a

10

court may take judicial notice,' such as public records." *Id.* (quoting *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007)).

## ARGUMENT

I.      **The Child Victims Act Violates the Due Process Clause as Applied to Defendants**

Applied here, the CVA would violate Defendants' due process rights in two ways. *First*, it would unjustly subject Defendants to the potential for liability when, because of the passage of decades of time, Defendants cannot mount a meaningful factual defense against the claims. *Second*, Defendants are not subject to personal jurisdiction in Maryland for the alleged assaults that occurred in other states, so applying the CVA to those claims would be impermissible.

A.      **Revival of Plaintiffs' Claims Causes Special Hardships to Defendants and Has Oppressive Effects In Violation of the Due Process Clause**

Statutes of limitations "assure fairness" and "promote justice by preventing surprises through the revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *Burnett* v. *N.Y. Cent. R. Co.*, 380 U.S. 424, 428 (1965) (quoting *Order of R.R. Telegraphers* v. *Ry. Express Agency, Inc.*, 321 U.S. 342, 348–49 (1944)). The revival of time-barred claims can thus violate the Due Process Clause when it results in "special hardships or oppressive effects." *Chase Secs. Corp.* v. *Donaldson*, 325 U.S. 304, 316 (1945). "'Special hardships' or 'oppressive effects' may be present where an individual took a course of action on the assumption that the limitations period would continue or, conversely, an individual would have taken a different course of action if a change in the limitations period could have been foreseen." *Grice* v. *Colvin*, 97 F. Supp. 3d 684, 709 (D. Md. 2015) (citing *Chase*, 325 U.S. at 316). In such situations, permitting the revival of previously time-barred claims would be arbitrary, irrational, and manifestly unjust, violating the Due Process Clause. *Cf. Stogner* v. *California*, 539 U.S. 607, 611 (2003) (recognizing that "enacting statutes with 'manifestly ***unjust***

11

*and oppressive*' retroactive effects . . . deprive[s] the defendant of the 'fair warning' that might have led him to preserve exculpatory evidence" (emphasis in original) (citations omitted)).

That is the case here. The CVA's revival of Plaintiffs' time-barred claims—decades after those causes of action accrued—imposes special hardships on Defendants' ability to defend against the claims asserted and is so oppressive that it violates Defendants' rights to due process. Following the expiration of the limitations period—which itself followed the 1990s media reports, the 1992 settlement with Cole, and the subsequent federal investigation that resulted in *no charges*—Defendants reasonably believed there would be no further litigation in the courts (or continued charges recounted in the press) related to allegations of abuse or harassment by Phillips, Garvin, or Patterson. Defendants therefore did not have fair notice that Plaintiffs' claims remained actionable and thus did not have any reason to try to preserve or obtain any relevant information, *Grice*, 97 F. Supp. 3d at 709, or exculpatory evidence just in case they needed it to defend claims in the future, *Stogner*, 539 U.S. at 611.

Given the specific facts and circumstances of this case, that lack of notice, coupled with the extraordinary passage of time, has profoundly impaired Defendants' ability to mount a defense against Plaintiffs' claims. There are three principal reasons why.

*First*, Defendants are unable to call or identify individuals who purportedly witnessed Plaintiffs' interactions with Phillips, Garvin, and Patterson four decades ago. Plaintiffs plead that the alleged abuse or harassment occurred on unspecified dates in the 1970s to 1990s, in secluded settings (for example, hotel rooms, private homes, dressing rooms, and cars) across the Northeast—sometimes alone with one or more of Phillips, Garvin, and Patterson, and sometimes in the presence of one or more unidentified "boys." No Defendant is alleged to have participated in or witnessed any abuse or harassment of Plaintiffs, so no Defendant can speak to what did or

12

did not transpire.  All three individuals alleged to have engaged in the abuse or harassment are deceased, so they too cannot speak to what did or did not transpire.  And none of the "boys" who allegedly witnessed the harms to Plaintiffs are identified or reasonably identifiable.  Plaintiffs refer to them simply as "boys" or "another boy from Boston who was close to John Doe 1's age."  AC ¶¶ 180, 185, 223, 244, 296.  Plaintiffs allege further that the "boys" were "local kids from the area" near wrestling shows who "Phillips hired" and transported to events, not employees identifiable from company payroll records (which, in any event, very likely no longer exist).  *See id.* ¶¶ 1, 3, 208; *cf. Temple-Inland, Inc.* v. *Cook*, 192 F. Supp. 3d 527, 544 (D. Del. 2016) ("[C]orporations do not normally retain records for longer than 7 years unless there is an identifiable need."); *United States* v. *Charles*, 240 F. Supp. 2d 488, 490 (M.D.N.C. 2002) ("People do not keep records indefinitely, especially when there is no apparent purpose to do so.").

