**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| JOHN DOE 1, et al., | Civil Action No. 1:24-cv-3487 |
| Plaintiffs, | Hon. James K. Bredar |
| v. | |
| WORLD WRESTLING ENTERTAINMENT, LLC, et al., | **HEARING REQUESTED** |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 1

II.   FACTUAL BACKGROUND............................................................................... 4

III.  PROCEDURAL HISTORY.................................................................................. 7

IV.   LEGAL STANDARD........................................................................................... 8

V.    ARGUMENT ....................................................................................................... 9

      A.    The Child Victims Act Does Not Violate Due Process. ......................................... 9

           1.    The CVA is rationally related to Maryland's legitimate interest in giving child victims access to remedies later in life. ................................ 10

           2.    Defendants fail to sufficiently identify special hardships or oppression. . 12

           3.    Boilerplate rationales for limitations periods are insufficient and discovery will determine what evidence is available................................ 13

           4.    Defendants have no constitutionally protected right to spoliate evidence and had plenty of incentive to preserve evidence. .................................... 15

           5.    The CVA is not being applied extraterritorially: Plaintiffs were abused in Maryland and only seek redress for those incidents. ............................ 19

      B.    The CVA Does Not Violate the Ex Post Facto Clause........................................ 20

           1.    The CVA is remedial, not punitive........................................................... 20

           2.    No punitive effect overwhelmingly negates Maryland's remedial intentions................................................................................................. 23

           3.    The CVA passes the Thomas/Gorsuch test proposed in *Ellingburg*, since it allows private parties to seek redress for private wrongs under 18th-Century common-law understandings. ............................................. 28

VI.   CONCLUSION................................................................................................... 30

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. S.U.*,
298 A.3d 573 (2023) ..................................................................................................13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................................................................................................8

*Bernard v. Cosby*,
648 F.Supp.3d 558 (D.N.J. 2023) ........................................................................22, 23

*C P v. Soc'y for Roman Cath. Diocese of Lake Charles*,
No. 2:24-CV-01615, 2025 WL 662821 (W.D. La. Feb. 28, 2025)..........................23

*Calder v. Bull*,
3 U.S. 386 (1798)............................................................................................ *passim*

*Campbell v. Holt*,
115 U.S. 620 (1885)...........................................................................................2, 9, 24

*Chase Secs. Corp. v. Donaldson*,
325 U.S. 304 (1945)...........................................................................................2, 9, 25

*Conner v. Cleveland Cnty., N. Carolina*,
22 F.4th 412 (4th Cir. 2022) .......................................................................................8

*DeLonga v. Diocese of Sioux Falls*,
329 F. Supp. 2d 1092 (D.S.D. 2004) .........................................................................22

*Does #1-5 v. Snyder*,
834 F.3d 696 (6th Cir. 2016) .....................................................................................27

*Does 1-7 v. Abbott*,
945 F.3d 307 (5th Cir. 2019) .....................................................................................27

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) .......................................................................................8

*Ellingburg v. United States*,
607 U.S. 163 (2026)........................................................................................ *passim*

*FCC v. Beach Comms., Inc.*,
508 U.S. 307 (1993)...................................................................................................12

*Foresman v. Foresman*,
    156 Hawai'i 128 (2025)......................................................................................................22

*Gen. Motors Corp. v. Romein*,
    503 U.S. 181 (1992)………………………………………………………………….10

*Giarratano v. Johnson*,
    521 F.3d 298 (4th Cir. 2008) ............................................................................................12

*Grice v. Colvin*,
    97 F. Supp. 3d 684 (D. Md. 2015)....................................................................................13

*Huff v. Att'y Gen. of Va.*,
    No. CIV. A. 3:07CV744, 2008 WL 4065544 (E.D. Va. Aug. 26, 2008), *aff'd*,
    323 F. App'x 293 (4th Cir. 2009) .....................................................................................23

*Kansas v. Hendricks*,
    521 U.S. 346 (1997)....................................................................................................20, 23

*Kennedy v. Mendoza-Martinez*,
    372 U.S. 144 (1963)..........................................................................................................24

*L.N.P. v. Kijakazi*,
    64 F.4th 577 (4th Cir. 2023) ..............................................................................................8

*Landholt v. Corley*,
    149 F.4th 486 (4th Cir. 2025) ..........................................................................................11

*Lundeen v. Canadian Pac. R. Co.*,
    532 F.3d 682 (8th Cir. 2008) ...........................................................................................26

*Moore v. Maryland Hemp Coal.*,
    343 A.3d 624 (2025)..........................................................................................................10

*Nat'l Ass'n for Rational Sexual Offense L. v. Stein*,
    112 F.4th 196 (4th Cir. 2024) ..............................................................................20, 24, 28

*O.M. v. Calvary Chapel Int'l Worship Ctr.*,
    No. CV EA-25-2618, 2026 WL 1107740 (D. Md. Apr. 23, 2026)....................................18

*PC-41 Doe v. Poly Prep Country Day Sch.*,
    590 F. Supp. 3d 551 (E.D.N.Y. 2021) ..............................................................................12

*Roman Cath. Archbishop of Washington v. Doe*,
    330 A.3d 1069 (2025)............................................................................................ *passim*

*Roman Cath. Bishop of Oakland v. Superior Ct.*,
    128 Cal. App. 4th 1155 (2005) .........................................................................................21

*S.C. Educ. Ass'n v. Campbell*,
  883 F.2d 1251 (4th Cir. 1989) ................................................................10

*Shadburne-Vinton v. Dalkon Shield Claimants Tr.*,
  60 F.3d 1071 (4th Cir. 1995) ..............................................................9, 10

*Sheehan v. Oblates of St. Francis de Sales*,
  15 A.3d 1247 (Del. 2011) ...........................................................16, 22, 26

*Smith v. Doe*,
  538 U.S. 84 (2003)........................................................................20, 28

*Stogner v. California*,
  539 U.S. 607 (2003)......................................................................13, 22

*Temple-Inland, Inc. v. Cook*,
  192 F. Supp. 3d 527 (D. Del. 2016)............................................................4

*In re World Wrestling Consol. Entm't, Inc. Merger Litig.*,
  C.A. No. 2023-1166-JTL (Del. Ch. May 26, 2026)..........................................3, 15

**Statutes**

Md. Code Ann., Cts. & Jud. Proc. § 5-117 ............................................... *passim*

2023 Md. Laws ch.5 (S.B. 686)..............................................................21

**Other Authorities**

U.S. Const., Ex Post Facto Clause ....................................................... *passim*

U.S. Const. Fifth Amendment...............................................................13, 28

U.S. Const. Fourteenth Amendment ...................................................2, 9, 28, 28

Fed. R. Evid. 801(d)(2) ......................................................................17

Fed. R. Evid. 804(b)(1) ...................................................................17-18

Maryland Constitution .......................................................................11

Fed. R. Civ. P. 5.1...........................................................................8

Fed. R. Civ. P. 12...........................................................................8

3 Blackstone 120.............................................................................30

## I.    INTRODUCTION

Mel Phillips exploited his public-facing job to groom, abuse, and prey on children in connection with Defendants' wrestling events. As World Wrestling Entertainment's ("WWE") announcer and ring crew chief, he used his prominent position as bait, offering, among other things, jobs, backstage access, wrestler meet-and-greets, and travel to underaged fans of wrestling, known as Ring Boys. FAC ¶¶ 1-3.[1] Phillips's unnatural attraction to children was known throughout the company. Defendants did nothing to protect the Ring Boys.

When Plaintiffs were children, Phillips lured them to WWE events in Maryland and sexually molested them in venues and hotel rooms during WWE tours. *Id*. ¶¶ 3-4, 329. WWE co-founders Vince McMahon and Linda McMahon knew Phillips had a "peculiar and unnatural interest" in young boys—Vince McMahon's own words—but did nothing to stop him. FAC ¶¶ 2, 44, 48.

Like most sexual assault survivors, the Ring Boys' fear of reprisal and never-ending shame and guilt kept them in silence, suffering alone. Any potential legal recourse was not on the radar of the Ring Boys in the 1980s and 1990s; the pain and trauma was theirs and theirs alone. Their claims lapsed before they had the healing and wherewithal to demand accountability.

