UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| JOHN DOE 1, *et al.*,<br><br>        *Plaintiffs*,<br><br>        v.<br><br>WORLD WRESTLING<br>ENTERTAINMENT, LLC, *et al.*,<br><br>        *Defendants*. | Civil Action No. 1:24-cv-3487-JKB |

**BRIEF OF AMICI CURIAE PUBLIC JUSTICE, AMERICAN ASSOCIATION FOR JUSTICE, MARYLAND ASSOCIATION FOR JUSTICE, ENOUGH ABUSE, CHILD USA, NATIONAL CENTER ON SEXUAL EXPLOITATION, AND HUMAN RIGHTS FOR KIDS IN SUPPORT OF PLAINTIFFS**

PUBLIC JUSTICE
Leila Nasrolahi*
475 14th St., Suite 610
Oakland, CA 94612
Tel: (202) 861-5257
lnasrolahi@publicjustice.net

PUBLIC JUSTICE
Shelby Leighton*
Tara Patel
1620 L St. NW, Suite 630
Washington, DC  20036
Tel: (202) 470-1060
tpatel@publicjustice.net
sleighton@publcjustice.net

*Attorneys for Amici Curiae*

*\*pro hac vice motion forthcoming*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

INTERESTS OF *AMICI CURIAE* ...................................................................................... 2

ARGUMENT ....................................................................................................................... 4

I.    The 2023 Child Victims Act Was Passed to Help Survivors of Child Sexual Abuse Get Access to Justice ............................................................................................................ 4

II.   The Child Victims Act of 2023 Does Not Violate the Due Process Clause .......................... 8

III.  The Child Victims Act of 2023 Does Not Violate the Ex Post Facto Clause ...................... 12

CONCLUSION .................................................................................................................... 15

**INTRODUCTION**

The Maryland Constitution guarantees every person access to justice. *See* Md. Const. Decl. of Rts. art. 19. Yet for so many survivors of child sexual abuse, that promise has long been an empty one. Manipulation by trusted abusers, concealment by culpable institutions, and the suppressive effects of trauma on memory and reporting have shielded perpetrators and their institutional enablers. And they have left victims to bear the lifelong costs of sexual abuse. The Maryland Child Victims Act ("CVA") was passed to address those realities. One of at least thirty similar laws passed in other states and territories, it makes good on the Maryland Constitution's promise of access to justice by offering abuse survivors a fair chance to pursue the relief they have long deserved.

In 2025, the Maryland Supreme Court recognized those purposes in holding that the CVA was constitutional under state law. The state's highest court acknowledged what survivors, researchers, and the Maryland legislature know to be true: "that numerous child sexual abuse claims, more prevalent than previously understood, were never pursued during the then-applicable limitations period through no fault of the victims and too often based at least in part on efforts of both perpetrator and non-perpetrator defendants to hide the misconduct." *Roman Cath. Archbishop of Washington v. Doe*, 489 Md. 514, 571 (2025).

Now, Defendants ask this Court to find the CVA unconstitutional under federal law. This Court should decline to do so. First, the CVA does not violate the Due Process Clause. As the Maryland Supreme Court held, the 2023 Act retroactively abrogated only an ordinary statute of limitations—not any vested substantive rights protected by due process. But even if the Act implicated due process protections, it would still withstand constitutional review because the Maryland General Assembly acted pursuant to a rational and legitimate legislative objective:

1

remedying the longstanding barriers that prevent survivors of child sexual abuse from obtaining justice by restoring their ability to pursue civil claims.

Nor does the CVA violate the Ex Post Facto Clause. The Ex Post Facto Clause applies only to criminal laws, and the CVA is a civil statute. Even assuming that the Clause reaches civil laws that are so punitive in purpose or effect as to be criminal, the CVA is compensatory, not punitive. Rather than imposing a punishment, the Act shifts the costs of abuse from victims and taxpayers to the institutions whose negligence enabled the abuse, while affording victims the opportunity to obtain compensation that they can use to pay for resources and services like therapy, job training, and education.

