**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **JOHN DOE 1, *et al.*,** | * | |
| **Plaintiffs,** | * | |
| **v.** | * | **CIVIL NO. JKB-24-3487** |
| **WORLD WRESTLING ENTERTAINMENT, LLC, *et al.*,** | * | |
| | * | |
| **Defendants.** | * | |

* * * * * * * * * * * *

## MEMORANDUM

Plaintiffs John Doe 1 through 8 ("Plaintiffs") allege that they suffered sexual abuse in the 1980s and 1990s while working as "Ring Boys" for Defendant World Wrestling Entertainment, LLC ("WWE"). Plaintiffs bring this suit against the WWE, its parent company, TKO Group Holdings, Inc., and former WWE executives Vincent and Linda McMahon (collectively, the "Defendants") for negligently hiring and retaining their alleged abusers. Decades have passed since the events underlying the Plaintiffs' allegations. And all the alleged abusers have died. This suit was recently made possible, however, by the passage of the Maryland Child Victims Act of 2023, ch. 6, 2023 Md. Laws ("CVA"), which amended Maryland law by eliminating any time limits on the right to bring an action for damages arising out of an incident of sexual abuse of a minor. Md. Code. Ann., Cts. & Jud. Proc. § 5-117. The Defendants filed a Motion for Judgment on the Pleadings (ECF No. 93) arguing that the CVA is unconstitutional under the United States Constitution's Due Process Clause as applied to the facts and circumstances of their case, as well as under the Ex Post Facto Clause. The Motion is fully briefed, and no hearing is required. For the reasons set forth below, Defendants' Motion for Judgment on the Pleadings will be denied.

# I. FACTUAL BACKGROUND

## A. Plaintiffs' Complaint

Plaintiffs are eight individuals who found work as "Ring Boys" for the WWE in the 1980s and 1990s, while they were minors. (*See generally* ECF No. 55.) Each was recruited by Melvin Phillips Jr., a ringsider announcer for the WWE, whom the Plaintiffs claim sexually harassed and abused them throughout their part-time employment. (*Id.* at ¶¶ 1–6.) Phillip's alleged predatory behavior had a common pattern: Philips used his position of influence within the WWE to lure the young boys into his service, plied them with promises of meeting wrestlers and with illicit substances, and then subjected them to egregious sexual abuse. (*See e.g., id.* at ¶¶ 184–85, 193–94, 210–14, 223–24, 244–47, 259–62, 294–97.) Plaintiff John Doe 3 also alleges sexual harassment by Terry Garvin, Vice President of WWE Operations, in the mid-1980s. (*Id.* at ¶¶ 35, 211.) And Plaintiff John Doe 5 also alleges sexual abuse by Pat Patterson, the "right-hand man" of Defendant Vincent McMahon, then-owner of WWE, in 1989. (*Id.* at ¶¶ 35, 264–66.) The alleged abuse took place across multiple states, but each Plaintiff alleges that at least part of it took place in Maryland. (*See generally id.* at ¶¶ 173–297.)

Throughout the Complaint, Plaintiffs allege that the "Defendants allowed Philips and others to engage in, and foster, the WWE's rampant culture of sexual abuse." (*Id.* at ¶¶ 23.) Plaintiffs point to former WWE employees who claim that these instances of child sexual abuse were generally known within the organization. (*Id.* at ¶¶ 32–34, 36–38.) They allege that Defendants Vincent and Linda McMahon (together, the "McMahons") hired Philips and placed him in positions of contact with vulnerable young boys, and that the McMahons knew about the repeated abuse but shielded Philips, Garvin, and Patterson anyway. (*See e.g., id. at* ¶¶ 364–66.)

Several decades have passed since the times detailed in Plaintiffs' allegations. As Defendants argue, several key witnesses have died, including the three alleged abusers, the "most prominent public accuser" repeatedly quoted in the Complaint, and others who possessed second-hand information about the alleged abuse, like Defendant Vincent McMahon's father. (ECF No. 93-1 at 12–13.) Yet at least some others who allegedly have knowledge of the abuse are still living. (*See* ECF No. 102 at 10–11 (pointing to six living witnesses quoted in the Complaint).)

Due to the alleged abuse, Plaintiffs claim that they "each sustained actual physical and mental injuries, lost wages, and benefits of employment, and suffered mental and emotional distress." (ECF No. 55 at ¶ 374.) They seek compensatory damages, punitive damages, attorneys' fees and costs, and other equitable relief. (*Id.* at ¶ 393.)

**B. The CVA**

In Plaintiffs' Corrected First Amended Complaint, they allege the same two counts—negligence and negligent hiring, training, and retention—against all four Defendants. (*Id.* at ¶¶ 338–391.) At the time of the underlying sexual abuse allegations, these civil claims were subject to Maryland's generally applicable three-year statute of limitations for torts. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-101. Maryland later established a longer limitations period specifically for claims arising out of alleged child sexual abuse in 2003 "when it adopted § 5-117 of the Courts and Judicial Proceedings Article, which established a seven-year limitations period for such claims." *Roman Cath. Archbishop of Washington v. Doe*, 330 A.3d 1069, 1074 (Md. 2025). Then "[i]n 2017, the General Assembly passed two identical bills to further expand the limitations period," allowing claims 20 years after a victim of child abuse reaches the age of majority or for three years following an abuser's conviction for certain sexual abuse crimes. *Id.*

In 2023, Maryland enacted the CVA to further amend the 2017 Act and eliminate any time limits on the right to bring an action for damages arising out of an alleged incident of child sexual abuse. *Id.* at 1075. In relevant parts, the Act as amended by the CVA states:

> [N]otwithstanding any time limitations under a statute of limitations, a statute of repose, the Maryland Tort Claims Act, the Local Government Tort Claims Act, or any other law, an action for damages arising out of a claim or claims of sexual abuse that occurred while the victim was a minor may be filed at any time.