*Second*, the individuals central to the claim that Defendants had prior notice of Phillips's alleged abuse have also died.  As this litigation progresses, Plaintiffs undoubtedly will continue to rely on double hearsay—particularly Sammartino's and Graham's statements concerning the 1982/1983 incident involving Phillips in a car—to attempt to establish Defendants' prior notice of Phillips's misconduct.  Because Sammartino and Graham are deceased, the provenance of their statements, their reasons for making them, and their credibility will be exceptionally difficult (if not impossible) for Defendants to challenge today as compared to 40 years ago.[7]

---

[7] The Court has dismissed all claims against Ms. McMahon that pre-date 1988, which is when Plaintiffs allege that she and Mr. McMahon fired and rehired Phillips "with the caveat that Phillips steer clear from kids." ECF No. 66 at 36; AC ¶¶ 44–45. That single allegation, resting on decades-old hearsay, is the sole basis on which John Does 2 and 6—who allege some acts of abuse occurring after 1988—were permitted to proceed against Ms. McMahon. While the reporter who reported Mr. McMahon's alleged "confession" regarding Phillips's rehiring is still alive, Defendants' ability to test that allegation has been seriously compromised, as memories of a conversation from more than 30 years ago have faded and any contemporaneous notes have likely long since been destroyed.

13

*Third*, Plaintiffs are attempting to rely on conduct alleged to have occurred decades *after* Plaintiffs' alleged injuries to contend that the alleged harm was part of a broader culture of sexual misconduct.  In particular, Plaintiffs have made clear they intend to bolster their claims by relying on allegations of sexual misconduct involving adult women that were publicly reported in 2022 (concerning the period between 2006 and 2022) and detailed in pending litigation.  AC ¶¶ 23, 32, 115–43.  Such allegations bear no relation to Plaintiffs' claims.  Alleged to have taken place decades after the alleged abuse at issue in this case, those claimed incidents do not involve sexual abuse of children or conduct by Phillips, Garvin, or Patterson.  *Cf. O.M.* v. *Calvary Chapel Int'l Worship Ctr.*, 2026 WL 1107740, at *4 (D. Md. Apr. 23, 2026) (dismissing case arising under CVA where female plaintiff alleged only that perpetrator of sexual abuse was known for inappropriate sexual behavior with adult males because knowledge of such behavior "would [not] have provided actual or constructive notice that this individual had the potential to sexually abuse a female child").  For these reasons, this "evidence" should be deemed inadmissible at trial.  But Plaintiffs' use of this lawsuit to rehash highly damaging but largely irrelevant allegations against Defendants nevertheless exacerbates the special hardships that the CVA imposes on Defendants.  Had Plaintiffs commenced suit within the original limitations period, such inflammatory allegations could never have been proffered because the underlying alleged events would not yet have transpired.

B.     **Applying the CVA to Out-of-State Assaults Exacerbates the Hardships of Revival and Exceeds Due Process Limits on Personal Jurisdiction**

Plaintiffs premise their claims mostly on alleged conduct and injuries that occurred ***outside of Maryland***—in Connecticut, Maine, Massachusetts, New Hampshire, New Jersey, New York, Pennsylvania, Rhode Island, and unspecified "other states."  *See id.* ¶¶ 173–302.  Though styled as two general negligence causes of action, the Amended Complaint actually purports to assert

14

multiple distinct negligence claims for each Plaintiff under various state laws. *See Philip Morris Inc.* v. *Angeletti*, 752 A.2d 200, 230 (Md. 2000) (applying Maryland's *lex loci delicti* rule dictating that "substantive rights of the parties . . . are to be determined by the law of the state in which the alleged tort took place"); *Hauch* v. *Connor*, 453 A.2d 1207, 1209 (Md. 1983) (holding the "substantive tort law of the state where the wrong occurs governs"). The expansive geographical scope of Plaintiffs' claims exacerbates the hardships and oppressive effects of the CVA's retroactive elimination of a limitations period: It significantly increases the number of allegations for which the unavailability of witnesses, fading of memories, and loss of documentary evidence makes it exceedingly difficult to defend against today as compared to 40 years ago. The practical implications of such an application of the CVA are far-reaching: any plaintiff could, by pleading one instance of Maryland-based abuse, circumvent the statute of limitations determinations made by sovereign states nationwide.