Then in 2023, the State of Maryland determined that the statute of limitations for torts involving childhood sexual abuse was out of step with the science on long-term trauma, including expert testimony Johns Hopkins doctors on research showing that most survivors of child sexual abuse delay disclosing their abuse until years and even decades after it occurred. Maryland's Child Victims Act of 2023 ("CVA"), Md. Code Ann., Cts. & Jud. Proc. § 5-117, eliminated the statute of limitations for civil suits involving child sexual abuse and revived lapsed claims. In February

---

[1] Plaintiffs' Corrected First Amended Complaint ("FAC"), ECF No. 55.

2025, the Maryland Supreme Court upheld the constitutionality of the CVA under Maryland's constitution. *Roman Cath. Archbishop of Washington v. Doe*, 330 A.3d 1069, 1073 (2025).

Now, Defendants claim the CVA, as applied to them, violates the U.S. Constitution. They argue it violates Fourteenth Amendment due process because evidence is either stale or spoliated by Defendants. They claim it violates the Ex Post Facto Clause because it is punitive in effect.

Not so. The U.S. Supreme Court has long held that statutes reviving lapsed civil limitations periods *do not violate* due process. *See Campbell v. Holt*, 115 U.S. 620, 628 (1885) (holding "no right is destroyed when the law restores a remedy which had been lost."); *Chase Secs. Corp. v. Donaldson*, 325 U.S. 304, 316 (1945) (upholding *Campbell*). Defendants' due process arguments fail for three main reasons.

*First*, Defendants invoke generic, boilerplate rationales for time limitations. But those standard tropes do not present particularized hardships that could potentially override Maryland's legitimate interests in revival. At the outset, Defendants' claims of hearsay and insufficient proof are summary judgment issues that first require discovery in this case. Defendants want this Court to rule they cannot possibly win at trial, and are thus denied due process, before a single document has been produced or witness deposed.[2] Such a finding cannot be made from the pleadings alone, and a Rule 12(c) motion cannot look beyond the pleadings.

Regardless, it is clear from the allegations and public record that evidence remains available. Yes, some witnesses are now deceased. But dozens of current and former WWE employees are still alive, and likely to lead to relevant evidence. More importantly, the individual Defendants and Plaintiffs are alive with memories. Contemporaneous statements are in the public record and can be offered as opposing party statements or for the non-hearsay purpose of proving

---

[2] When summary judgment is briefed later in this case, Defendants will no doubt argue the opposite—that Plaintiffs cannot possibly win at trial and a defense verdict is inevitable.

state of mind. There is also deposition testimony that is admissible, quoted in the Complaint, from a defamation suit prosecuted by Defendants. *See*, *e.g.*, FAC ¶¶ 16, 48, 51-55. But these are matters for discovery and summary judgment. The broader point is this: Plaintiffs ultimately have the burden of proof, not Defendants. So, a purported dearth of evidence prejudices Plaintiffs above all. Evidence Defendants have not yet destroyed would, more likely than not, be inculpatory, rather than exculpatory.

*Second*, Defendants' seeming admission that they spoliated evidence is not a constitutional defense. ECF No. 93-1 ("Mot.") at 12. Spoliation appears to be a common practice among WWE executives, as Vince McMahon was recently sanctioned for such conduct by the Delaware Court of Chancery. *In re World Wrestling Consol. Entm't, Inc. Merger Litig.*, C.A. No. 2023-1166-JTL (Del. Ch. May 26, 2026). Here, Plaintiffs allege that Defendants engaged in cover-up tactics, from hush-payments to witness intimidation—and destroying evidence would be consistent with that pattern. *See*, *e.g.*, FAC ¶¶ 48, 99-108, 112. If indeed Defendants destroyed evidence, this should be probed in discovery, not now in a motion on the *pleadings*. And more fundamentally, Defendants cannot leverage the possibility of their own misconduct to prejudice Plaintiffs.

*Third*, Defendants' attempt to relitigate personal jurisdiction—long after this Court already decided that issue—is both improper and moot. *See* December 10, 2025 Memorandum Order, ECF No. 66 at 22-30, 37-39. But Defendants are simply mistaken – the CVA is *not* being applied extraterritorially in this case. Plaintiffs only seek damages for harassment and abuse in Maryland. FAC ¶ 327. Where out-of-state conduct *is* alleged, it's for separate reasons: proving Defendants' state of mind and knowledge of the perpetrators' misconduct.

*Finally*, the Ex Post Facto Clause does not apply because that Clause governs punitive statutes, not remedial civil measures like the CVA, which is a limitation that the Supreme Court

has reaffirmed for over two centuries. *Calder v. Bull*, 3 U.S. 386, 390–91 (1798); *Temple-Inland, Inc. v. Cook*, 192 F. Supp. 3d 527, 552 (D. Del. 2016). Defendants admit that *Calder* and its progeny are binding here,[3] but they instead rely on Justice Thomas's non-binding concurrence in *Ellingburg v. United States*, 607 U.S. 163, 165–67 (2026) which does not help them. That concurrence merely underscores that a statute reviving private redress of private wrongs is outside the original understanding of the Ex Post Facto Clause.

The CVA is constitutional. Defendants' motion should be denied.

## II.    FACTUAL BACKGROUND

Mel Phillips, WWE's ring announcer and ring crew chief, recruited and groomed underaged boys to work for Defendants and to satisfy him sexually while on the job. FAC ¶¶ 1-3. His method of grooming and abuse was uniform and much of the process was displayed in front of dozens of WWE officials and wrestlers: Phillips would "wrestle" a boy into a submission hold, painfully manipulate the boys' feet and toes, press them against his genitals, and ejaculate. *Id*. ¶ 8-11, 50, 91, 99, 109-110, 194. One Ring Boy went public in 1992 by saying that boys were getting propositioned and played with all the time. *Id*. ¶ 99. Sometimes Phillips filmed it, and it was known throughout WWE that he had a foot fetish and underaged boys traveling with him. *Id*. ¶¶ 5, 50, 91, 113, 142, 193, 196.

Phillips sexually assaulted each of the Plaintiffs in Maryland. WWE held hundreds of shows in the state—in Baltimore, Landover, Salisbury—and Vince McMahon attended many of them, while also taping about 100 episodes of a TV program in Owings Mill, Maryland in connection with WWE's wrestling events. *Id*. ¶¶ 329-333, 336. When John Doe 1 was a minor, Phillips drove him to Baltimore for a WWE event, took him and three other boys to a hotel where

---

[3] Mot. at 24 n.8.

they met wrestlers, stripped them, wrestled them, and molested them. *Id*. ¶¶ 184-185. When John Doe 2 performed Ring Boy duties at numerous WWE events from approximately 1984-1989 in multiple states including Maryland, Phillips sexually abused him and other boys in connection with those events, including painfully clenching his penis and videotaping the abuse. *Id*. ¶¶ 192-196, 200-201, 203. Phillips sexually abused John Doe 3 in Maryland, including giving him drinks that made him light-headed and abusing him afterwards. *Id*. ¶¶ 212-215. Phillips took John Doe 4 and John Doe 5 to the Capital Centre in Landover, got them drunk, and assaulted them at a local motel. *Id*. ¶¶ 222, 244-47.

Phillips transported John Doe 6 to a Baltimore show on July 14, 1989, after Vince and Linda McMahon had fired Phillips for his carousing with young boys but then re-hired him. Linda McMahon entered the dressing room that night, looked directly at Doe 6, and summoned Vince McMahon to leave with her. Phillips brought him back to his hotel, sexually abused him, then sent him to the room of WWE employee Pat Patterson, who plied him with alcohol and forced him to perform oral sex. *Id*. ¶¶ 14, 264–266. John Doe 7 attended WWE events at the Baltimore Civic Center and Phillips abused him in Baltimore hotel rooms, forcing him into oral sex and genital fondling. Vince McMahon, wrestlers, and other executives ate breakfast with Phillips and Doe 7 at those hotels and directed Doe 7 to carry wrestlers' luggage. *Id*. ¶¶ 282-288. Phillips met John Doe 8 at the Baltimore Civic Center in 1982, took him to a hotel, made him undress, and forced his feet onto Phillips' erect penis. Vince McMahon attended the Baltimore show and inspected the ring while Doe 8 was in plain sight, along with wrestlers and other executives. *Id*. ¶¶ 293–300.