### INTERESTS OF *AMICI CURIAE*

Public Justice is a national public interest advocacy organization that fights against abusive corporate power and predatory practices, the assault on civil rights and liberties, and the destruction of the earth's sustainability. The organization maintains an Access to Justice Project that pursues high-impact litigation and advocacy efforts to remove procedural obstacles that unduly restrict the ability of people who have been wrongfully injured or whose civil rights have been violated to seek redress in the civil court system. Towards that end, Public Justice has a longstanding practice of fighting for survivors of sexual abuse to have their day in court. For example, Public Justice recently wrote amicus briefs in the consolidated Maryland Supreme Court cases involving the constitutionality of the statute at issue in this case, *The Key School, Inc. v. Valerie Bunker*, *Board of Education of Hartford County v. Doe* and *Roman Catholic Archbishop of Washington v. Doe*, 489 Md. 514 (2025).

The American Association for Justice ("AAJ") is a national, voluntary bar association established in 1946 to strengthen the civil justice system, preserve the right to trial by jury, and

protect access to the courts for those who have been wrongfully injured. With members in the United States, Canada, and abroad, AAJ is the world's largest plaintiff trial bar. AAJ members primarily represent plaintiffs in personal injury actions, employment rights cases, consumer cases, and other civil actions. Throughout its 80-year history, AAJ has served as a leading advocate for the right of all Americans to seek legal recourse for wrongful conduct.  This case is of acute interest to AAJ, as our members advocate for the survivors of childhood sexual abuse, including those who did not disclose their abuse until well into adulthood.  AAJ recognizes that access to the civil justice system is essential to not only providing survivors with a meaningful opportunity to seek redress, but also deterring future abuse by holding accountable the individuals and institutions whose conduct enabled it.

The Maryland Association for Justice, Inc. ("MAJ") is a specialty bar association comprised of attorneys who represent Marylanders injured by the wrongful conduct of others. MAJ has a vital interest in the constitutional validity and interpretation of laws affecting access to the civil justice system, including the Child Victims Act and the rights it affords survivors of sexual abuse to seek redress in court.

ENOUGH ABUSE® is the nation's oldest citizen-based child-advocacy organization. Since 2002, its mission has been preventing child sexual abuse through education and evidence-based prevention curricula for schools and youth-serving organizations Through its Children's Justice Campaign, Enough Abuse advocates for laws—including statute-of-limitations reform of the kind Maryland enacted in the Child Victims Act—that give survivors a fair opportunity to hold perpetrators and the institutions that enabled them accountable.

CHILD USA is a leading nonprofit think tank dedicated to protecting children's civil rights through legal analysis and social science research. Its mission is to prevent abuse and neglect,

3

advance justice for survivors, and remove barriers that impede child sex abuse victims from seeking accountability from individuals and institutions.

The National Center on Sexual Exploitation ("NCOSE") is a nonprofit organization, founded in 1962, that combats sexual exploitation and abuse by litigating in state and federal courts on behalf of survivors, engaging in corporate advocacy to encourage companies to adopt responsible and safe practices, particularly regarding children, and advocating for legislative reforms that protect survivors and promote human dignity.

Human Rights for Kids (HRFK) is a non-profit organization dedicated to the promotion and protection of the human rights of children. HRFK incorporates research and public education, coalition building and grassroots mobilization, as well as policy and strategic litigation, to advance critical human rights on behalf of children. A central focus of HRFK's work is advocating in state legislatures and courts for comprehensive justice reform for children consistent with the U.N. Convention on the Rights of the Child and the International Covenant on Civil and Political Rights.

## ARGUMENT

I.    **The 2023 Child Victims Act Was Passed to Help Survivors of Child Sexual Abuse Get Access to Justice**

The Maryland General Assembly passed the 2023 Child Victims Act to provide access to justice for survivors of child sexual abuse. Maryland General Assembly, *Judiciary Committee (3/2/2023)*, at 1:11:18-3:14:42 (Mar. 3, 2023), https://mgaleg.maryland.gov/mgawebsite/ Committees/Media/false?cmte=jud&ys=2023RS&clip=JUD_3_2_2023_meeting_1&billNumber =hb0001 (containing testimony presented in support of the CVA). Since "the late 1980's, lawmakers across the country" have become "increasingly aware that young victims often delay reporting sexual abuse because they are easily manipulated by offenders in positions of authority and trust, and because children have difficulty remembering the crime or facing the trauma it can

4

cause." *Doe v. Roe*, 419 Md. 687, 704 (2011) (quoting *People v. Frazer*, 982 P.2d 180, 183 (Cal. 1999)). "Even if the child is aware of the nature of the abuse, significant delays in reporting this abuse may occur because of confusion, guilt, and fear on the part of the child." *Morgan v. Foretich*, 846 F.2d 941, 947 (4th Cir. 1988). The CVA is the culmination of a decades-long legislative effort to ensure remedies for victims of childhood sexual abuse by extending the deadlines to sue perpetrators and their institutional enablers.