Md. Code. Ann., Cts. & Jud. Proc. § 5-117(b). The Act defines "sexual abuse" to include solicitation, incest, rape, sexual offenses, or "[a]ny other sexual conduct that is a crime." *Id.* at § 5-117(a). Maryland's legislature construed the CVA to apply retroactively to any previously barred claim, but it also narrowed retroactive claims specifically by capping their noneconomic damages and by excluding claims where the victim of abuse is deceased. *Id.* at § 5-117(c)–(d).

With their claims revived by the CVA, the Plaintiffs filed this action in Maryland state court, and it was later removed to this Court. (ECF Nos. 1, 15.) After removal, Defendants filed a motion to stay the case, claiming that the Plaintiffs' formerly time-barred claims depended entirely on the constitutionality of the CVA, a matter that the Supreme Court of Maryland was poised to decide in a consolidated appeal. (ECF No. 2.) This Court agreed and stayed the case, (ECF No. 13), until February 2025 when the Supreme Court of Maryland upheld the constitutionality of the CVA against several as-applied challenges. *Roman Cath. Archbishop of Washington*, 330 A.3d at 1073. Those challenges were limited to claims under Maryland's Constitution and did not address the instant challenges under the United States Constitution. *Id.* at 1076 (asking only whether the CVA was in "violation of Article 24 of the Maryland Declaration of Rights and/or Article III, Section 40 of the Maryland Constitution").[1]

---

[1] Although the Supreme Court of Maryland's decision plays a role in the history of this case, this Court is not bound by it. This Motion turns on the Due Process and Ex Post Facto Clauses of the United States Constitution, not analogous

The Supreme Court of Maryland dedicated most of its opinion to the question of whether the Maryland General Assembly intended the CVA to be a statute of limitations or a statute of repose. *See generally id.* at 1077–1102 (discussing statutes of limitations, statutes of repose, and vested rights); *id.* at 1106–1125 (Biran, J., dissenting). That question is not at issue here because it is not an issue under federal law, as interpreted in the Fourth Circuit. *See Shadburne-Vinton v. Dalkon Shield Claimants Tr.*, 60 F.3d 1071, 1077 (4th Cir. 1995) ("For purposes of constitutional analysis, the same [rational basis] test applies regardless of whether the statute at issue is one of repose or one of limitation.")

The Supreme Court of Maryland also discussed whether the Maryland General Assembly's passage of the CVA bore a "real and substantial relation to the problem being addressed." *See Roman Cath. Archbishop of Washington*, 330 A.3d at 1102–06. It held that the CVA passed that low threshold based on the "growing body of evidence" presented to the General Assembly "that many individuals do not disclose abuse until well into adulthood but still suffer life-long emotional, psychological, and physical health issues resulting from the abuse." *Id.* at 1103. Following the Supreme Court of Maryland's decision, this Court lifted its stay. (ECF No. 31.)

**C. The Motions**

After lifting its stay, the Court considered Defendants' Motions to Dismiss. (ECF Nos. 57–59.) The Court determined that, for the most part, Plaintiffs had "*plausibly pled*" that the Defendants "had relevant knowledge [of the sexual abuse] at relevant times, and that they could and should have taken action to prevent the abuse and the harm that ensued." *Doe 1 v. World Wrestling Ent., LLC*, 811 F. Supp. 3d 706, 717 (D. Md. 2025) (emphasis original). The Court

---

provisions of the Maryland state constitution, and so this Court must conduct its own analysis. *See Nat'l Cap. Naturists, Inc. v. Bd. of Sup'rs of Accomack Cnty., Va.*, 878 F.2d 128, 133 (4th Cir. 1989) ("The fact that language in a state constitution may parallel that in the United States Constitution is no reason to suppose that the lines of decisional authority under those provisions will invariably be identical.")

largely denied the Motions to Dismiss, but granted the Motions as to the claims brought by Plaintiffs John Doe 1, 3, 4, 5, and 8 against Linda McMahon, and all claims by Plaintiff John Doe 7. *Id.* at 741. Most relevant to the constitutional questions in this Motion, the Court also found that Plaintiffs established a prima facie case of personal jurisdiction over Defendants because the allegations "arose out of conduct that satisfies . . . Maryland's long-arm statute . . . and constitutes purposeful availment of the privilege of conducting activities in Maryland." *Id.* at 731. And Maryland has significant "interest in adjudicating allegations of childhood sexual abuse committed within its boundaries." *Id.* at 732. The Court thus found the exercise of personal jurisdiction over all Defendants to be "constitutionally reasonable." *Id.* at 732–33, 740.

With some of Plaintiffs' claims still live, Defendants called the Court's attention to the constitutional defenses raised in their respective answers. (ECF No. 80.) Pursuant to Federal Rule of Civil Procedure 5.1(b), the Court certified to the Maryland Attorney General that the Defendants had challenged the constitutionality of the Maryland statute as amended by the CVA. (ECF No. 81.) And it subsequently granted the Attorney General of Maryland's Motion to Intervene for a Limited Purpose to defend against those constitutional challenges. (ECF No. 89.)

Defendants now jointly bring this Motion for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure 12(c) against all remaining claims in this case (ECF No 93.) Specifically, Defendants contend that Plaintiffs' claims cannot be brought against them because the CVA contravenes the United States Constitution for two reasons: first, it violates the Due Process Clause of the Fourteenth Amendment, and second, it violates the Ex Post Facto Clause. (*Id.*) Plaintiffs responded to the Motion (ECF No. 102) as did the Maryland Attorney General (ECF No. 101). Moreover, a group of seven organization—nonprofits, advocacy organizations, and voluntary bar associations—sought and were granted leave to file a single brief as amicus

curiae in support of Plaintiffs' Opposition to Defendants' Motion for Judgment on the Pleadings. (ECF Nos. 106, 111–112.)

## II. STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings once pleadings are closed "but early enough not to delay trial." Fed. R. Civ. P. 12(c). Customarily, a party makes a Rule 12(c) motion to dispose of a case before discovery and trial "on the basis of the underlying merits of the parties' claims and defenses as they are revealed in formal pleadings." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed. 2008).