The CVA further exceeds the limits of due process as applied here to the extent it is interpreted to authorize personal jurisdiction over Defendants for the non-Maryland-based conduct alleged in the Amended Complaint. If correct, the CVA would operate as a nationalized revival statute, unbound by the limits that personal jurisdiction jurisprudence imposes. But the Supreme Court has made clear that for a court to exercise specific jurisdiction over a defendant for a given claim, there must be an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Bristol-Myers Squibb Co.* v. *Superior Ct. of Cal.*, 582 U.S. 255, 264 (2017) (quoting *Goodyear Dunlop Tires Ops., S.A.* v. *Brown*, 564 U.S. 915, 919 (2011)). Here, that required affiliation is absent for most of Plaintiffs' claims, which bear no nexus to Maryland at all.

Maryland's long-arm statute confirms the point.  It authorizes jurisdiction only against parties who transact or contract *in Maryland*, cause tortious injury *in Maryland*, own property *in Maryland*, or are otherwise subject to general jurisdiction *in Maryland*.  *See* Md. Code Ann., Cts. & Jud. Proc. § 6-103(b); *Phillips* v. *British Airways*, 743 F. Supp. 3d 702, 713 (D. Md. 2024).  No provision of that statute confers jurisdiction over conduct occurring outside Maryland, directed at non-residents of Maryland, with no meaningful connection to the state whatsoever.  Nor could it. Exercising jurisdiction on that basis plainly offends due process, as the out-of-state allegations "do not arise out of and are not sufficiently related to [defendant's] activities in Maryland."  *Phillips*, 743 F. Supp. 3d at 714 (internal quotations omitted).  It also raises serious concerns of interstate federalism, entangling Maryland in matters for which it has no legitimate interest.  *See DeBellis* v. *Woodit*, 728 F. Supp. 3d 330, 343 (D. Md. 2024) ("The interstate federalism considerations inherent in this analysis weigh against the exercise of jurisdiction.").

To be sure, as the Court appropriately noted, Maryland undisputedly has an interest in "adjudicating allegations of childhood sexual abuse committed within its boundaries."  ECF No. 66 at 26.  But that interest does not extend to allegations concerning claimed conduct outside its boundaries—particularly those that would be time-barred by the laws of the states in which they allegedly took place.  Indeed, when the plaintiffs themselves are non-residents, courts have deemed Maryland's interest in a suit diminished even where the claims do touch the State in some way. *See Carey* v. *Fiberfloat Corp.*, 849 F. Supp. 423, 426 (D. Md. 1994) ("Because this case involves a non-resident plaintiff, Maryland's interest in resolving this dispute is lessened.").  Although courts may in some circumstances exercise personal jurisdiction over certain out-of-state parties and conduct, that doctrine requires the conduct to be "purposefully directed at [the forum state]." *See Keeton* v. *Hustler Magazine*, 465 U.S. 770, 774, 780–81 (1984) (internal quotations omitted).

16

Plaintiffs' allegations with respect to alleged sexual assaults occurring in other states cannot satisfy this requirement. The non-Maryland claims arise from alleged abuse that occurred in hotel rooms, private vehicles, and other locations across eight different states—conduct that was never directed at Maryland.

Other jurisdictions recognize this very concern—that a revival statute may be wielded to resurrect claims with no nexus to the enacting state—and have drawn clear lines against it. *See Besser* v. *E.R. Squibb & Sons, Inc.*, 146 A.D.2d 107, 117 (N.Y. App. Div. 1989) ("Nothing in the revival statute or its legislative history suggests that the statute was intended to create a national safe harbor for second chance litigation by otherwise time-barred claimants."). For example, in *S.H.* v. *Diocese of Brooklyn*, 205 A.D.3d 180 (N.Y. App. Div. 2022), the court properly held that New York's Child Victims Act "does not apply extraterritorially, where the plaintiff is a nonresident, and the alleged acts of sexual abuse were perpetrated by a nonresident outside of New York." *Id.* at 188–90.