Defendants knew. Vince McMahon personally admitted to journalist Phil Mushnick (alive today)[4] that he and Linda McMahon knew of Phillips' "peculiar and unnatural interest" in boys

---

[4] https://nypost.com/author/phil-mushnick/.

and fired him for it in 1988—only to rehire him six weeks later with the caveat that he steer clear from kids. *Id*. ¶¶ 44-45, 48. He did not.

WWE executives and wrestler after wrestler said the same thing. *Id*. ¶¶ 61-68. Jake Roberts (alive today):[5] "It was all true" and it made him "sick." *Id*. ¶ 64A. Marty Jannetty (alive today)[6] said it was known that Phillips liked young boys and "was a freak for feet." *Id*. ¶ 64F. Shane Douglas (alive today)[7] watched Phillips, from across an airplane aisle, engage in a sexual act with a young boy under a blanket during a flight. *Id*. ¶ 64G. Bret Hart (alive today)[8] said Phillips was "a total pedophile" who refused to hire boys who would not comply with his sexual demands. *Id*. ¶ 65. Ring crew worker Tony Chimel (alive today)[9] told John Doe 6 to "run." *Id*. ¶ 256.

Despite their knowledge, Defendants failed to adopt basic safety measures to protect the Ring Boys. Multiple employees complained to WWE executives including Vince McMahon about Phillips traveling with underaged boys; no meaningful action followed. *Id*. ¶ 63. WWE continued to provide Phillips with private dressing rooms at venues, continued to pay Ring Boys as WWE labor, and continued to allow Phillips unsupervised access to children at shows and hotels across the country, including in Maryland. *Id*. ¶¶ 5, 26. This was the product of an organization whose leadership was itself engaged in and acquiescing to the same conduct. Executives Garvin and Patterson were abusing Ring Boys, including some of the Plaintiffs, and propositioning wrestlers and referees for sexual favors—conduct so brazen that former wrestlers described being solicited and assaulted in elevators and locker rooms. *Id*. ¶¶ 67-68, 75-76, 80-86. Vince McMahon himself has been accused of sexual misconduct for decades. *Id*. ¶¶ 115-143. All of which created within

---

[5] https://www.facebook.com/RealJakeTheSnake/.
[6] https://www.facebook.com/addiejannetty/posts/10165124587697359?ref=embed_post.
[7] https://www.news4jax.com/news/local/2026/03/25/going-ringside-ep-183-shane-douglas/.
[8] https://www.facebook.com/hitmanbrethart/.
[9] https://www.fightful.com/wrestling/tony-chimel-clarifies-status-with-aew-says-he-was-not-let-go/.

WWE a culture of sexual misconduct that Vince McMahon knew or should have known about due to his own conduct and his micromanagement of the company. *Id*. ¶¶ 115-167.

And Defendants tried to cover it up. They paid Ring Boy Tom Cole $55,000 to drop his threatened suit, extracted a promise of silence, and then fired him anyway. *Id*. ¶¶ 100–107. They entered into another confidential settlement to end a lawsuit from Ring Boy Scott Hopkins. *Id*. ¶¶ 110-112. They filed a sham defamation action against the reporter who published Vince McMahon's own admissions. *Id*. ¶¶ 16, 48. They edited Phillips out of historic archival footage— including the Wrestlemania III main event—to erase him from the record. *Id*. ¶¶ 87-88. They paid Phillips upwards of hundreds of thousands of dollars when they fired him *for the second time* in 1992 and told him to go quietly. *Id*. ¶ 60. Although admitting to the media that Phillips had a foot fetish, Linda McMahon claimed it was a joke blown out of proportion. *Id*. ¶¶ 20-21. Vince McMahon has openly admitted that he will cheat and lie to protect the WWE business. *Id*. ¶¶ 157-159. Vince McMahon himself has since been charged by the SEC for hiding more than $19 million in hush-money payments to women, agreed to pay one victim $7.5 million after allegedly coercing sex and retaliating against her, and was under federal criminal investigation. *Id*. ¶¶ 118, 129, 137, 160. WWE/TKO's own annual reports disclose a Special Committee's findings and the company's ongoing financial exposure to such conduct. *Id*. ¶¶ 116-120, 139-140. And now, Defendants suggest that evidence has been spoliated. Mot. at 2.

## III.    PROCEDURAL HISTORY

Plaintiffs filed suit in Maryland state court. Defendants removed to this Court. ECF No. 1. In December 2024, the Court stayed the action pending the Supreme Court of Maryland's decision on as-applied state-constitutional challenges to the CVA. ECF No. 13. In February 2025, the Supreme Court of Maryland upheld the constitutionality of the CVA under Maryland's constitution. *Roman Cath. Archbishop of Washington*, 330 A.3d at 1073.

7

After lifting the stay, in December 2025, this Court denied Defendants' motions to dismiss for lack of personal jurisdiction and granted in part and denied in part their motions to dismiss for failure to state a claim. ECF No. 66. The Court held that Plaintiffs' negligence claims were adequately pled (with narrow exceptions), that Defendants had sufficient claim-arising contacts with Maryland, and that Maryland has a substantial interest in adjudicating childhood sexual abuse committed within its borders. *Id.* at 26. In January 2026, Defendants answered and asserted constitutional defenses. ECF Nos. 74, 75, 76. Defendants filed a Rule 5.1 constitutional notice. ECF No. 80. The Maryland Attorney General then intervened. ECF Nos. 86, 89.

## IV.    LEGAL STANDARD

The purpose of a Rule 12(c) motion is to challenge the legal sufficiency of the opposing party's pleadings. A motion under Rule 12(c) for failure to state a claim is subject to the "same standard" as a Rule 12(b)(6) motion. *Conner v. Cleveland Cnty., N. Carolina*, 22 F.4th 412, 416 (4th Cir. 2022). Courts "recount the facts as alleged by Plaintiff, accepting them as true and drawing all reasonable inferences in Plaintiff's favor." *Id*. To avoid dismissal, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[10] Judgment on the pleadings is not properly granted unless Defendants have clearly established that no material issue of fact remains to be resolved and that the plaintiff cannot prove any set of facts entitling him to relief. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999).

To prevail on an affirmative defense in a motion to dismiss—as Defendants now attempt—the defendant must show "that the plaintiff's potential [response] to the affirmative defense was foreclosed by the allegations in the complaint." *L.N.P. v. Kijakazi*, 64 F.4th 577, 586 (4th Cir.

---

[10] Unless otherwise noted, all internal citations and quotation marks have been omitted in this brief.

2023). Defendants can only succeed in those "rare circumstances" where "all facts necessary to the affirmative defense clearly appear on the face of the complaint." *Id*.

## V.       ARGUMENT

### A.       <u>The Child Victims Act Does Not Violate Due Process.</u>

The Due Process Clause of the Fourteenth Amendment provides, in pertinent part, that no state shall "deprive any person of life, liberty, or property, without due process of law." Since 1885, a long and unbroken line of cases holds that retroactively modifying civil limitations periods and reviving lapsed claims *comports with due process. See*, *e.g., Campbell v. Holt*, 115 U.S. 620, 628 (1885) (holding "no right is destroyed when the law restores a remedy which had been lost."). That dooms Defendants' due process argument right out the gate.

In 1945, the Supreme Court reaffirmed *Campbell* in *Chase Securities Corporation. v. Donaldson*, holding that statutes of limitations generally concern *remedies* rather than substantive rights and therefore may be extended or revived by a legislature without violating the Due Process Clause. 325 U.S. 304, 315-316 (1945). The case arose after Minnesota revived certain securities fraud claims that had previously become time-barred under an earlier limitations period. The Supreme Court rejected the argument that a defendant acquires a vested constitutional right in a statute-of-limitations defense, allowing the state to revive the plaintiff's claim. The Court reasoned that statutes of limitations represent a public policy about the privilege to litigate, that their "shelter has never been regarded as what now is called a fundamental right," and that they are "good only by legislative grace" and "subject to a relatively large degree of legislative control." *Id.* at 314-315. In the end, the defendant acquired no immunity or constitutional right against a change in public policy, despite its expectation that lapse of time had closed the courts to the case. *Id.* at 316.