In 2003, "in response to the outcry and evolving understanding of childhood sexual abuse," Maryland extended the statute of limitations from three to seven years from the date the victim turned 18. *Doe*, 419 Md. at 703-05 (citation omitted). The Maryland Supreme Court held that the extension constitutionally applied to claims that accrued prior to its effective date because, in modifying the limitations period, the law was "remedial" and did "not affect substantive or vested rights." *Id*. at 703 (quoting *Langston v. Riffe*, 359 Md. 396, 408-09 (2000)).

In 2017, "[i]n response to growing recognition of the long-term impact of child sexual abuse," the General Assembly again extended the statute of limitations for civil child sexual abuse claims. Dep't of Leg. Servs., The 90 Day Report – A Review of the 2017 Legislative Session, Md. Gen. Assemb., 2017 Sess., Part F-3 (2017). The law provided that, as to claims against direct perpetrators, "an action for damages . . . may be filed" (1) any time before the victim turned 18 or (2) subject to certain conditions, within 20 years after they turned 18 (i.e., by age 38) or within three years of the date the defendant was convicted of sexual abuse. Cts. & Jud. Proc. § 5-117(b) (2017). As to claims against enabling institutions like Defendants, the 2017 law provided that such a claim must be filed by the time the victim turns age 38. *Id.* § 5-117(d) (providing that an "action for damages" against a non-perpetrator must "be filed" within "20 years after the date on which the victim reaches the age of majority"). The law applied retroactively only to "actions that were

barred by the application of the [seven-year] period of limitations applicable before October 1, 2017." 2017 Md. Laws c. 12, § 3.

The 2023 CVA was enacted in response to new revelations about the prevalence of child sexual abuse in Maryland and the barriers that prevented victims from getting justice.  In 2018, the Attorney General launched an investigation into the "pervasive and persistent [child sexual] abuse by priests" within the Archdiocese of Baltimore and the longstanding efforts to "cover up . . . that abuse." Md. Att'y Gen., *Attorney General's Report on Child Sexual Abuse in the Archdiocese of Baltimore*, at 1 (2023) ("Att'y Gen. Report").  The Attorney General's report of the investigation, released in September 2023, revealed a "common thread" in victims' stories: years and often decades-long delays in reporting the abuse. *Id*. at 19. "Some did not come forward until their parents had passed away to spare them the pain of knowing about the abuse." *Id*. "Many intended never to tell but were persuaded to come forward with the help of a therapist, support group, or on their own when they confronted the impact of the abuse on their lives and the lives of those close to them." *Id*. "Some victims repressed their memories and the recollections of abuse emerged only many years later." *Id*. "Still others only recognized that what they experienced was abuse once they reached adulthood; children, especially those who are groomed by their abusers, may not recognize the behavior as abuse at the time it is happening." *Id*. As a result, many of the hundreds of victims who came forward in the investigation had no access to civil justice because their claims were time-barred.

In addition to the findings in the Attorney General's report, the General Assembly "heard first-hand accounts from several victims who testified that children often lack the emotional and cognitive skills to come forward in the moment." *Roman Cath. Archbishop of Washington*, 489 Md. 514 at 574. Expert organizations testified that "children molested and sexually exploited are

6

especially unlikely to be able to promptly file suit" due to "threats against the victim or loved ones, manipulating the victim, convincing the victim nothing is wrong, and exploiting the victim's desire to keep a family together." *Id.* at 572 (quoting Maryland Coalition Against Sexual Assault, Testimony Supporting Senate Bill 686 (Mar. 28, 2023)). Some victims are "financially and emotionally depend[e]nt on the perpetrator well into their early adulthood." *Id.* And "others face pressure from other family members to remain silent, or have a deep sense of shame." *Id*. Moreover, several victims testified that even "contemporaneous childhood reports of abuse … were ignored." *Id.* As a result, "most survivors of child sexual abuse delay disclosing their abuse until years and even decades after it occurred." *Id.* at 573 (quoting Testimony of Elizabeth Letourneau and Rebecca Fix in Support of SB 686 (Feb. 23, 2023)); *see* CHILD USA, Testimony in Support of SB686 (Feb. 23, 2023) (testifying that in a study of survivors of childhood sexual abuse in the Boy Scouts of America, 51% of survivors first disclosed the abuse at age 50 or older).