Mechanically, Rule 12(c) motions operate like other Rule 12 motions. *Conner v. Cleveland Cnty., N. Carolina*, 22 F.4th 412, 416 (4th Cir. 2022) ("We apply the same standard for [Rule] 12(c) motions for judgment on the pleadings as for motions made pursuant to Rule 12(b)(6).") The Court evaluates the Complaint in its entirety, *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011), and may also reference any "matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007) (citation omitted). In its review, the Court must "assume the facts alleged in the complaint are true" and "draw all reasonable factual inferences" in favor of Plaintiffs. *Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002); *Bruce v. Riddle*, 631 F.2d 272, 273 (4th Cir. 1980).

Despite the similar mechanics, Defendants here do not bring the traditional motion designed to "test [] the sufficiency of the complaint," but rather ask the Court to rule on their affirmative defense of unconstitutionality. *Goodman v. Praxair*, Inc., 494 F.3d 458, 464 (4th Cir. 2007). This case's early procedural posture demands a strong showing. A ruling granting such a motion is appropriate only in the "relatively rare circumstances" when "all facts necessary to the affirmative defense clearly appear on the face of the complaint." *L.N.P. v. Kijakazi*, 64 F.4th 577,

586 (4th Cir. 2023) (quoting *Goodman*, 494 F.4d at 464). And "to succeed in these rare circumstances, the defendant must show 'that the plaintiff's potential [response] to the affirmative defense was foreclosed by the allegations in the complaint.'" *Id.* (quoting *Goodman*, 494 F.4d at 466). This standard is "fairly restrictive" because "hasty or imprudent use of this summary procedure by the courts violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense." *Youmans v. City of N. Charleston*, Civ. No. DCN-11-3227, 2014 WL 897137, at *2 (D.S.C. Mar. 6, 2014) (citation omitted).

## III. DISCUSSION

### A. The Due Process Clause

Defendants first challenge the CVA as unconstitutional under the Due Process Clause of the U.S. Constitution, as applied to this case. (ECF No. 93-1 at 17.) Defendants argue that the CVA would "unjustly subject Defendants to potential liability when, because of the passage of decades of time," they cannot mount a "meaningful factual defense against the claims." (*Id.*) And Defendants argue that they "are not subject to personal jurisdiction" for alleged assaults that happened outside of Maryland, "so applying the CVA to those claims would be impermissible" under Due Process. (*Id.*) The Court has already decided and will not relitigate issues regarding personal jurisdiction,[2] so it will only consider Defendants' substantive due process arguments.

#### 1. Rational Basis review applies.

The Fourteenth Amendment's Due Process Clause prohibits a state from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV. "Due process contains both substantive and procedural components. Procedural due process prevents

[2] Plaintiffs seek relief only for claims that "arise out of and relate to Defendants' business and activities in Maryland." (ECF No. 55 at ¶ 327.) As discussed, this Court has already found that personal jurisdiction over the remaining claims is "constitutionally reasonable." *World Wrestling Ent., LLC*, 811 F. Supp. 3d at 732–33, 739–40.

mistaken or unjust deprivation, while substantive due process prohibits certain actions regardless of procedural fairness." *Snider Int'l Corp. v. Town of Forest Heights, Md.*, 739 F.3d 140, 145 (4th Cir. 2014). Defendants contend that application of the CVA to their case would be "arbitrary, irrational, and manifestly unjust." (ECF No. 93-1 at 17.) Their arguments about "arbitrary action" sound in substantive due process, so the Court will consider their challenge under that standard. *See Huggins v. Prince George's Cnty., Md.*, 683 F.3d 525, 535 (4th Cir. 2012).

Plaintiffs, Intervenor, and amici argue that the court should apply rational basis review to Defendants' substantive due process claim. (ECF Nos. 101 at 6–8; 102 at 14–15; 112 at 12–13.) Defendants instead urge the Court to apply the language found in *Chase Securities Corp. v. Donaldson*, 325 U.S. 304 (1945), concerning whether the revival of previously barred claims may produce "special hardships or oppressive effects" sufficient to establish a due process violation. (ECF No. 93–1 at 17 (quoting *Chase*, 325 U.S. at 316).) In *Chase*, the Supreme Court imagined potential "rules of law" or a "class of cases" in which a party's detrimental reliance on a statute of limitations could result in special hardship or oppression. *Chase*, 325 U.S. at 315–16. It stated:

> The Fourteenth Amendment does not make an act of state legislation void merely because it has some retrospective operation. What it does forbid is taking of life, liberty or property without due process of law. Some rules of law probably could not be changed retroactively without hardship and oppression, and this whether wise or unwise in their origin.

*Id.* Although the *Chase* court did not find that there were "special hardship or oppressive effects" on the facts before it, it explained what "special hardships or oppressive effects" might look like:

> This is not a case where appellant's conduct would have been different if the present rule had been known and the change foreseen. It does not say, and could hardly say, that it sold unregistered stock depending on a statute of limitation[s] for shelter from liability. The nature of the defenses shows that no course of action was undertaken by appellant on the assumption that the old rule would be continued. When the action was commenced, it no doubt expected to be able to

> defend by invoking [state] public policy that lapse of time had closed the courts to the case, and its legitimate hopes have been disappointed. But the existence of the policy at the time the action was commenced did not, under the circumstances, give[] the appellant a constitutional right against change of policy before final adjudication. Whatever grievance appellant may have at the change of policy to its disadvantage, it had acquired no immunity from this suit that has become a federal constitutional right.

*Id.* at 316. *Chase* envisioned some circumstances in which a change in a limitations period may impose special hardships on someone who acts in reliance on a statute before it is altered, based on their assumption that it would stay on the books. *Id.* Defendants construe that language as establishing a distinct constitutional standard that would allow them to avoid rational basis review and instead litigate the hardships allegedly resulting from their reliance on Maryland's pre-CVA statute of limitations. (ECF No. 93–1 at 18.) Defendants further suggest that rational basis review does not apply in an as-applied challenge. (*See* ECF No. 113 at 7.) Defendants are incorrect.