Put simply, revival statutes cannot serve as vehicles for boundless, forum-indifferent litigation. Insofar as the CVA is construed to reach Plaintiffs' sprawling non-Maryland-based claims asserted in this litigation, it violates due process.

## II.    The Child Victims Act Violates the Ex Post Facto Clause

Application of the CVA here would be unconstitutional for an additional reason as well: it would violate the Ex Post Facto Clause. A statute violates the Ex Post Facto Clause where it imposes or enhances punishment for an act compared to when the act was committed or alters the rules of evidence so as to require less or different evidence to impose liability. *See* U.S. Const. art. I, § 9, cl. 3; U.S. Const. art. I, § 10, cl. 1; *Calder* v. *Bull*, 3 U.S. 386, 390–91 (1798) (opinion of Chase, J.).

Under existing Supreme Court precedent, the CVA is unconstitutional because it is punitive in effect as applied to Defendants for three main reasons. *First*, it revived, in 2023, claims against Defendants that had all expired by the late 1990s even though the legislature had expressly declined to do so in 2003 and again in 2017. *Second*, the CVA revived respondeat superior claims predicated on the alleged *criminal* sexual conduct of third-party perpetrators. *Third*, the CVA is punitive because it imposes reputational harm and loss of standing in the community.

Alternatively, the CVA is unconstitutional under the original meaning of the Ex Post Facto Clause because it retroactively increases the punishment for a public wrong. The public wrong is the sexual abuse of children, defined in the CVA to encompass any "sexual conduct that is a *crime*" and therefore prosecuted by the public. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-117 (emphasis added). The retroactive increase in punishment is the coercive penalty—a deprivation of property by way of monetary damages.

### A.    The CVA Violates the Ex Post Facto Clause Under Existing Supreme Court Precedent Because It Is Punitive In Nature and Retroactive

The Supreme Court has explained that a retroactive statute labeled "civil" violates the Ex Post Facto Clause, just as any retroactive criminal statute would, if its effects are punitive in nature. *Smith* v. *Doe*, 538 U.S. 84, 92 (2003). To determine whether a statute's effects are punitive in nature, courts apply a two-step inquiry. *Id. First*, courts analyze the statutory text and context to determine whether the legislature intended to impose punishment. *Ellingburg* v. *United States*, 607 U.S. 163, 165–67 (2026). If so, "that ends the inquiry." *Id*. at 168. *Second*, even if the legislature did not intend to impose punishment, the court must then determine whether the statute's effects are "so punitive" as to override that intent. *Smith*, 538 U.S. at 92; *see also Kennedy* v. *Mendoza-Martinez*, 372 U.S. 144, 168–69 (1963).

18

### 1.    *The CVA Is Punitive In Nature*

Courts employ a seven-factor test to evaluate whether a civil statute is punitive in effect: (1) whether the sanction imposes an "affirmative disability or restraint," such as a prohibition or restriction on an individual's movement; (2) whether it has historically been regarded as punishment; (3) whether it requires a finding of scienter; (4) whether it promotes retribution or deterrence; (5) whether it applies to behavior that is already criminal; (6) whether a non-punitive purpose can rationally be assigned; and (7) whether the sanction is excessive in relation to that purpose. *Kennedy*, 372 U.S. at 168–69. These factors are "neither exhaustive nor dispositive" but rather are guideposts in determining a statute's effect. *Smith*, 538 U.S. at 97.

Here, at least six factors compel the conclusion that the CVA is punitive in effect as applied in this case, such that its retroactive effects violate the Ex Post Facto Clause.

*First*, the conduct to which the CVA is expressly tethered has long been understood as the proper subject of criminal punishment (factor 2). The statute is triggered only by conduct the Maryland legislature has defined by reference to paradigmatic criminal sexual offenses, including rape, incest, sexual offenses in any degree, and "other sexual conduct that is a crime." *See* Md. Code Ann., Cts. & Jud. Proc. § 5-117(a). Those offenses have long been treated as criminal offenses prosecuted and punished by the State. *See Wentz* v. *State*, 150 A. 278, 279 (Md. 1930); *Cranford* v. *State*, 373 A.2d 984, 988 (Md. 1977) ("It is well settled that unlawful sexual intercourse . . . constitutes the common-law felony of rape."). When a statute singles out conduct that has always borne a distinctly criminal character, the statute operates less like an ordinary civil remedial measure and more like an additional mechanism for imposing consequences for conduct long understood to warrant punishment. In that sense, the CVA extends the State's punitive response to offenses that have been viewed as punishable for centuries, reinforcing the conclusion that its effect is punitive rather than merely regulatory or compensatory.