The Fourth Circuit followed suit in *Shadburne-Vinton v. Dalkon Shield Claimants Tr.*, 60 F.3d 1071, 1074-1077 (4th Cir. 1995), holding that reviving claims by retroactively amending a

9

statute of repose does not violate due process. There, the Fourth Circuit clarified that courts "apply the rational basis test" to determine whether retroactively amending a civil statute of limitations violates due process. *Shadburne-Vinton*, 60 F.3d at 1077 (applying Fifth Amendment), *citing Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992) (applying rational basis review to state law retroactively imposing liability). To be constitutional, the retroactive statute need only be "rationally related to a legitimate legislative purpose." *Shadburne-Vinton*, 60 F.3d at 1077.

> **1.      The CVA is rationally related to Maryland's legitimate interest in giving child victims access to remedies later in life.**

Maryland's Child Victims Act, enacted in 2023, provides that "an action for damages arising out of a claim or claims of sexual abuse that occurred while the victim was a minor may be filed at any time." Md. Code, Cts. & Jud. Proc. § 5-117(b). The Act expressly revives previously time-barred claims—those that would have been barred before October 1, 2023[11]—subject to two limitations: deceased victims largely cannot bring claims, and noneconomic damages for revived claims are capped at $1,500,000 "against a single defendant" for actions filed on or before May 31, 2025, and $700,000 per single defendant if filed on or after June 1, 2025. § 5-117(c)-(d).

Under the federal rational basis standard applicable to retroactive civil legislation, the CVA easily passes muster. Indeed, a strong presumption of constitutionality attaches to acts of the Maryland General Assembly. *See Moore v. Maryland Hemp Coal.*, 343 A.3d 624, 642 (2025); *S.C. Educ. Ass'n v. Campbell*, 883 F.2d 1251, 1260 (4th Cir. 1989) (attendant to enactments of a state legislature is a strong presumption of validity and constitutionality).

---

[11] Before the CVA, Maryland generally required civil claims for childhood sexual abuse to be filed by the victim's 38th birthday. That limitations period was created by a 2017 amendment to Md. Code, Cts. & Jud. Proc. § 5-117, which gave survivors until age 38 (20 years after reaching age 18) to bring suit against perpetrators and responsible institutions. *See Roman Cath. Archbishop of Washington*, 330 A.3d at 1074-75. The 2023 CVA repealed that limitations period and expressly revived claims that had already become time-barred under the prior law, allowing survivors to file civil actions regardless of their age or when the abuse occurred.

As the Maryland Supreme Court determined, the Maryland General Assembly enacted the CVA to correct specific problems: (1) numerous child sexual abuse claims were never pursued through no fault of the victims and too often based in part on efforts of both perpetrator and non-perpetrator defendants to hide misconduct; and (2) a body of evidence that many individuals do not disclose abuse until well into adulthood but still suffer life-long issues from the abuse. *See Roman Cath. Archbishop of Washington*, 330 A.3d at 1104 (upholding the Act under the Maryland constitution).[12]  Too often, the statute of limitations for tort claims expired before child victims of sexual abuse could sufficiently recover from past traumas and assert their rights, and the prior statute of limitations did not reflect the reality of the time in which a reasonably diligent victim of child sexual abuse should be expected to pursue a claim. *Id.*

That legitimate legislative purpose was based on *evidence* that included expert testimony from doctors at the Johns Hopkins Bloomberg School of Public Health on research showing "that most survivors of child sexual abuse delay disclosing their abuse until years and even decades after it occurred." *Id.* at 1104-1105. Indeed, one study revealed that over half of survivors first disclosed their childhood sexual abuse at age 50 or older. *Id.* The evidence also included testimony that extensive research established profound, long-lasting, and sometimes lifetime-long negative effects from childhood sexual abuse, including increased risk for future health problems. *Id.* The Maryland Supreme Court concluded that "[b]ased on the evidence before the General Assembly concerning the historical prevalence of child sexual abuse, prior cover-ups, and significantly delayed reporting by victims well beyond the 20-year window provided by Subsection (d) [*i.e.*,

---

[12] This Court is bound by the Maryland Supreme Court's construction of the CVA. *Landholt v. Corley*, 149 F.4th 486, 490 (4th Cir. 2025) ("When a state's highest court interprets a statute, we are bound by the state court's interpretation. . . .")

the abrogated statute of limitations], the elimination of the statute of limitations in the 2023 Act bore a real and substantial relation to the problem being addressed." *Id.* at 1105.

So too here. These findings provide a more than adequate rational basis for the Act's retroactive provisions.[13] And here, Defendants' cover-up actions and long-standing trauma alleged in the Complaint are precisely the injustice the CVA was designed to address, by re-opening the courthouse doors. *See* FAC ¶ 24 (for decades Plaintiffs have suffered in silence from their childhood trauma).

**2.      Defendants fail to sufficiently identify special hardships or oppression.**

Defendants argue that the CVA offends due process because it revives claims that might be hard to defend after the passage of time. But this argument—which does nothing more than recite the standard policy rationale for statutes of limitations—"applies equally to any expired claim that could potentially be revived." *PC-41 Doe v. Poly Prep Country Day Sch.*, 590 F. Supp. 3d 551, 564 (E.D.N.Y. 2021) (rejecting defendants' state constitutional due process challenge in childhood sexual abuse case) (cleaned up). Defendants sound the refrain—common to all defendants opposing revived claims—that they "made strategic decisions [they] might not have made had [they] known about the possibility of revival." *Id.* But as the Eastern District of New York noted in the *PC-41 Doe* case, the same "argument could be made of any revival statute, and Defendants have not indicated why this concern is uniquely problematic in this context." *Id.* The *PC-41 Doe* Court, therefore, rejected the defendants' arguments that the New York's CVA was

---

[13] In fact, they far exceed the low bar: the "State has no obligation to produce evidence to support the rationality of the statute, which 'may be based on rational speculation unsupported by any evidence or empirical data.'" *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 315 (1993)). Indeed, the Supreme Court of Maryland found the CVA constitutional even though it applied a heightened rational basis review regarding whether the CVA bears a real and substantial relation to the problem the statute addresses. *Roman Cath. Archbishop of Washington*, 330 A.3d at 1103-1105.

12

unreasonable because it reopened claims from long ago that may be difficult to defend and that defendants made decisions they might not have made had they known about the possibility of revival. *Id.*

### 3.    Boilerplate rationales for limitations periods are insufficient and discovery will determine what evidence is available.

Defendants assert boilerplate "special hardships" and "oppressive effects" because they assumed a limitations period would continue and generally would have acted differently if a change in the limitations period could have been foreseen. They cite as support inapposite cases. In *Grice v. Colvin*, 97 F. Supp. 3d 684, 709 (D. Md. 2015), the *plaintiffs* brought a claim for a Fifth Amendment due process violation based on the Social Security Administration's interception of tax refunds—a property interest in money—after lifting its self-imposed limitations period for collecting overpayments through tax offsets and the retroactive collection of overpayment. The court declined to dismiss the due process claim because it could not resolve contested facts at the motion to dismiss stage, and it was plausible that plaintiffs failed to preserve evidence regarding tax payments assuming the Social Security Administration's self-imposed limitation to collect overpayments would remain in effect. Here, Defendants have no comparable deprivation of a property interest in money that could plausibly violate due process.  Defendants also cite *Stogner v. California*, 539 U.S. 607, 611 (2003), but that case did not address due process; rather, it involved analysis, under the Ex Post Facto Clause, of a California law that extended the time in which *criminal prosecution* was allowed. It is not applicable to the civil claims here. *See A.B. v. S.U.*, 298 A.3d 573, 582 (2023) (in childhood sexual abuse case the Supreme Court of Vermont concluded that a statute's retroactive elimination of a prior limitations period did not violate constitutional due process; rejecting defendants' argument that passage of time might prevent

13

adequate access to documentation or witnesses and finding *Stogner* inapplicable because it involved a criminal statute and concerns rooted in the Ex Post Facto Clause).[14]