Considering that "growing body of evidence," the Maryland General Assembly passed the 2023 CVA to eliminate a statute of limitations that "did not reflect the reality of the time in which a reasonably diligent victim … should be expected to pursue a claim." *Roman Cath. Archbishop of Washington*, 489 Md. at 571. The Act seeks to provide survivors access to justice by lifting the time limits in effect under the 2017 law. It states that claims arising from child sexual abuse may be filed at any time during the survivor's life. Cts. & Jud. Proc. § 5-117(b) (2023). The Act applies retroactively to claims that would have been time-barred before its effective date, while capping the non-economic damages recoverable in such cases. *Id;* Cts. & Jud. Proc. § 12-104(b) (2023). In doing so, it "express[es] the intent of the General Assembly that any claim of sexual abuse that occurred while the victim was a minor may be filed at any time without regard to previous time

7

limitations that would have barred the claim." Dep't of Leg. Servs., The 90 Day Report – A Review of the 2023 Legislative Session, Md. Gen. Assemb., 2023 Sess., Part F-3 (2023).

**II.     The Child Victims Act of 2023 Does Not Violate the Due Process Clause**

As a threshold matter, this Court is bound by the Maryland Supreme Court's holding that Section 5-117(d) is "an ordinary statute of limitations, not a statute of repose." *See Roman Cath. Archbishop of Washington*, 489 Md. at 575. What remains is a question of federal law: whether reviving an ordinary statute of limitations implicates the Due Process Clause. The Supreme Court and lower courts have long answered that question: the "revival of time-barred claims does not implicate federal due process protections." *In re World Trade Ctr. Lower Manhattan Disaster Site Litig.*, 846 F.3d 58, 67 n.7 (2d Cir. 2017); *Chase Sec. Corp. v. Donaldson*, 325 U.S. 304, 314 (1945); *Campbell v. Holt*, 115 U.S. 620, 629-30 (1885) (holding that a legislature may repeal or extend a statute of limitations, without violating the Constitution, even after a right of action is barred); *United States v. Falcon*, 805 F.3d 873, 875 (9th Cir. 2015) ("We join the other circuits in holding that [a statute's] elimination of the limitations period for actions to collect on federally guaranteed student loans does not result in a denial of due process.").

Defendants rely on dicta from *Chase Securities* to argue that the legislature's elimination of the statute of limitations violates federal due process because it "causes special hardships" and "has oppressive effects." Mot. at 11. The *Chase Securities* Court held that reviving a statute of limitations is not "per se an offense against the Fourteenth Amendment." 325 U.S. at 315-16; *see also Shadburne-Vinton v. Dalkon Shield Claimants Tr.*, 60 F.3d 1071, 1074 (4th Cir. 1995) (explaining that Supreme Court held in *Chase Securities* "that retroactive application of a statute of limitation does not violate the Due Process Clause of the Fourteenth Amendment"). Then, the Court noted, "[n]or has the appellant pointed out special hardships or oppressive effects which

result from lifting the bar in this class of cases with retrospective force." *Chase Securities*, 325 U.S. at 316. That language was dicta, so it is not binding on this Court. But even assuming *Chase Securities* left open the possibility that in some cases due process may be violated if "special hardships or oppressive effects" result from eliminating a statute of limitations, a child sex abuse case is clearly not such a case.