The Court applies rational basis review for two reasons. First, the Fourth Circuit affirmed the application of rational basis review to substantive due process claims against retroactive legislation, like those presented here. Second, both facial and as-applied challenges under substantive due process are governed by the same underlying legal standard.

**a. The weight of legal authority supports rational basis review.**

Courts consider substantive due process challenges "under rational-basis review unless a fundamental right is implicated." *Doe v. Settle*, 24 F.4th 932, 953 (4th Cir. 2022). If the asserted liberty interest is not fundamental, the government action survives if it is "rationally related" to a legitimate governmental interest. *Id.* Only government actions that are "arbitrary in the constitutional sense" give rise to substantive due process violations. *Huggins*, 683 F.3d at 535 (citation omitted). The Fourth Circuit has set a high bar for such a finding: "the arbitrary action must be 'unjustified by any circumstance or governmental interest, as to be literally incapable of

avoidance by any pre-deprivation procedural protections or of any adequate rectification by any post-deprivation state remedies.'" *Snider*, 739 F.3d at 150 (quoting *Rucker v. Harford Cnty.*, 946 F.2d 278, 281 (4th Cir. 1991)).

The ability to shelter under a statute of limitations is not a "fundamental right." *Chase*, 325 U.S. at 314. Rather, such protection is the product of "legislative grace" and is "subject to a relatively large degree of legislative control." *Id.* Statutes of limitations are "practical and pragmatic devices" enacted "to spare the courts from litigation of stale claims, and the citizen from being put to his defense after memories have faded, witnesses have died or disappeared, and evidence has been lost." *Id.* So, the legislatures who create these practical devices may also withdraw them, so long as they remain within constitutional limits. *See Campbell v. Holt*, 115 U.S. 620, 628 (1885) ("[S]hortening the period [of a statute of limitations] or making it longer, which is necessary to its operation, have always been held to be within the legislative power . . . .")

Because no fundamental right is implicated by a change in a statute of limitations, the Supreme Court has time and again held that a due process challenge to such a change triggers the deferential rational basis review applicable to most legislation: the law need only be "supported by a legitimate legislative purpose furthered by rational means." *Pension Benefit Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 729 (1984); *see also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15–17 (1976); *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992); *United States v. Carlton*, 512 U.S. 26, 30–34 (1994). Moreover, the Fourth Circuit, in interpreting those Supreme Court cases, specifically held that "the analysis used by the Court" in earlier cases including "*Danzer*, *<u>Chase</u>*, and *Campbell* is outdated and no longer valid for purposes of analyzing the constitutionality of retroactive legislation." *Shadburne-Vinton*, 60 F.3d at 1076 (emphasis added). In other words, the Fourth Circuit reviewed *Chase*—the case that sets out the standard that

Defendants urge the Court to apply—and held that a more recent line of cases "commands" a different analysis as to the "constitutionality of retroactive time bar statutes."[3] *Id.* at 1075. As *Shadburne-Vinton* simply concluded, that analysis is rational basis review. *Id.* at 1076.

Defendants provide no cases in which the Supreme Court or the Fourth Circuit have ever employed *Chase*'s "special hardships or oppressive effects" language as a due process constitutional standard. (*See* ECF No. 113 at 7–8.) They rely on a single district court case from this district employing the language in *Chase* to resolve a motion to dismiss. *See Grice v. Colvin*, 97 F. Supp. 3d 684, 709 (D. Md. 2015) (finding that it is "plausible that a retroactive change in the limitations period may have resulted in 'special hardships' or 'oppressive effects'").[4] The Court does not find *Grice* persuasive, as it did not explain why it employed the language in *Chase* as a standard nor why it neglected to reference *Shadburne-Vinton*'s more recent guidance. Nevertheless, and without citation to relevant authority, Defendants argue that the "Supreme Court has never departed from [its] observation [in *Chase*], nor has the Fourth Circuit suggested otherwise." (ECF No. 113 at 7.)

Not so. The Supreme Court has repeatedly rejected the notion from *Chase* that a change in a statute of limitations may work "special hardships" on defendants whose "conduct would have been different if the present rule had been known and the change foreseen." *Chase*, 325 U.S. at 316; *see Turner Elkhorn Mining Co.*, 428 U.S. at 16 ("[O]ur cases are clear that legislation

---

[3] *Shadburne-Vinton* held that *Chase* is outdated specifically because it created a substance/procedure dichotomy to distinguish between statutes of limitation and statutes of repose, a distinction that the Fourth Circuit no longer uses. *Shadburne-Vinton*, 60 F.3d at 1076. But *Shadburne-Vinton* came to this conclusion based on a broader proposition that applies to this case: "The recent developments in the law require us to apply the rational basis test in determining whether retroactive legislation violates the Due Process Clause . . .." *Id.* at 1077.

[4] *Grice v. Colvin* was later mooted and its appeal voluntarily dismissed without arguments on the merits. *Hart v. Berryhill*, Civ. No. GJH-16-1371, 2017 WL 3928324 (4th Cir. June 7, 2017). The Court has identified limited case law citing the "special hardships or oppressive effects" language, but those cases are inapposite. *See United States v. Distefano*, 279 F.3d 1241, 1244 (10th Cir. 2002) (labeling the relevant Chase language "dicta" but entertaining the argument for a pro se plaintiff in summary judgment); *United States v. Charles*, 240 F. Supp. 2d 488, 491 (M.D.N.C. 2002) (denying a motion for summary judgment because the finding of a "special hardship" is a factual matter).

readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations."); *Carlton*, 512 U.S. 26 at 33 ("[R]eliance alone is insufficient to establish a constitutional violation."); *R.A. Gray*, 467 U.S. at 733 ("[A]lthough we have noted that retrospective civil legislation may offend due process if it is particularly 'harsh and oppressive' . . . that standard does not differ from the prohibition against arbitrary and irrational legislation . . ..")