*Second*, the CVA requires a finding of scienter (factor 3).  Liability under the CVA turns on whether the plaintiff proves that "sexual abuse" occurred.  Md. Code Ann., Cts. & Jud. Proc. § 5-117(a) (2023).  A finding of scienter makes a statute appear more punitive because of the close relationship between scienter and punishment.  *See NFIB* v. *Sebelius*, 567 U.S. 519, 566 (2012) ("[S]cienter requirements are typical of punitive statutes, because Congress often wishes to punish only those who intentionally break the law."); *see also Scienter*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("[T]he fact of an act's having been done knowingly, esp. as a ground for civil damages or criminal punishment.").  As noted, the statute defines "sexual abuse" by reference to a list of criminal sexual offenses that by their nature involve intentional or knowing wrongdoing by the perpetrator.  *See*, *e.g.*, *Berry* v. *State*, 2019 WL 360147, at *8 (Md. Jan. 29, 2019) (a fourth-degree sexual offense requires "intentional touching").

*Third*, by reviving otherwise time-barred claims decades after the alleged abuse, the CVA functions as retribution for past conduct (factor 4).  The punitive effect is especially pronounced where, as here, the statute eliminates the limitations period entirely and reopens liability long after the legislature previously determined that enforcement was no longer appropriate.  In *Does #1-5* v. *Snyder*, the Sixth Circuit held that Michigan's Sex Offenders Registration Act ("SORA") violated the Ex Post Facto Clause where the statute retroactively required convicted sex offenders to register on a public database, report in person to law enforcement, and comply with restrictions barring them from living, working, or loitering near a school.  834 F.3d 696, 697–98, 706 (6th Cir. 2016).  The court recognized that this nominally civil statute actually operated to advance the traditional aims of punishment because its operation was backward-looking and untethered to any individualized assessment of present risk.  *Id.* at 704.  The court emphasized that SORA was "retributive in that it looks back at the offense (and nothing else) in imposing its restrictions."  *Id.*

20

The Sixth Circuit also stressed the reputational impact of SORA in determining that it imposes punishment, explaining that SORA "brands registrants as moral lepers" and "consigns them to years, if not a lifetime, of existence on the margins." *Id.* at 705.

The same logic applies here. Like SORA, the CVA does not condition liability on any present finding of dangerousness or ongoing risk; it looks exclusively to punish past conduct and imposes consequences—both monetary and reputational—solely on that basis. And just as SORA's professed purpose of deterring recidivism was undermined by "scant support" that the statute actually accomplished that goal, the CVA's revival of decades-old claims can claim only a tenuous connection to any forward-looking regulatory objective. *See Snyder*, 834 F.3d at 704. Indeed, the legislature's stated objectives—rooting out systemic abuse in Maryland and allowing victims to confront their abusers—are not served here, as Defendants are not abusers and neither Plaintiffs nor Defendants are Maryland residents. *See Roman Cath. Archbishop of Washington*, 330 A.3d at 1098–99 (explaining the objectives of the CVA). Rather, by reopening long-expired claims based solely on historical conduct, the statute operates in a manner that is inherently retributive. The CVA's wholesale elimination of the statute of limitations for claims that the legislature repeatedly deemed too stale to pursue strongly suggests that the statute's operative purpose is not to regulate prospective conduct but to exact a retrospective penalty.

*Fourth*, the CVA applies exclusively to behavior that is criminal (factor 5). The statute defines "sexual abuse" solely by reference to criminal offenses—production of child sex-abuse materials, incest, rape, sexual offense in any degree, and "[a]ny other sexual conduct that is a crime." Md. Code Ann., Cts. & Jud. Proc. § 5-117(a). Unlike an ordinary tort action for assault or battery—which permits civil liability based on a broader range of non-criminal conduct—the CVA conditions liability on a determination that the defendant or its employee committed specific

21

criminal acts. *Compare Ghassemieh* v. *Schafer,* 447 A.2d 84, 88 (Md. App. 1982) ("[H]orseplay, pranks, or jokes can be a battery."), *with* Md. Code Ann., Cts. & Jud. Proc. § 5-117(a)(5). By tethering civil liability to criminal conduct, the CVA goes well beyond traditional tort law and functions to punish past crimes or the past crimes of a defendant's employee under the guise of a civil remedy.