Additionally, Defendants are wrong on the facts (and it is irrelevant how they construe Plaintiffs' allegations at this stage in any event). Defendants contend that they did not have fair notice that Plaintiffs' claims remained actionable and thus had no reason to preserve relevant information because: the media reports of the Ring Boys Scandal occurred in the 1990s, Defendants settled with Ring Boy Tom Cole in 1992, and the federal investigation into Phillips resulted in no charges. Mot. at 12. But the media reports in the 1990s did not mean that Ring Boy survivors would suddenly seek justice in the courthouse, particularly because of the modern evidence revealing that victims of childhood abuse often take decades to report their abuse. *See supra* Section V.A.1. When put in that proper context, it also makes sense why the FBI did not bring charges when investigating Phillips because the survivors were largely still too young to adequately understand their abuse and be willing to come forward. *See* FAC ¶ 19 (the FBI found that Phillips "has a sexual preference for young adolescent boys which focuses around a strong foot fetish. His recruitment, seduction and manipulation of these boys *is consistent with the behavior of hundreds of boy lover pedophiles*"; however, despite confirming ten victims, the FBI found problematic at the time that the victims were not willing to admit to or describe the sexual nature of Phillips' abuse). And Plaintiffs allege that Defendants' settlements with Ring Boys Tom Cole and Scott Hopkins after they alleged sexual abuse were part of Defendants' efforts to cover up the Ring Boys Scandal. FAC ¶¶ 100–112. *See Roman Cath. Archbishop of Washington*, 330 A.3d at 1104 (the CVA addresses the problems that many individuals do not disclose abuse until

---

[14] The Supreme Court of Vermont also found irrelevant defendants' contentions about litigating against claims given the passage of time, because the court concluded that "defendants have no vested property interest in the expired limitations period." *Id*.

well into adulthood and numerous child sexual abuse claims were never pursued through no fault of the victims and too often based on efforts of both perpetrator and non-perpetrator defendants *to hide misconduct*). In sum, Defendants' fact-based reasons for believing that litigation could not occur are unpersuasive and hotly contested.

### 4. Defendants have no constitutionally protected right to spoliate evidence and had plenty of incentive to preserve evidence.

Defendants seemingly admit that they destroyed relevant evidence concerning the Ring Boys Scandal. Such self-inflicted conduct does not transform into a hardship once Defendants face litigation like this case, particularly when any such evidence would likely be inculpatory and provide further support for Plaintiffs in this case. Indeed, Plaintiffs allege that Defendants' destruction of relevant evidence was part of their cover up misconduct. *See* FAC ¶¶ 87-89 (Defendants edited Phillips out of archived video footage, including the historic Wrestlemania III match between Hulk Hogan and André the Giant, along with various shows on WWE's streaming video platform, in order to scrub Phillips from WWE's history which is an acknowledgment of his sexual misconduct). Defendants should not be rewarded for such conduct.

Moreover, similar obfuscation and evidence destruction has continued to this day. *Id*. ¶¶ 157-160 (Vince McMahon has admitted to lying and cheating in order to win and said there's nothing he wouldn't do for the WWE business, which included violating the Securities Exchange Act by knowingly circumventing WWE's internal accounting controls, directly or indirectly making or causing to be made false or misleading statements to WWE's auditor, and failing to disclose to WWE's Board of Directors, accountants, auditor, and others hush agreements paying women millions of dollars for them to not disclose relationships or allegations against him); *see also In re World Wrestling Consol. Entm't, Inc. Merger Litig.*, C.A. No. 2023-1166-JTL (Del. Ch. May 26, 2026) (sanctioning Vince McMahon for spoliating communication evidence). Simply put:

there is no constitutional protection for destroying evidence, let alone any purported due process problem now created by Defendants' own misconduct.

Defendants proffer three other reasons why they believe special hardships and oppressive effects exist here. Mot. at 12-14. All three should be rejected. First, Defendants categorically declare that they are unable to call or identify individuals who purportedly witnessed Plaintiffs' interactions with the perpetrators Phillips, Garvin, and Patterson (all of whom were employed by Defendants). Although some witnesses are deceased, including the three main perpetrators, many witnesses are still alive. *See supra* Section II. (describing as examples multiple witnesses with knowledge of the Ring Boys Scandal who are alive). Plaintiffs describe and name numerous witnesses throughout the Complaint—including Defendants' own employees—and Plaintiffs allege interactions that Vince and Linda McMahon had with Ring Boys, including some of the Plaintiffs. *See, e.g.*, FAC ¶¶ 7, 11, 37-38, 45-47, 53-54, 62-68, 93, 113-14, 227-30, 257, 264, 267, 277, 282-84, 300. And other evidence may still exist. *Id*. ¶ 48 (in 1993 Defendants and their attorney were in possession of a videotape noted in the FBI's investigation of Phillips, and the attorney wrote to the video's owner "Should we have any need for the videotape in the future. I will be in touch."). Discovery has not yet commenced in this case, including possible initial disclosures, so it is baseless for Defendants to contend that they are unable to call or identify witnesses. *See Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1260 (Del. 2011) (rejecting defendant's due process challenge in childhood sex abuse case because although the perpetrator had died, there was other evidence—including defendant's own records and other co-workers who testified—demonstrating prior knowledge of the perpetrator's abuse and other problems; there was sufficient circumstantial evidence to support the jury verdict despite the

16

perpetrator's death because the question was whether defendants had knowledge of his history as an abuser and failed to act in response).

Second, Defendants discuss how they contest the facts surrounding Plaintiffs allegations that Vince McMahon and his father were told about Phillips engaging in a sexual act with an underaged boy in a vehicle in 1982/1983. *Id*. ¶¶ 40-42. Defendants theorize whether descriptions of that incident from two deceased witnesses are hearsay or somehow admissible (ignoring that Plaintiffs allege Vince McMahon himself was involved in the incident), but such evidentiary issues are for another day, not to be resolved right now on the pleadings. Indeed, factual disputes about the incident as a whole cannot be resolved at this stage, and Plaintiffs' allegations are to be taken as true along with all reasonable inferences. Defendants also contest Vince McMahon's confession that he and Linda McMahon knew about Phillips's "peculiar and unnatural interest" in boys—because they saw him going around with kids—*before* they temporarily fired him for it in 1988 only to re-hire him just weeks later with the caveat that he steer clear of underaged boys and chasing after kids. *Id*. ¶¶ 43-46, 48, 51-52.[15] Such contemporaneous statements are in the public record and can be offered as opposing party statements under FRE 801(d)(2) or for the non-hearsay purpose of proving state of mind.[16] There is also deposition testimony about the confession, quoted in the Complaint, from a defamation suit prosecuted by Defendants and admissible under FRE

---

[15] Ms. McMahon declares that a single allegation based on hearsay (although it is Vince McMahon's party opponent confession) is the sole basis upon which John Does 2 and 6 are permitted to proceed in this case against her. Mot. at 13 n.7. Wrong. Although this Court found when largely denying Defendants' motion to dismiss that the *earliest* act of misfeasance against Linda McMahon was in 1988 (ECF No. 66 at 36), that does not mean it was the only misfeasance by her. *See* FAC ¶¶ 264-265 (alleging later misfeasance during a 1989 WWE event in Baltimore when she left John Doe 6 in a dressing room with the perpetrators, including Phillips, and instead summoned Vince McMahon to leave the room with her).

[16] Defendants speculate without any basis that contemporaneous notes about Vince McMahon's confession "have likely long since been destroyed." Mot. at 13 n.7. But it is equally plausible that such notes from a reporter do exist, because not everyone engages in the same pattern and practice of document destruction and spoliation as Defendants. Again, this is a discovery issue not to be resolved at this early stage.