"Applying the 'hardship and oppressive effects standard' to child sex abuse case[s] would require a finding that a sex abuser's conduct would have been different depending on changes in a statute of limitations." *Quintanilla v. Roman Cath. Archbishop of Agana*, No. CV 17-00011, 2021 WL 11629867, at *4 (D. Guam Mar. 22, 2021). And Defendants cannot make that showing here because the acts they committed were "as illegal at the time of their commission as they are now." *Bernard v. Cosby*, 648 F. Supp. 3d 558, 571 (D.N.J. 2023). Of course, sexual abuse of a child was illegal, *id.*, and torts for negligence on the part of an employer who enables such abuse to occur also existed long before the abuse at issue here occurred, *see, e.g.,* Restatement (Second) of Torts § 317 (Am. L. Inst. 1965) (discussing employer's liability for negligent failure to control employee's conduct); *Doe 1 v. World Wrestling Ent., LLC*, 811 F. Supp. 3d 706, 722 (D. Md. 2025) (explaining that Maryland courts rely on Restatement (Second) of Torts for negligent supervision liability). So, Defendants cannot plausibly claim reliance on a shorter limitations period in deciding whether to commit or conceal unlawful conduct. To hold otherwise "would allow alleged child sex offenders to evade lawsuits by arguing that in the ensuing years they had based their conduct on a short statute of limitations." *Roe v. Ram*, CV 14-00027, 2014 WL 4276647, at *8 n.10 (D. Haw. Aug. 29, 2014). There is, in short, "no such thing as a vested right to do wrong." *Johannessen v. United States*, 225 U.S. 227, 242 (1912) (citation modified); *see also Campbell*, 115 U.S. at 628; *cf Chase Securities,* 325 U.S. at 316 ("This is not a case where appellant's conduct would have

been different if the present rule had been known and the change foreseen. It does not say, and could hardly say, that it sold unregistered stock depending on a statute of limitation for shelter from liability.").

Even if the Act did implicate Defendants' federal due process protections, due process is satisfied because the Maryland legislature had a rational basis in enacting the CVA. Retroactive civil legislation comports with due process so long as it is supported by a legitimate legislative purpose furthered by rational means. *Pension Benefit Guar. Corp. v. R.A. Gray & Co*., 467 U.S. 717, 729-30 (1984); *Usery v. Turner Elkhorn Mining Co*., 428 U.S. 1, 15-16 (1976); *see also* 16B Am. Jur. 2d Constitutional Law § 964 (2026) ("While retroactive legislation must meet a burden not faced by legislation that has only future effects, the burden is met simply by showing that the retroactive application of the legislation itself is justified by a rational legislative purpose.").

The General Assembly had a rational legislative purpose in enacting the CVA. Indeed, based on the "undisputed purpose of" and "undisputed basis for" the CVA, the Maryland Supreme Court "readily conclude[d]" that the Act bore a "real and substantial relation to the problem it addressed," even under "heightened" rational basis review. *Roman Cath. Archbishop of Washington*, 489 Md. at 572, 574. The General Assembly's choice to expand the statute of limitations was "based on the evidence … concerning the historical  prevalence of child sexual abuse, prior cover-ups, and significantly delayed reporting by victims well beyond the 20-year window provided by Subsection (d), the elimination of the statute of limitations in the 2023 Act bore a real and substantial relation to the problem being addressed." *Id* at 574. This "sufficient factual foundation" supported the policy judgment underlying the Act. *Id.* at 570.

Courts around the country have consistently held the same for similar revival statutes. "Given the unique psychological and social factors that often result in delayed reporting of

10

childhood sexual abuse, which frustrated the ability of victims to bring an action under earlier revisions of the statute of limitations," revival laws are "a rational response by the legislature." *Doe v. Hartford Roman Cath. Diocesan Corp.*, 317 Conn. 357, 405, 441-42, 119 A.3d 462, 517 (2015); *accord Sliney v. Previte*, 41 N.E.3d 732, 741-42 (Mass. 2015) (explaining revival law was "tied directly to the compelling legislative purpose" of opening access to justice for child sex abuse survivors who do not process their injuries until well into adulthood); *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1259 (Del. 2011) (upholding Delaware sexual abuse claim revival law); *Cosgriffe v. Cosgriffe*, 864 P.2d 776, 779-80 (Mont. 1993) (upholding Montana revival law); *K.E. v. Hoffman*, 452 N.W.2d 509, 514 (Minn. Ct. App. 1990) (upholding Minnesota revival law because it "has a reasonable relation to the state's legitimate purpose of affording sexual abuse victims a remedy"); *Liebig v. Superior Ct.*, 209 Cal. App. 3d 828, 834 (1989) (upholding California revival statute because "[e]ven if we were to assume arguendo that a vested right exists in repose of a cause of action, the law is clear that vested rights are not immune from retroactive laws when an important state interest is at stake"); *ARK269 Doe v. Archdiocese of New York*, No. 950301/2020, 2022 WL 2954144, at *2 (N.Y. Sup. Ct. July 19, 2022) ("Multiple New York courts and two federal district courts in the Second Circuit have held that the [New York revival statute] does not run afoul of due process because it remedies an injustice."); *Bernard v. Cosby*, 648 F. Supp.3d 558, 567-68 (D.N.J. 2023) (upholding New Jersey law).