In short, Defendants' proposed standard runs afoul of more recent precedent that stands "for the proposition that the Due Process Clause . . . allows retroactive application of either federal or state statutes as long as the statute serves a legitimate legislative purpose that is furthered by rational means." *Shadburne-Vinton*, 60 F.3d at 1076. Defendants' standard cannot withstand the weight of contrary legal authority. The Court declines to use it.

**b. Facial *and* as-applied due process claims use rational basis review.**

In addition to their arguments that the Court should apply the "special hardships or oppressive effects" language set out in *Chase*, Defendants also suggest that the as-applied nature of their challenge allows them to escape rational basis review. (*See* ECF No. 113 at 5, 8 (disputing the rational basis review standard and applying a "special hardships or oppressive effects" standard to their "as-applied" challenge).) Their argument fails.

A challenge to the constitutionality of a statute can be "facial" or "as applied." To succeed in a facial challenge, a movant must establish "that no set of circumstances exists under which [the challenged statute] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (citations and internal quotation marks omitted). But to prevail in an as-applied challenge, a movant must only show that the statute is unconstitutional based on the record of their case. *Educational Media Co. at Va. Tech, Inc. v. Insley*, 731 F.3d 291, 298 n.5 (4th Cir. 2013). Here, Defendants frame the pending Motion as an as-applied challenge

and so are not required to prove that the CVA is "invalid in all its circumstances," only as to their circumstances. *Cap. Associated Indus., Inc. v. Stein*, 922 F.3d 198, 204 (4th Cir. 2019).

The parties have not identified—and the Court has not located—any cases resolving the exact standard for an "as-applied" due process violation "when a statute of limitations is removed after some period of time or a statute is passed creating retrospective liability." *See United States v. Charles*, 240 F. Supp. 2d 488, 491 (M.D.N.C. 2002) (finding "no cases providing guidance").

The as-applied nature of a challenge, however, generally does not alter the underlying standard of law to be satisfied: "[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the *remedy* employed by the Court, *not what must be pleaded in a complaint*." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010) (emphases added). "So classifying a lawsuit as facial or as-applied affects the extent to which the invalidity of the challenged law must be demonstrated and the corresponding 'breadth of the remedy,' but it does not speak at all to the substantive rule of law necessary to establish a constitutional violation."[5] *Bucklew v. Precythe*, 587 U.S. 119, 139 (2019) (citation omitted). So, although Defendants' as-applied challenge affects "the amount of caution with which we proceed and how much we consider [Defendants'] particular identit[ies] and circumstances," it does not alter the basic legal standard that the Court must apply. *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 782 (4th Cir. 2023). That standard here, as already discussed, is rational basis review.

The Court also finds guidance from cases in the equal protection context that apply rational basis review to both facial and as-applied challenges. In *Cleburne*, for example, the Supreme

[5] There are contexts in which the substantive rule of law necessary to establish a constitutional violation of the rights of one party differs from the substantive rule that would apply in a challenge to a statute on its face. *See e.g., Moody v. NetChoice*, LLC, 603 U.S. 707, 723 (2024) (finding that a different legal standard applies in facial First Amendment cases); *Doe v. Reed*, 561 U.S. 186, 203 (2010) (J. Alito, concurring) (describing a different standard for "as-applied exemptions from disclosure requirements" under the First Amendment). But the Defendants cite no authority supporting its argument that a different standard applies in as-applied challenges to retroactive civil statutes under the Due Process Clause.

Court considered the constitutionality of a zoning ordinance that required a special use permit for groups homes for people with intellectual disabilities. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 435–37 (1985). The *Cleburne* court invalidated the ordinance as it applied to the plaintiff because "the record [did] not reveal any rational basis for believing that" the specific group home "would pose any special threat to the city's legitimate interests." *Id.* at 448.

But the Court should not go too far in considering the needs of every as-applied challenger. For a statute to survive an as-applied challenge under rational basis review, the State's interest in passing that statute must still only be sufficiently connected to its means more broadly. *W. Virginia v. B. P. J. by Jackson*, 146 S. Ct. 2356, 2378 (2026) (rejecting as-applied challenges that "require a much tighter relationship" between the legislature's law and its interests). The Supreme Court recently clarified the relationship between as-applied challenges and rational basis review:

> To be sure, the [] as-applied nomenclature . . . is a useful construct in equal protection cases to help analyze the relationship between a State's classification and the State's asserted interests. Specifically, if a State's interests do not apply to an especially large subclass within the class specified by the State's law, then that fact may demonstrate that the relationship between the State's classification and the State's interests is not close enough. But as long as the relationship is sufficient as a general matter, the State is not constitutionally required to grant individualized exemptions to specific [people] or subclasses.

*Id.* at 2377. An as-applied challenge can illuminate the way in which a statute may be unconstitutional, but the nature of the challenge itself does not alter the underlying legal standard. *See id.* at 2377 n.5 (describing other cases in which courts "looked to the facts of the case at hand to illustrate" the broader constitutional questions in as-applied challenges).

Ultimately, although Defendants' special hardships may be a useful lens under which to review the choices of the Maryland General Assembly in passing the CVA, the as-applied nature of their challenge does not override established legal standards for interpreting the Constitution.

*See Bucklew*, 587 U.S. at 139 ("To hold now . . . that choosing a label changes the meaning of the Constitution would only guarantee a good deal of litigation over labels . . . .")

**c. Defendants have not met their burden of proof under rational basis review or under Rule 12(c).**

Defendants' as-applied challenge fails for two reasons. First, Defendants have not tied their arguments to the necessary standard; they do not grapple at all with rational basis review, and they in fact concede that the "CVA is rationally related to legitimate government interests." (ECF No. 113 at 7.) Defendants do not argue—let alone establish— that the CVA is "unjustified by any circumstance or governmental interest." *Snider*, 739 F.3d at 150. Nor do they show how their particular hardships make the CVA arbitrary or irrational. Rather, Defendants' arguments focus "exclusively on [their] notice and reliance," and thus attempt to hold the legislature to a stricter standard than is required under the Due Process Clause. *See Carlton,* 512 U.S. at 35.