*Fifth*, a non-punitive purpose cannot be rationally assigned to the CVA as applied here (factor 6). The plain text of the statute reflects the General Assembly's decision to impose a monetary sanction only for claims arising from criminal sexual offenses. Rather than reviving a broad category of civil claims based on private injury, the statute singles out claims tied to conduct the legislature expressly defined by reference to criminal law, including rape, sexual offenses, and other criminal sexual misconduct. Md. Code Ann., Cts. & Jud. Proc. § 5-117(a). By tethering civil liability to criminal conduct, the statute can only be rationally understood as punitive in nature.

*Sixth*, the application of the CVA here is excessive (factor 7). The statute permits adjudication of claims based on alleged abuse dating back to 1981—nearly *40 years* before this action was filed. The sole nonparty witnesses identified as having contemporaneous, albeit secondhand, knowledge of the central 1982–1983 notice event—Sammartino, Graham, and Mr. McMahon, Sr.—are all deceased, leaving no one to corroborate Mr. McMahon's denial. Plaintiffs will no doubt endeavor to vigorously challenge Mr. McMahon's credibility and denial that he had prior knowledge, *see generally* AC ¶¶ 40–42, 115–160, while Defendants are unable to press Sammartino and Graham about their secondhand accusations. As to the underlying abuse, Plaintiffs allege that the principal witnesses were other "ring boys" but do not name them and provide no facts suggesting they can now be identified. Given the informal nature of their alleged

22

work, the absence of employment records, and the passage of decades, those purported witnesses are likely unavailable.  A statutory scheme that predictably requires adjudication based on evidence so eroded by time is excessive in relation to any civil regulatory purpose and operates as punishment in practice.  Taken together, the *Mendoza-Martinez* factors confirm that the CVA is punitive in effect and thus triggers the protections of the Ex Post Facto Clause.  *See Snyder*, 834 F.3d at 706.

### 2.    The CVA's Retroactive Application Violates the Ex Post Facto Clause

Because the CVA is punitive in nature and therefore subject to the Ex Post Facto Clause, it violates the Constitution if it applies retroactively, within the scope of the categories identified in Justice Chase's leading opinion in *Calder*, 3 U.S. at 390–91.  The relevant categories include statutes that:  (1) aggravate an offense or enhance its punishment, compared to when the crime was committed; or (2) alter the legal rules of evidence so as to require less or different evidence to impose liability.  *Id.*  The CVA does both.

As to the first *Calder* category, the CVA enhances punishment because at the time of the alleged misconduct, Defendants could not have been civilly liable after the year 1998 at the very latest (even assuming Plaintiffs could overcome the challenges in proving vicarious liability).  Nor could Defendants have anticipated such liability because they cooperated with a full-scale federal criminal investigation and neither they nor Phillips, Garvin, or Patterson were ever charged.  Because the CVA extends the window of potential liability to the present and beyond, the CVA enhances punishment for the alleged misconduct compared to the punishment to which Defendants were exposed at the time the alleged misconduct occurred.

As to the second *Calder* category, the CVA retroactively alters the quantum of evidence deemed sufficient to impose liability.  As the Supreme Court in *Stogner* explained, a statute of limitations reflects a legislative judgment that after a certain amount of time has passed, no

quantum of evidence can justify punishment.  539 U.S. at 615 (holding that California's law permitting prosecution for child sexual abuse within one year of the victim's report to police, as applied to offenses whose prosecution was time-barred at the time of the law's enactment, violated the Ex Post Facto Clause).  By retroactively eliminating that bar, the CVA necessarily lowers the evidentiary threshold for imposing liability.

Applied here—approximately 40 years after the alleged conduct—the CVA strips Defendants of the protections against stale claims that the legislature originally deemed essential. It is clear from the face of the pleadings that the detrimental impact of the loss of such protections is not merely hypothetical.  Witnesses are unavailable, memories have faded, and documentary evidence no longer exists, rendering a meaningful defense today exceedingly difficult, if not impossible, to muster.