804(b)(1). The point is that Defendants proffer contested factual and evidentiary issues that are improper for the instant motion and do not provide a basis for any purported due process problem.[17]

Third, Defendants misconstrue and contest Plaintiffs' allegations about sexual misconduct within WWE in the years after the Ring Boys Scandal broke in the early 1990s by stating that such allegations bear no relation to Plaintiffs' claims and should be inadmissible at trial. Mot. at 14. Defendants are wheeling the cart down the road while the horse is still in the stable. Plaintiffs' allegations help reveal the culture of sexual misconduct that permeated the WWE and reached all the way to the top of the company (Vince McMahon), which empowered the perpetrators (Phillips, Patterson, and Garvin) to abuse boys, including Plaintiffs. FAC ¶¶ 90, 115-143 (detailing decades-long allegations of sexual misconduct within WWE and against Vince McMahon and other executives like Patterson and Garvin). Moreover, some of those allegations date to the same time period when many of the Plaintiffs were abused, so Defendants' assertion that the allegations are decades after Plaintiffs' injuries is false. This a negligence case, so Plaintiffs' allegations about Defendants fostering, cooperating or participating in, and/or acquiescing to sexual misconduct, including of underaged boys, goes to the heart of Plaintiffs' claims and is highly relevant. *Id*. ¶¶ 141-43. Such allegations do not exacerbate supposed special hardships on Defendants; rather, they represent a culture of sexual misconduct that fostered Plaintiffs' injuries and that Defendants tried to hide but has been uncovered as more survivors have been brave enough to come forward over the years.

---

[17] Defendants also cite inapposite case law that conspicuously distinguishes itself from this case. *See O.M. v. Calvary Chapel Int'l Worship Ctr.*, No. CV EA-25-2618, 2026 WL 1107740, at *3-4 (D. Md. Apr. 23, 2026) (distinguishing the allegations there from this case because unlike the knowledge allegations here, the plaintiff alleged knowledge of a personnel member's inappropriate behaviors with adult male church members but not the potential to sexually abuse a female child, which the court found to be too far of an inferential leap).

**5.    The CVA is not being applied extraterritorially: Plaintiffs were abused in Maryland and only seek redress for those incidents.**

Defendants' argument that the CVA is somehow being applied extraterritorially here is the epitome of a straw man. Plaintiffs were sexually abused in Maryland, and they only seek damages for those incidents in Maryland. FAC ¶ 327.

Where out-of-state conduct *is* alleged, it's for separate reasons: proving Defendants' state of mind and knowledge of the perpetrators' misconduct. Mel Phillips molested Ring Boys while employed by Defendants and traveling for their events (and sometimes with Vince and Linda McMahon) up and down the East Coast with underaged boys. FAC ¶¶ 3, 227-229, 264, 267, 277, 282-283, 300, 332. The grooming and abuse were so open and notorious that Defendants knew or should have known that they had a child predator with a foot fetish in their midst. *Id*. ¶¶ 9-11, 13, 20, 26-27, 36-38, 42, 44, 48, 51-55, 62-68. While this modus operandi and notice evidence is proof on the merits, it is irrelevant to personal jurisdiction and the CVA's constitutionality. Article III does not permit the Court to issue an advisory opinion on whether the CVA may constitutionally apply to claims accruing outside Maryland, because Plaintiffs bring no such claims. Plaintiffs make no attempt whatsoever to apply the CVA nationwide—let alone "boundless, forum-indifferent litigation"—like Defendants falsely suggest; therefore, Defendants' contention regarding jurisdiction (Mot. at 14-17) is entirely irrelevant and creates no due process problem here.

\*\*\*

In sum, Defendants' due process arguments fail. The Maryland General Assembly enacted the CVA to correct specific survivor-related problems that were based on evidence, and the CVA is rationally related to Maryland's legitimate interest in giving child victims access to *remedies* later in life. Beyond that, Defendants fail to identify special hardships or oppression as applied to them. Defendants' contentions regarding the facts are inappropriate for this stage, their evidentiary

19

assertions put the cart before the horse and fail to take into account potentially admissible evidence (and Defendants' own evidence destruction), and their point about extraterritoriality and jurisdiction is an irrelevant straw man.

### B.    The CVA Does Not Violate the Ex Post Facto Clause.

The Ex Post Facto Clause of the U.S. Constitution, Art. I, § 10, cl. 1, "forbids the application of any new punitive measure **to a crime** already consummated." *Kansas v. Hendricks*, 521 U.S. 346, 370 (1997) (emphasis added); *Calder v. Bull*, 3 U.S. 386 (1798). In *Smith v. Doe*, 538 U.S. 84, 92 (2003), the U.S. Supreme Court "developed a two-pronged inquiry" to "determine whether a challenged law imposes punishment." *Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, 112 F.4th 196, 202 (4th Cir. 2024).

First, the Court considers "whether the legislature meant the statute to establish 'civil' proceedings." *Smith*, 538 U.S. at 92. If not, and the "intention of the legislature was to impose punishment, that ends the inquiry." *Id*. But if the legislature intended to "enact a regulatory scheme that is civil and nonpunitive," the Court proceeds to *Smith*'s second step. *Id.* There, the Court asks whether the statute is "so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Id*. (cleaned up). "[O]nly the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id*. (cleaned up).

#### 1.    The CVA is remedial, not punitive.

Under *Smith*'s first step, the Maryland General Assembly intended to impose a non-punitive, *remedial* framework for survivors' civil claims. The CVA is plainly remedial, as recognized by the Supreme Court of Maryland. *See Roman Cath. Archbishop of Washington*, 330 A.3d at 1080-82, 1103 (discussing how statutes of limitations are remedial or procedural devices and that the CVA "retroactively resurrects a remedy that had previously been precluded by a statute

of limitations"). In other words, it revives "a lapsed civil limitations period in order to restore common law remedies that actually existed at the time of the alleged misconduct." *Roman Cath. Bishop of Oakland v. Superior Ct.*, 128 Cal. App. 4th 1155, 1164 (2005) (holding that civil revival statute for sex abuse did not violate Ex Post Facto Clause because it was not punishment, despite including punitive damages).

The CVA expressly applies to "civil actions." 2023 Md. Laws ch.5 (S.B. 686). It criminalizes no conduct, imposes no fines or penalties, and alters no definition of any crime. It is codified in Title Five of the Maryland Code of Courts and Judicial Proceedings—which is entirely limited to civil actions. And its purpose is remedial and compensatory: to provide a civil remedy to survivors of childhood sexual abuse who were unable to bring timely claims due to the psychological, emotional, and other barriers associated with childhood trauma. *See supra* Section V.A.

In other words, the CVA has *none* of the hallmarks of the needed retroactive punishment, as the Supreme Court recently identified in *Ellingburg v. United States*, 607 U.S. 163, 168 (2026). The CVA—unlike the federal Mandatory Victim Restitution Act in *Ellingburg*—is *not* "labeled as a penalty," is *not* "codified in the criminal code," is *not* "predicated on a criminal conviction," is *not* "imposed against a criminal defendant," is *not* "imposed in lieu of other penalties," is *not* "ordered at sentencing where the United States [or a State] is an adverse party," and can *never* "result in resentencing when the defendant refuses to pay." *Id.*

Defendants incorrectly claim the CVA is tethered to criminal punishment since it defines "sexual abuse" by referencing criminal definitions. Mot. at 19. There is no such tether, because the CVA is not "predicated on a criminal conviction." *Ellingburg*, 607 U.S. at 168 (holding mandatory restitution—triggered by criminal conviction—is punitive and subject to the Ex Post Facto

21

Clause). There is nothing punitive about borrowing a criminal-law definition for a civil procedure statute. Indeed, the Delaware Supreme Court rejected this same argument in an ex post facto challenge to Delaware's Child Victims Act: "the CVA's reference to the Criminal Code does not transform this civil statute into a criminal one to which *ex post facto* analysis applies" because the "[a]ct is and continues to be a civil statute of limitations affecting matters of procedure and remedy." *Sheehan*, 15 A.3d at 1258 (noting that the cross-referenced crime nevertheless must have been penalized at the time of commission).

Also, Defendants try to shoehorn this case into *Stogner*, 539 U.S. at 615, but it does not fit. *See* Mot. at 23-24, 26. There, the Court held that a criminal statute reviving criminal prosecutions for child sex abuse violates the Ex Post Facto Clause, unlike a civil statute reviving civil claims for damages. In fact, the Kennedy/Scalia/Thomas dissent specifically noted that civil revival statutes are *not* punitive *ex post facto* laws because they merely affect access to remedies: "We have held that expired statutes of limitations can be repealed to revive a civil action." *Stogner*, 539 U.S. at 651 (Kennedy, J., dissenting).