In sum, the CVA does not violate—or even implicate—federal due process protections. The revival of time-barred civil claims is constitutionally permissible under longstanding Supreme Court precedent. And, in any event, the Act is supported by a rational legislative purpose to ensure that survivors of child sexual abuse are not deprived of access to justice solely because of the well-documented delays inherent in disclosure of such abuse.

11

### III.    The Child Victims Act of 2023 Does Not Violate the Ex Post Facto Clause

As Defendants acknowledge, the Ex Post Facto clause applies only to retroactive criminal, not civil, laws. Mot. at 24 & n.8.  A "long line of Supreme Court cases beginning with *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798), has established that the ex post facto clause applies only to criminal laws." *United States v. Bodre*, 948 F.2d 28, 31 (1st Cir. 1991); *see, e.g., Collins v. Youngblood*, 497 U.S. 37 (1990) ("It has long been recognized by this Court that the Constitutional prohibition of ex post facto laws applies only to penal statutes which disadvantage the offender affected by them."); *Harisiades v. Shaughnessy*, 342 U.S. 580, 594 (1952) ("It always has been considered that that which [the ex post facto clause] forbids is penal legislation which imposes or increases criminal punishment for conduct lawful prior to its enactment.").

The CVA is a civil statute: it extends the statute of limitations for civil actions, not criminal actions. To determine whether a law like the CVA that is intended by the legislature to provide for civil liability should nonetheless be treated as a "penal" law, courts "examine whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it 'civil.'" *Smith v. Doe*, 538 U.S. 84, 92 (2003) (citation omitted). Because courts "defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (citation modified).

The legislature's intention was to enact a civil statute that extends the time period to bring civil claims. And the CVA is not "so punitive" in its effect as to negate the General Assembly's intent. Indeed, the factors the Supreme Court uses to separate civil regulation from punishment all point the same way. *See Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963). The CVA imposes no affirmative disability or restraint; a damages remedy has not historically been regarded as punishment; liability turns not on scienter but on duty and causation; the Act serves the plainly

compensatory aim of shifting the costs of abuse to those who caused them; and it is not excessive in relation to that remedial purpose. *See* Pls.' Opp'n to Defs.' Mot. for J. on the Pleadings at 28-33, Dkt. No. 102. None of the indicia of punishment are present, and "only the clearest proof" could override the legislature's civil designation. *Id.* at 33.

The overwhelming evidence presented to the General Assembly demonstrates what the real purposes and effects of the CVA really are: helping survivors of child sexual abuse get access to justice and be compensated for the abuse they suffered.  In cases involving similar revival statutes, courts have explained that the law "was not enacted to punish perpetrators of sexual assault, but instead to compensate survivors and foster healing." *Lotte-Lublin v. Cosby*, No. 23-CV-00932, 2024 WL 4199872, at *6 (D. Nev. Sept. 16, 2024). Rather than imposing criminal punishment, the CVA seeks only to "shift the cost of the abuse from the victim to those that caused the harm." Maryland General Assembly, *Judiciary Committee (3/2/2023)*, at 1:13:20-1:13:28. (Mar. 3, 2023), https://mgaleg.maryland.gov/mgawebsite/Committees/Media/false?cmte=jud&ys=2023RS&clip =JUD_3_2_2023_meeting_1&billNumber=hb0001.