And even if the Defendants tailored their arguments to rational basis review, this Court doubts that they would carry their burden. The Court finds instructive the Supreme Court of Maryland's discussion of this issue. The Maryland General Assembly passed the CVA with retroactive effect to remedy a well-known problem—the fact that trauma, low cognition, and other factors suppress the ability of child sexual abuse victims to report within traditional statute of limitations periods. *See Roman Cath. Archbishop of Washington*, 330 A.3d at 1103–04. In drafting the CVA, the legislature considered testimony and first-hand accounts regarding delayed reporting of abuse. *Id.* And it considered dissenting reports citing "equity concerns" should it allow retroactive claims like those brought by Plaintiffs. *See e.g.*, Maryland Catholic Conference, Testimony Opposing of SB 686, at 2 (Mar. 28, 2023). The legislature in response narrowed the CVA's retroactive effects by capping noneconomic damages and barring claims where the victim

is deceased. *See* Md. Code. Ann., Cts. & Jud. Proc. § 5-117(c)–(d). To be sure, the legislature "could have more closely tailored its solution" to the problems it sought to address, such as with "heightened proof requirements or lower damages caps applicable to older claims." *Roman Cath. Archbishop of Washington*, 330 A.3d at 1105. But "[a]bsent a constitutional limitation, it is the prerogative of the political branches, not the Judiciary, to make those policy choices." *Id.*

Second, Defendants do not meet their burden under Rule 12(c). Defendants claim that the "unavailability of witnesses, fading of memories, and loss of documentary evidence makes it exceedingly difficult to defend against [these allegations] today as compared to 40 years ago." (ECF No. 93-1 at 21.) But Defendants do not sufficiently show that it would be impossible for them to defend against this suit. Plaintiffs point in their Complaint to several sources of evidence that have stood the test of time. They include sources of documentary evidence. (*See* ECF No. 55 at ¶ 36 (discussing a recent investigation reviewing available court records, Freedom of Information requests, and interviews).) And they discuss potential living witnesses. (*See id.* at ¶ ¶¶ 61–68; 181–85, 221–23, 232–34, 240, 244–47, 256–58, 262–64, 296–97 (naming several potential living witnesses, including WWE wrestlers and employees).) In a Rule 12(c) motion, the Court must take all these well-pleaded factual allegations as true and draw all reasonable inferences in favor of Plaintiffs. *Elkins Radio Corp.*, 278 F.3d at 406. Based on the pleadings, it is reasonable to infer that Plaintiffs can make a case by producing at least some material facts to contest, documents to dispute, and witnesses to cross-examine. Thus, because the Plaintiffs' "potential rejoinder" to the affirmative defense of unconstitutionality is not "foreclosed by the allegations in the complaint," Defendants' Motion must fail. *Goodman*, 494 F.3d at 464.

For the foregoing reasons, Defendants do not carry their burden as to their claim that the CVA violates the Due Process Clause under the Fourteenth Amendment.

**B. The Ex Post Facto Clause**

Defendants also argue that the CVA is unconstitutional because it violates the Ex Post Facto Clause of the United States Constitution. U.S. Const. art. I, § 9, cl. 3. They make two arguments in this respect. First, Defendants argue that the CVA is barred by the Ex Post Facto Clause because it is punitive in effect. (ECF No. 93-1 at 23–24.) Second, Defendants argue that the Supreme Court rulings construing *Calder v. Bull*, 3 U.S. 386, 389–91 (1798), as restricting the Ex Post Facto Clause only "to retroactive criminal, not civil, laws" are "misguided" and should be altered. (*Id.* at 30–33.) Defendants note that this Court is bound by *Calder* and its progeny and so make that second argument "for preservation purposes only." (*Id.* at 30 n.8.)

The Ex Post Facto Clause "forbids the application of any new punitive measure to a crime already consummated." *California Dept. of Corrections v. Morales*, 514 U.S. 499, 505 (1995) (citation omitted). In *Calder v. Bull,* the Supreme Court restricted application of the Ex Post Facto Clause to criminal legislation by holding that the Clause only forbids retroactive laws that impose punishment for a crime. 3 U.S. at 389–91. Thus the Ex Post Facto Clause applies "exclusively to penal statutes." *Kansas v. Hendricks*, 521 U.S. 346, 370 (1997). And "[w]hen determining whether a law violates the Ex Post Facto Clause, the Court must evaluate whether the law imposes a criminal or penal sanction as opposed to a civil remedy." *Ellingburg v. United States*, 607 U.S. 163, 165 (2026).

The penal versus civil determination requires a two-step inquiry, outlined in *Smith v. Doe*, 538 U.S. 84, 92 (2003). *Id.*; *Nat'l Ass'n for Rational Sexual Offense L. v. Stein*, 112 F.4th 196, 202 (4th Cir. 2024). First, the Court "'consider[s] the statute's text and its structure.'" *Ellingburg*, 607 U.S. at 163 (citing *Smith*, 538 U.S. at 92). If "the text and structure of the [statute] demonstrate that [the legislature] intended at least 'to impose punishment,' that 'ends the inquiry'" and the law

is unconstitutional. *Id.* at 168 (citing *Smith*, 538 U.S. at 92). But, if the Court finds that the state legislature's "intention was to enact a regulatory scheme that is civil and nonpunitive," it must move to the second step of "examin[ing] whether the statutory scheme is so punitive either in purpose or effect as to negate the State's intention to deem it civil." *Smith*, 538 U.S. at 92 (quoting *United States v. Ward*, 448 U.S. 242, 248–49 (1980) (internal quotation marks omitted)).

**1. The CVA is not punitive in intent.**

Under the first step from *Smith*, the Court considers whether the Maryland legislature had a punitive intent in enacting the CVA. To do so, the Court reviews statutory text to see if the legislature "indicated either expressly or impliedly its intent and afford[s] considerable deference to the intent as stated." *Stein*, 112 F.4th at 202 (cleaned up) (internal citations omitted).