**B.     Independently, the Ex Post Facto Clause Should Apply to Retroactive Civil Laws, Including the CVA**

In early cases applying the Supreme Court's interpretation of the Ex Post Facto Clause in *Calder*, the Supreme Court generally treated the Clause as applying only to retroactive criminal, not civil, laws.  *See Calder*, 3 U.S. at 389–91 (opinion of Chase, J.); *see, e.g.*, *Carpenter* v. *Com. of Pa.*, 58 U.S. 456, 461 (1854) (interpreting *Calder* to hold that it does not generally apply to civil laws);  *League* v. *State of Texas*, 184 U.S. 156, 161 (1902) (similar).  As has been increasingly recognized since *Calder*, however, that rule is misguided.  *See Ellingburg*, 607 U.S. at 178–86 (Thomas, J., concurring).[8]

Constitutional interpretation requires ascertaining the original public understanding of the language in the constitutional provision at issue.  *See, e.g.*, *N.Y. Rifle & Pistol Ass'n, Inc.* v. *Bruen*,

---

[8] Recognizing that *Calder* and its progeny are binding on this Court, Defendants raise these points for preservation purposes only.

597 U.S. 1, 25 (2022).  At the time of the Founding, the term "ex post facto" was used to refer broadly to *all* retroactive laws, both civil and criminal alike.  *See* Evan C. Zoldan, *The Civil Ex Post Facto Clause*, 2015 Wis. L. Rev. 727, 744–49 (2015); Oliver P. Field, *Ex Post Facto in the Constitution*, 20 Mich. L. Rev. 315, 319–20 (1922).  In debates at the Constitutional Convention, the Framers used the terms "ex post facto" and "retrospective" interchangeably and did not draw a civil–criminal distinction.  Field, *supra*, at 319–20.  Founding-era sources also used the terms "ex post facto" and "retrospective" interchangeably and applied the concept to civil disputes affecting property, debt, and other private rights.  Zoldan, *supra*, at 731–32, 757–71.  The historical record thus directly undermines any criminal-only limitation.  *Ellingburg*, 607 U.S. at 177–86 (Thomas, J., concurring).

In light of this historical evidence, members of the Supreme Court have recognized that the Supreme Court's modern articulations of the scope of Ex Post Facto protections have unduly limited the reach of the Clause to criminal statutes.  In *Ellingburg*, Justice Thomas, joined by Justice Gorsuch, explained that the Clause's original meaning encompasses *all* retroactive laws that "impose coercive penalties for public wrongs"—regardless of whether the legislature labels those laws civil or criminal.  *Id.* at 169, 182.  *Calder*'s reference in 1789 to "criminal punishment" did not draw a rigid, formalistic line between civil and criminal.  *Id.* at 176–82.  Properly understood through the lens of *Calder*, the Ex Post Facto Clause prohibits retroactive laws that impose coercive penalties for public wrongs.  *Id.* at 182–84.

Justice Thomas has further criticized the modern ex post facto framework for departing from the best reading of *Calder* and placing undue weight on legislative labels and semantics, an approach that allows legislatures to evade constitutional scrutiny simply by rebranding punitive

25

schemes to evade constitutional scrutiny. *Id.* at 176–78; *accord Burgess* v. *Salmon*, 97 U.S. 381, 385 (1898). That danger is not hypothetical; it is precisely what is at issue here.

In enacting the CVA, the sovereign (i.e., the State of Maryland) has deputized private litigants to act as enforcers to vindicate what the State has identified as a public wrong—the crime of sexual abuse of children—and to do so retroactively. *See Robertson* v. *United States ex rel. Watson*, 560 U.S. 272, 279 (2010) (Roberts, C.J., dissenting). Consistent with that aim, the CVA authorizes coercive sanctions by imposing compulsory monetary liability that deprives defendants of property through the exercise of state power. The fact that liability is imposed through a civil cause of action does not alter the constitutional reality that the State has authorized retroactive punishment for a public wrong. *Ellingburg*, 607 U.S. at 180 ("A single act could be both a private wrong and a public wrong."). In other words, the sovereign defines the offense, selects the class of conduct to be sanctioned, and authorizes liability for past acts long deemed beyond reach. The resulting scheme falls squarely within the historical core of the Ex Post Facto Clause and cannot be imposed retroactively. Yet this is exactly what the CVA does.