Other courts addressing civil revival statutes like the CVA agree that the Ex Post Facto Clause is no impediment. For example, in *Foresman v. Foresman*, 156 Hawai'i 128, 136-137 (2025), the Hawaii Supreme Court held that a civil child sexual abuse limitations statute did not violate the federal Ex Post Facto Clause because it was non-punitive and civil in nature. For the same reasons, in *Bernard v. Cosby*, 648 F.Supp.3d 558, 572 (D.N.J. 2023), the federal district court held that a civil sexual abuse revival statute did not implicate the Ex Post Facto Clause, even where the statute permitted punitive damages.[18] In *DeLonga v. Diocese of Sioux Falls*, 329 F. Supp. 2d

---

[18] Also, the court in *Bernard* was not persuaded by the defendant's citation to scholarly articles asserting that the Supreme Court wrongly decided *Calder. Id*. Here, the Defendants cite the same articles (Mot. at

1092, 1102 (D.S.D. 2004), the district court held the Ex Post Facto Clause did not apply to a civil statute of limitations for child sexual abuse claims, noting that *Stogner* recognized a distinction between civil and criminal statutes. And in *C P v. Soc'y for Roman Cath. Diocese of Lake Charles*, No. 2:24-CV-01615, 2025 WL 662821, at *5 (W.D. La. Feb. 28, 2025), the court found "no basis for extending the protections of the ex post facto prohibitions to civil liability statutes in light of the legislature's broad discretion in this area and affirmative findings in favor of the public interest."

Ultimately, the CVA is a creature of tort law, not criminal law. As with any tort, a finding of liability will burden the defendant with a debt to be paid. But debt is not punishment, particularly in the context of a remedial statute like the CVA that addresses important survivor-related difficulties caused by childhood sex abuse.[19] Defendants wear blinders to that context here and take their argument to the extreme by speciously proclaiming that the CVA serves no purpose for Plaintiffs. Mot. at 21. It should go without saying that the CVA's objectives detailed above serve Plaintiffs by allowing them to pursue remedies for the trauma they have suffered from for decades from their childhood sexual abuse. The fact that Defendants even argue otherwise reveals just how erroneous it is for them to attempt to transform the CVA's remedial nature into something punitive.

### 2.    No punitive effect overwhelmingly negates Maryland's remedial intentions.

Since Maryland's "legislature intended to create a civil, nonpunitive regime," Defendants can prevail only by showing that "the law's punitive effect is so overwhelming that it negates the

---

25-26), and this Court should reject their attempt to theorize about overturning Supreme Court precedent, just as in *Bernard*.

[19] Indeed, the Supreme Court did not even treat civil *involuntary confinement* under Kansas's Sexually Violent Predator Act as a punishment that violates the Ex Post Facto Clause. *Kansas v. Hendricks*, 521 U.S. 346, 362-71 (1997); *see also Huff v. Att'y Gen. of Va.*, No. CIV. A. 3:07CV744, 2008 WL 4065544, at *7 (E.D. Va. Aug. 26, 2008), *aff'd*, 323 F. App'x 293 (4th Cir. 2009) (citing the Supreme Court's *Hendricks* decision and holding that Virginia's civil commitment process does not invoke ex post facto protections).

State's nonpunitive intentions." *Nat'l Ass'n for Rational Sexual Offense L.*, 112 F.4th at 205.

This inquiry generally considers seven factors:  (1) "[w]hether the sanction involves an affirmative disability or restraint," (2) "whether it has historically been regarded as a punishment," (3) "whether it comes into play only on a finding of scienter," (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence," (5) "whether the behavior to which it applies is already a crime," (6) "whether [a non-punitive] purpose to which it may rationally be connected is assignable for it," and  (7) "whether it appears excessive in relation to" its non-punitive purpose. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963).

Under these factors, the CVA has no meaningful punitive effect—much less an overwhelming one. At the outset, the CVA imposes no restraint on liberty (**factor one**).

**Factor Two:**    Reviving an expired tort cause of action has *never* been considered punishment in the United States. Nearly 150 years ago, the Supreme Court made clear in *Campbell v. Holt* that a civil revival statute merely "restores a remedy which had been lost" and that "no right is destroyed." 115 U.S. 620, 628 (1885). Nothing punitive there. Nearly 230 years ago, Justice Chase's opinion in *Calder v. Bull* held that the Ex Post Facto Clause applies exclusively to laws that retroactively penalize what was lawful when committed, aggravate a crime, increase punishment, or lessen evidentiary burdens. 3 U.S. 386, 390 (1798). Reviving pre-existing tort liability to enable suits by injured parties does none of those things.

Defendants' assertion that the CVA fits into the *Calder* categories is not to be taken seriously. Under *Calder*, the Ex Post Facto Clause prohibits "[e]very law that makes an action, done before the passing of the law, and which was innocent when done, criminal; . . ." *Id*. The CVA does not criminalize or even regulate any conduct and besides, all the defined forms of sexual abuse were already unlawful "when done." The Ex Post Facto Clause prohibits "[e]very law that

24

aggravates a crime, or makes it greater than it was, when committed." *Id.* But the CVA does not change the degree of an assault or battery. The Clause prohibits "[e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Id.* But since the CVA imposes no fines, penalties, or forfeitures to the State, nor any restitution to the crime victim, it does not inflict a punishment.[20] And since it is not predicated on a prior conviction, or even a prior finding of liability, it does not change any punishment "annexed" to any crime.

Finally, the Clause prohibits "[e]very law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offence, in order to convict the offender." *Id*. On its face, this category only applies to evidence in criminal not civil proceedings. Regardless, Defendants are wrong that the "CVA retroactively alters the quantum of evidence deemed sufficient to impose liability." Mot. at 23. The CVA does nothing of the sort. It alters no rule of evidence, relaxes no burden of proof, creates no rebuttable presumption, and crafts no new hearsay exception. If, due to the passage of time, the plaintiff cannot adduce enough admissible evidence, he will lose on summary judgment. The Act says a molested child gets to bring his claim as an adult—it doesn't say he will win.

In short, no amount of shoehorning will place Defendants under *Calder*'s precedent. A civil statute of limitations for tort claims has nothing to do with punishment. Instead, as the Supreme Court has held, civil statutes of limitations "represent a public policy about the privilege to litigate." *Chase Sec. Corp.*, 325 U.S. at 314. *Id.* They are "good only by legislative grace" and can be extinguished by legislative grace. *Id.* Since "[t]heir shelter" is not a "fundamental right," removing that shelter is no punishment. *Id.*

---

[20] In fact, it does the opposite: it imposes, in a defendant's favor, a noneconomic damages cap. § 5-117(c)-(d).

***Factor Three:*** Defendants are also wrong about scienter. Mot. at 20. The CVA does not require that the Defendant had scienter; it doesn't even require that the Defendant be the sexual abuser. Since the CVA is not predicated on the defendant having been convicted of a crime, it does not import any scienter requirements. It is sufficient that an enabler acted negligently. And this is a negligence case. *See Lundeen v. Canadian Pac. R. Co.*, 532 F.3d 682, 691 (8th Cir. 2008) (concluding that the Ex Post Facto Clause had no application to amendment of statute that affected "negligence actions brought by injured parties against railroads" because "such actions are inherently civil in nature."). As discussed above, the CVA's borrowing of a criminal-law definition for "sexual abuse" does not transform its remedial nature into something punitive. *Sheehan*, 15 A.3d at 1258 ("the CVA's reference to the Criminal Code does not transform this civil statute into a criminal one to which *ex post facto* analysis applies").

***Factor Four***: The CVA is not "retribution for past conduct." Mot. at 20. The revival of tort claims does not turn on any prior finding of liability, whether criminal or civil. And bearing the burden of potential civil litigation is the price paid by all citizens and corporations living and existing under the rule of law—many of them face the prospect of being sued, that doesn't make them tarred and feathered.

Defendants claim the CVA is retributive because it is "backward-looking." *Id.* But so is all tort liability. The question at trial is always whether an alleged tortfeasor's *past* conduct injured the plaintiff. Defendants argue the CVA's "purpose is not to regulate prospective conduct." Mot. at 21. But of course not. The Act doesn't regulate conduct, period. Other laws create liability. The CVA merely determines whether a remedy is still available. In any case, nothing in the CVA limits the plaintiff to retrospective damages: if the defendant still poses a risk, the revived claim could seek injunctive relief.