Child sexual abuse imposes crippling costs on victims. Sexual abuse inflicts lasting mental, physical, and financial damage on its victims. Victims of childhood sexual abuse are more likely to develop both psychological and physical health issues than other children. They are more likely to develop anxiety, depression, PTSD, and borderline personality disorder; more likely to misuse substances; more likely to experience obesity, eating disorders, and poor overall health; more likely to struggle with unstable relationships, get divorced, and have difficulty parenting; and more likely to experience further abuse. *See* Darkness to Light, *The Issue of Child Sexual Abuse* 12-13 (2023) (citations omitted). When the abuse includes penetration, victims are "nearly twelve times more likely to attempt suicide." Karen M. Matta Oshima et al., *The Influence of Childhood Sexual Abuse*

*on Adolescent Outcomes: The Roles of Gender, Poverty, and Revictimization*, 23 J. Child Sexual Abuse 367, 369-70 (2014). And they are less likely to finish high school, attend college, or complete college. *Id.* at 370.

This all leads to crippling financial costs that snowball well into adulthood. Women with a history of childhood sexual abuse require healthcare with costs 16% higher than those who were not abused. Amy E. Bonomi et al., *Health Care Utilization and Costs Associated with Childhood Abuse*, 23 J. Gen. Internal Med. 294, 298 (2008). And female sexual abuse victims earn 20.3% less than other women. Elizabeth J. Letourneau et al., *The Economic Burden of Child Sexual Abuse in the United States*, 79 Child Abuse & Neglect 413, 416 (2018). Studies have put the average lifetime cost of childhood sexual abuse at $282,734 as of 2015 for women ($14,357 in childhood healthcare costs, $9,882 in adulthood medical costs, $223,581 in lost earnings, $8,333 in child welfare costs, $2,434 in violence and crime costs, $3,760 in special education costs, and $20,387 in suicide death costs) and $74,691 for men—a conservative estimate due to insufficient data. *Id.* at 417. These studies estimate a loss in quality of life equal to around $40,000 per victim. *Id.*

And the costs ripple far past the immediate victims; they also fall on the public at large. Victims' healthcare needs raise insurance premiums for employers and other consumers, and the government "bears the remaining costs through lost tax revenues and Medicare and Medicaid payments." Ted. R. Miller et al., Nat'l Inst. of Just., Off. Just. Programs, U.S. Dep't of Just., *Victim Costs and Consequences: A New Look* 19 (1996). As of 1993, insurance payments associated with child sexual abuse totaled $600 million. *Id.* at 21. When victims require child welfare services, special education, and drug and alcohol abuse treatment, those costs fall on the public, too. Letourneau, *supra*, at 416. When they struggle to complete degrees and find good jobs, their families lose earnings, the economy loses their contributions, and the government loses tax dollars.

14

*Id*. at 422. A 2015 study put the total lifetime cost of child sexual abuse (i.e., the average lifetime cost per victim times the estimated number of new cases in 2015) at $9.3 billion. *Id*. at 419.  So by opening a path for victims to get compensation that they can use to pay for resources and services like therapy, job training, and education, the CVA relieves costs that would otherwise be borne not only by victims themselves, but also by the public at large.

Shifting these costs from the survivors to the institutions that enabled the abuse is compensatory in nature, not a form of punishment that implicates the Ex Post Facto Clause. Indeed, the Supreme Court has explained that "money penalties" have not "historically been viewed as punishment." *Hudson v. United States*, 522 U.S. 93, 104 (1997). Instead, placing the burden on institutional defendants reflects the primary purpose of tort law: to fairly compensate wronged persons for their injuries. *Eichenwald v. Rivello*, 318 F. Supp. 3d 766, 772 (D. Md. 2018)

**CONCLUSION**

For these reasons, the Court should deny Defendants' motion for judgment on the pleadings.

 July 3, 2026                                      Respectfully submitted,

                                                  /s/ Tara Patel
                                                  Tara Patel
                                                  Shelby Leighton*
                                                  PUBLIC JUSTICE
                                                  1620 L. St. NW, Suite 630
                                                  Washington, DC 20036
                                                  Tel: (202) 470-1060
                                                  tpatel@publicjustice.net
                                                  sleighton@publicjustice.net

                                                  Leila Nasrolahi*
                                                  PUBLIC JUSTICE
                                                  475 14th St., Suite 610
                                                  Oakland, CA 94612
                                                  Tel: (202) 861-5257
                                                  lnasrolahi@publicjustice.net

*pro hac vice motion forthcoming

16