The Maryland General Assembly made the purposes of the CVA clear:

> FOR the purpose of altering the definition of "sexual abuse" for purposes relating to *civil actions* for child sexual abuse; establishing certain limitations on damages that may be awarded under this Act; repealing the statute of limitations in certain *civil actions* relating to child sexual abuse; repealing a statute of repose for certain *civil actions* relating to child sexual abuse; providing that a certain party may appeal an interlocutory order under certain circumstances; providing for the retroactive application of this Act under certain circumstances; and generally relating to child sexual abuse.

CVA, ch.5 (S.B. 686) (emphases added). The General Assembly thus described the purview of the CVA as relating to "civil actions," indicating that they intended it to be a civil statutory scheme. *Id.* Moreover, as discussed above, the Maryland General Assembly enacted the CVA to afford victims of child sexual abuse additional and necessary avenues for relief—a distinctly remedial goal, not punitive in intent. *Roman Cath. Archbishop of Washington*, 330 A.3d at 1104.

The Court takes the General Assembly at its word. And Defendants have not argued it should do anything to the contrary; in their briefing, Defendants concede that the first step of the *Smith* inquiry has been met, as they only discuss the second step. (*See* ECF No. 113 at 12.)

**2. The CVA is not punitive in purpose or effect.**

The second step of the *Smith* inquiry tasks the Court with determining whether, despite the legislature's intent, the CVA is punitive in effect. Defendants face a high hurdle here: they must show that "the law's punitive effect is 'so overwhelming that it negates the State's nonpunitive intentions.'" *Stein*, 112 F.4th at 202 (quoting *Settle*, 24 F.4th at 946). Because courts "ordinarily defer to the legislature's stated intent, only the clearest proof will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (internal quotation marks and citations omitted). Defendants fail to meet their burden.

To determine whether the Defendants pass their high hurdle, the Court uses the factors outlined in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168–169 (1963). The *Mendoza* factors are a "useful framework" for analyzing the effects of a statute in a variety of contexts, but they are "neither exhaustive nor dispositive." *Smith*, 538 U.S. at 97 (internal citations and quotation marks omitted). The Supreme Court has focused on five factors in connection with retroactive laws:[6]

> The factors most relevant to our analysis are whether, in its necessary operation, the regulatory scheme: has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose.

[6] Defendants assess two other *Mendoza* factors in their analysis—whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime. But the Supreme Court has disregarded these as "of little weight" in cases involving a regulatory scheme that necessarily "only applies to past conduct, which was, and is, a crime." *Smith*, 538 U.S. at 105. Because the CVA applies to past conduct that was a tort, the Court follows the guidance of the Supreme Court and gives these factors little weight in its analysis.

*Id.* at 97. There is some overlap between these five factors, but the Fourth Circuit has followed the Supreme Court's lead by analyzing each in order of priority and this Court will do the same. *See Stein*, 112 F.4th at 205 (describing the five-factor analysis in order of priority).

*Rational connection to a nonpunitive purpose.* The Court first considers whether the CVA has a "rational connection to a nonpunitive purpose." *Smith*, 538 U.S. at 97. This is the most significant factor and so it holds heavy weight. *See id.* at 102. Defendants argue briefly under this factor that, because the CVA imposes a "monetary sanction" only for "criminal sexual offenses" and not for other "private injuries," it can "only be rationally understood as punitive in nature." (ECF No. 93–1 at 28.) The Court finds this argument unpersuasive. The CVA imposes no "monetary sanction" itself but rather only lifts a limitations period. Moreover, even if reference to a crime may infer punitive effects, that is not the question under this factor. Here, like in rational basis review, the Court only asks whether the CVA's revival of time-barred claims is rationally connected to the legislature's nonpunitive goal of restoring access to civil justice for child sexual abuse survivors. This factor is "not demanding" and the statute need not have a "close or perfect fit with the nonpunitive aim it seeks to advance." *Settle*, 24 F.4th at 948 (citations omitted). For the same reasons that the CVA likely passes rational basis review, this factor favors Plaintiffs.

*Excessive with respect to its purposes.* Second, the Court considers whether the CVA is "excessive with respect to [its] purpose." *Smith*, 538 U.S. at 97. "This inquiry is 'reminiscent of the rational basis test' addressed by the first factor," and so the Court asks whether the choice to implement the CVA was rational considering its legislative purpose. *Stein*, 112 F.4th at 206 (quoting *Settle*, 24 F.4th at 949). Defendants here largely repeat their claims from their due process argument regarding the difficulty of defending against decades-old claims revived by the CVA. (*See* ECF No. 93-1 at 29 ("A statutory scheme that predictably requires adjudication based on

evidence so eroded by time is excessive in relation to any civil regulatory purpose . . ..").)

As the Court noted in its application of rational basis review, the CVA may not be most narrowly tailored solution to the identified problem of dormant child sexual abuse claims. Yet "[t]his excessiveness inquiry is not about second-guessing the legislature's choice of solution; we only ask whether the chosen means are 'reasonable in light of the nonpunitive objective.'" *Settle*, 24 F.4th at 949 (quoting *Smith*, 538 U.S. at 105). The General Assembly could have helped Defendants by modifying the CVA's proof requirements for older claims, but to ask that would be to "apply a more stringent fit analysis than is required by *Smith*." *Id.* The Maryland General Assembly found, like other legislatures, that lifting the limitations period altogether was the best route to relief. And contrary to Defendants' argument, their choice will not categorically lead to adjudication based on eroded evidence, as the CVA both excludes cases in which the victim is deceased and caps damages for retroactive claims, deterring some bad cases. § 5-117(c)–(d). The CVA is not excessive with respect to Maryland's legislative purposes. This factor favors Plaintiffs.