Beyond the persuasive historical evidence of how the Ex Post Facto Clause originally was understood, the core justifications for the Ex Post Facto Clause confirm that it applies in the civil context. *First*, the Clause exists to ensure fair notice and legal stability so that individuals may conform their conduct to the law. *United States* v. *Ramirez*, 846 F.3d 615, 623 n.7 (2d Cir. 2017) ("[T]he principle of fair notice . . . undergirds *ex post facto* jurisprudence."); Jane H. Aiken, *Ex Post Facto in the Civil Context: Unbridled Punishment*, 81 Ky. L.J. 323, 329 (1993). *Second*, it exists to prevent "arbitrary and potentially vindictive legislation." *Stogner*, 539 U.S. at 611, *see also* Aiken, *supra* at 330. Those protections are no less necessary when the legislature imposes severe civil consequences than when it imposes criminal ones.

26

The CVA offends both principles.  By retroactively abolishing limitations periods entirely and reopening decades-old claims, the CVA has destroyed fair notice, upended reliance on a stable and predictable regime, and deprived defendants of any realistic ability or expectation to preserve evidence or mount a defense years after the claims' expiration.  *See Stogner*, 539 U.S. at 611. Forcing Defendants to litigate allegations that they reasonably expected were long ago put to rest creates an extreme and unjust disadvantage—the precise evil that the Ex Post Facto Clause was designed to prevent.  And the risk of legislative vindictiveness is no less acute merely because liability proceeds through a civil action.

*    *    *

In sum, the CVA cannot be applied to Plaintiffs' claims here, consistent with the Constitution.

**CONCLUSION**

The motion for judgment on the pleadings on all claims should be granted.

Dated: May 21, 2026                               Respectfully submitted,
New York, New York

> **PAUL, WEISS, RIFKIND, WHARTON &**
>     **GARRISON LLP**
>
> */s/ Gregory F. Laufer*
> Daniel J. Toal (*pro hac vice*)
> Richard C. Tarlowe (*pro hac vice*)
> Gregory F. Laufer (*pro hac vice*)
> Emily A. Vance (*pro hac vice*)
> 1285 Avenue of the Americas
> New York, NY  10019-6064
> Tel: (212) 373-3000 | Fax: (212) 757-3990
> dtoal@paulweiss.com
> rtarlowe@paulweiss.com
> glaufer@paulweiss.com
> evance@paulweiss.com

27

**GOODELL, DEVRIES, LEECH & DANN, LLP**

/s/ Sean Gugerty
Linda S. Woolf (Federal Bar No.: 08424)
K. Nichole Nesbitt (Federal Bar No.: 26137)
Sean Gugerty (Federal Bar No.: 21125)
One South Street, 20th Floor
Baltimore, MD  21202
Tel: (410) 783-4000 | Fax: (410) 783-4040
lsw@gdldlaw.com
knn@gdldlaw.com
sgugerty@gdldlaw.com

*Attorneys for World Wrestling Entertainment, LLC and TKO Group Holdings, Inc.*

/s/ Jessica T. Rosenberg
Jessica T. Rosenberg (*pro hac vice*)
jrosenberg@akingump.com
Ilana Roberts (*pro hac vice*)
iroberts@akingump.com
(signed with permission of Ilana Roberts)
Akin Gump Strauss Hauer Feld LLP
One Bryant Park
New York, NY  10036
Tel: (212) 872-1012 | Fax: (212) 872-1002

John A. Bourgeois
jbourgeois@kg-law.com
Christopher C. Jeffries
cjeffries@kg-law.com
Kramon & Graham, P.A.
750 East Pratt Street, Suite 1100
Baltimore, MD  21202
Tel: (410) 347-7408 | Fax: (410) 361-8204

*Counsel for Vincent K. McMahon*

/s/ Samantha Miller Kavanagh
William J. Murphy (Federal Bar No.: 00497)
wmurphy@zuckerman.com
Samantha Miller Kavanagh
skavanagh@zuckerman.com

28

(signed with permission of William J. Murphy)
Zuckerman Spaeder LLP
100 E. Pratt Street, Suite 2440
Baltimore, MD  21202
Tel: (410) 332-0444 | Fax: (410) 659-0436

Laura A. Brevetti (*pro hac vice*)
Laura.brevetti@brevettilaw.com
Law Offices of Laura A. Brevetti
575 Lexington Avenue, 14th Floor
New York, NY  10022
Tel: (917) 970-0250

*Counsel for Linda McMahon*

29