Lacking any other authorities, Defendants try to conflate the CVA, a tort revival statute, with the sex offender registry at issue in *Does #1-5 v. Snyder*, 834 F.3d 696, 697–98, 706 (6th Cir. 2016). But the distinction is clear. Unlike the CVA, Michigan's sex offender registry imposes actual restraints on liberty, requiring that offenders "report in person to law enforcement, and comply with restrictions barring them from living, working, or loitering near a school." Mem. at 20. The Sixth Circuit thus found that this civil statute was "retributive . . . in imposing its *restrictions*." *Snyder*, 834 F.3d at 704 (emphasis added). "Restrictions" is the key word. The CVA imposes none. It merely re-opens the courthouse doors.[21] In fact, the Sixth Circuit's decision in *Snyder* is an outlier even among other appellate courts deciding sex offender registration laws, which is not at issue here. *See, e.g.*, *Does 1-7 v. Abbott*, 945 F.3d 307, 314–15 (5th Cir. 2019) (distinguishing *Snyder* because the Michigan law's restrictions were more burdensome than Texas's law; citing Tenth and Eight Circuit opinions finding other sex offender residency limits to be *nonpunitive*).

Lastly, Defendants' claim that the CVA is retributive ignores the fact that the statute actually *eases* the burden on defendants facing revived claims, by imposing a noneconomic damages cap. § 5-117(c)-(d).

***Factor Five***: Defendants erroneously claim the Act "appl[ies] exclusively to behavior that is criminal." Mot. at 21. But Defendants concede the Act applies to them—even though they are merely accused of committing negligence, not a crime. The fact that revived claims are *not* limited to perpetrators of crimes confirms that the Act is remedial, not punitive.

---

[21] And while Michigan's sex offender registry might "brand registrants as moral lepers," 834 F.3d at 705, the CVA does not. Whatever legitimate privacy concerns a tort defendant may have, the CVA does not disturb the availability of protective orders or other judicial devices.

***Factors Six and Seven:*** As shown above at Section V.A.1., the CVA is "rationally connected to a nonpunitive purpose." *Nat'l Ass'n for Rational Sexual Offense L.*, 112 F.4th at 206; *see also Roman Cath. Archbishop of Washington*, 330 A.3d at 1104-05 (the Maryland General Assembly enacted the CVA to correct specific victim-related problems). And its means are not excessive: its scope is limited to defined types of "sexual abuse." § 5-117(a). It largely excluded claims from deceased victims. § 5-117(d). And it capped noneconomic damages for revived claims. § 5-117(c). These measures are rationally related to the General Assembly's legitimate interests and demonstrate that the CVA's scope was carefully crafted.

In sum, Defendants fail to meet the demanding standard required of them to apply the Ex Post Facto Clause. *See Smith*, 538 U.S. at 92 ("only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty.") (cleaned up).

### 3. The CVA passes the Thomas/Gorsuch test proposed in *Ellingburg*, since it allows private parties to seek redress for private wrongs under 18th-Century common-law understandings.

***Although*** Defendants concede this Court cannot overturn *Calder v. Bull*, 3 U.S. 386, 390 (1798), they argue the Ex Post Facto Clauses of the Fifth and Fourteenth Amendments should apply to *all* statutes, regardless of whether they are criminal or civil. Mot. at 24 n.8. Defendants' stated purpose for that argument is "for preservation purposes only," likely to tee up an eventual Supreme Court challenge—and no doubt a motion to certify interlocutory appeal as a further delaying tactic. Such effort would be wasted.

It's wasted because the CVA still passes constitutional muster under the originalist approach proposed in the concurring opinion of Justices Thomas and Gorsuch in *Ellingburg*, 607 U.S. at 178–86 (Thomas, J., concurring).

Under that non-binding approach, the Clauses turn on how a law is enforced and what sort

28

of wrong it vindicates—not on whether it is labeled civil or criminal. In the founders' era, the common law distinguished between public wrongs and private wrongs. "A public wrong was a breach and violation of public rights and duties. . . ." *Id*. at 179. "Because a public wrong injured the community, it was deemed an injury to the sovereign. . . ." *Id*. (citing 4 Blackstone Commentaries 2-7).

"Private wrongs, in contrast, were injuries to individuals in their private capacity" that "'infringed the private or civil rights belonging to individuals.'" *Id*. at 180 (quoting 3 Blackstone 2). "Private wrongs were redressable by the individuals whose rights were violated, not the sovereign." *Id*.

"A single act could be both a private wrong and public wrong." *Id*. at 180 An assault and battery, for example, is both a private injury and a public crime. From the same act arises two constitutionally distinct legal actions: "Theft can be redressed through a tort suit brought by the victim and a criminal prosecution brought by the state." *Id*.

Under this originalist account, the "Ex Post Facto Clauses therefore prohibit retroactive laws that impose coercive penalties for public wrongs." *Id*. To determine this, the concurrence argues that courts should look to how the law is enforced. *Id*. "If it is enforced on behalf of the sovereign to redress a sovereign injury, then it is subject to the Clauses." *Id*. "If instead it is enforced by a private person to vindicate his own private rights, then it is not." *Id*.

The Thomas/Gorsuch test dooms Defendants' prospects for interlocutory appeal and a Supreme Court challenge—because the CVA "is enforced by a private person to vindicate his own private rights." *Id*. True, sexual abuse like rape is a public wrong. And if the CVA were to revive a criminal or civil action brought by the State of Maryland, it might violate the Clause under the

Thomas/Gorsuch test. But because the CVA is being enforced by private parties who suffered a violation of their private rights, it falls outside the Ex Post Facto Clause.

There is no originalist case that a claim for battery or negligence revived by the CVA is a punishment for a public wrong. The private remedy for personal injury has ancient common law roots. As Blackstone wrote in Book Four of his Commentaries—titled "Private Wrongs"—the "party injured" by assault or battery "may have redress by action of trespass vi et armis; wherein he shall recover damages as compensation for the injury." 3 Blackstone 120.

It therefore makes little sense for Defendants to denigrate the Plaintiffs as mere "deputized private litigants" (Mot. at 26), as if they were deputized sheriffs or qui tam plaintiffs—not adult survivors of childhood sexual abuse. The CVA does not create a cause of action and confers no special standing on a plaintiff. It revives claims recognized as private remedies for private wrongs for over 250 years. Because the CVA revives a private action, to be enforced by a private person, to vindicate his own private rights, it falls outside the Ex Post Facto Clause, even under Defendants' wished-for Thomas/Gorsuch test from a non-binding concurring opinion.

## VI.      CONCLUSION

Defendants' constitutional challenge should be rejected in full. They make many fact-based contentions that cannot be resolved at this stage. And their arguments regarding due process and the Ex Post Facto Clause dress the CVA in punitive garb that is too bunchy in some spots and too long in others: it simply does not fit. Underneath Defendants' dressings—at its heart—the CVA remains remedial and compensatory. This Court should follow the Supreme Court of Maryland's lead in recognizing its constitutionality. Defendants' motion must be denied.

Dated: June 26, 2026                    */s/ Greg G. Gutzler*
                                        Greg G. Gutzler
                                        Emma Bruder
                                        **DICELLO LEVITT LLP**

485 Lexington Avenue, Suite 1001
New York, New York 10017
Telephone: (646) 933-1000
ggutzler@dicellolevitt.com
ebruder@dicellolevitt.com

Adam Prom
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
aprom@dicellolevitt.com

Mark A. DiCello
Robert F. DiCello
**DICELLO LEVITT LLP**
8160 Norton Parkway, Third Floor
Mentor, OH  44060
Telephone: (440) 953-8888
madicello@dicellolevitt.com
rfdicello@dicellolevitt.com

William H. "Billy" Murphy, Jr. (# 07985)
**MURPHY, FALCON & MURPHY**
1 South Street, Suite 3000
Baltimore, Maryland 21202
Telephone: (410) 951-8750
billy.murphy@murphyfalcon.com

*Attorneys for Plaintiffs*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 26th day of June 2026, I caused a copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system and electronic notification of such filing is sent to all CM/ECF participants and counsel of record.


*/s/ Greg G. Gutzler*
Greg G. Gutzler