*Historical punishments.* Third, the Court considers whether the CVA imposes what has been "regarded in the Nation's history and traditions as a punishment." *Smith*, 538 U.S. at 86. Defendants argue that the Court here should look not to the CVA itself but rather to "the conduct to which the CVA is expressly tethered," like rape, incest, and other sexual offenses, which "has long been the subject of criminal punishment." (ECF 93-1 at 25.) They argue that the CVA operates like an "additional mechanism" for imposing punishments based on those crimes. (*Id.*)

Defendants' arguments stretch this factor beyond its point of usefulness. This factor assumes that "a State that decides to punish an individual is likely to select a means deemed punitive in our tradition." *Smith*, 538 U.S. at 97. For example, *Smith* described traditional punishments as those akin to "whipping, pillory, and branding" that "inflicted physical pain and

staged a direct confrontation between the offender and the public." *Id.* at 98. But the means that the legislature selected here does not impose *any* punishment for its underlying criminal offenses; the CVA merely opens the potential for civil liability and its associated damages. Lifting the bar on liability is not akin to lifting the bar on the village pillory.

Of course, many of those newly subject to a child sexual abuse claim under the CVA may fall prey to greater public embarrassment and occupational scrutiny, which seems more like the punishment of the pillory. But the Defendants here are not alleged in the act of child sexual abuse and, even if they were, the prospect of civil liability posed by the CVA does not itself generate reputational harm any more than did the sex offender registry approved by the Supreme Court in *Smith*, especially in cases where the alleged acts of abuse are already well known. *See id.*, 538 U.S. at 99–100 ("Although the public availability of the information may have a lasting and painful impact on the convicted sex offender, these consequences flow not from the Act's registration and dissemination provisions, but from the fact of conviction, already a matter of public record.") This factor does not offer any clear proof of the CVA's punitive effect and thus favors Plaintiffs.

*Affirmative disability or restraint.* Fourth, the Court considers whether the statute imposes an "affirmative disability or restraint." *Smith*, 538 at 97. Defendants do not make an argument under this factor. The Fourth Circuit has held that statutory schemes that do not "approach the level of restraint imposed by a prison sentence," that is, physical restraint, are "minor and indirect." *Stein*, 112 F.4th at 209 (citations omitted). "If the disability or restraint is minor and indirect, its effects are unlikely to be punitive." *Smith*, 538 U.S. at 100. Because the effects of the CVA do not come close to imprisonment—the "paradigmatic affirmative disability or restraint"—this factor points to the nonpunitive nature of the CVA and favors Plaintiffs. *Id.* at 86.

*Promotes the traditional aim of punishment (retribution or deterrence).* Fifth and finally,

the Court asks whether the CVA "promotes the traditional aims of punishment—'mainly retribution and deterrence.'" *Stein*, 112 F.4th at 209 (quoting *Settle*, 24 F.4th at 952). Defendants argue that the CVA is "inherently retributive" because it "re-open[s] long-expired claims based solely on historical conduct," and does nothing to distinguish between actual abusers and those who merely incur their liability. (ECF No 93-1 at 27.) In support, Defendants cite a Sixth Circuit case labelling a retroactive sex offender registry requirement "retributive in that it looks back at the offense (and nothing else) in imposing its restrictions." *Does #1-5 v. Snyder*, 834 F.3d 696, 704 (6th Cir. 2016). Reasoning by analogy, Defendants argue that the CVA is similarly retributive because it does not narrow its application to those who currently pose a risk, but rather "looks exclusively to punish past conduct" for its own sake. (*See* ECF No. 93-1 at 21.)

Defendants ignore, however, the fact that the Sixth Circuit in *Snyder* ultimately gave this fifth factor "little weight" because many of the seemingly retributive aims of a statute "can also rightly be described as civil and regulatory." *Snyder*, 843 F.3d at 704. The Fourth Circuit, too, tends to give this final factor very little weight when applying the *Smith* inquiry:

> We've recognized that *Smith* did not find it sufficient to simply state how the law might further the goals of retribution and deterrence. Instead, *Smith* acknowledged that any number of governmental programs might deter crime without imposing punishment. And it rejected arguments that aspects of the law were retributive because they were nevertheless reasonably related to the law's regulatory objectives. So too in *Settle*, we gave this factor little weight because the wisps of deterrence and retribution weren't enough to show punitive intent.

*Stein*, 112 F.4th at 209 (cleaned up) (quotations and internal citations omitted). The CVA may also be a hybrid of retributive and regulatory goals. But its primary aim is not to punish the perpetrators of sexual abuse, but rather to allow the survivors to bring childhood claims that were lost through no fault of their own, and often due to the actions of their abusers. Any "wisps of

deterrence and retribution" flowing from that goal, such as the prospect of civil censure for past conduct, are not enough to show the CVA's punitive intent. *Id.* The Court gives this factor—which in any event does not, on balance, weigh in favor of Defendants—little weight.

The *Mendoza* factors favor Plaintiffs. Defendants do not show that the CVA's punitive effect is "so overwhelming that it negates the State's nonpunitive intentions." *Settle*, 24 F.4th at 946. Accordingly, the CVA is a civil remedy to which the Ex Post Facto Clause does not apply.[7]

## IV. Conclusion

The Court is acutely aware that the revival of decades-old allegations poses difficult evidentiary issues for both parties. And it may be hard for Defendants to muster an effective defense where evidence is stale, memories are frail, and witnesses are deceased. But the Court's role here is to interpret the United States Constitution and to resolve disputes that arise under it. Statutes of limitations are practical legislative devices and challenges to their alteration trigger deferential rational basis review. The Maryland General Assembly created its statute of limitations for child sexual abuse claims and, in response to a legitimate and pressing issue, decided to alter it in a rational way. As the Fourth Circuit has established, "[t]he judiciary is not meant to revise laws because they are clumsy, unwise, or—even in some cosmic sense—unfair. In cases like this, courts are asked to make judgments about what is inside and what is outside the precise lines drawn by the Constitution." *Settle*, 24 F.4th at 953. The Maryland General Assembly's choice to enact the CVA falls within constitutional lines.

For the foregoing reasons, Defendants' Motion for Judgment on the Pleadings (ECF No. 93) will be denied. A separate Order follows.

[7] Because the Court finds that the CVA is not subject to the Ex Post Facto Clause, it need not address whether it fits within the scope of the categories identified in *Calder*, 3 U.S. at 390–91.

DATED this 19 day of October, 2026.

BY THE COURT:

James K. Bredar
United States District Judge